**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**



JAMES BONINI
CLERK

2010 MAY 19 ℗ 1: 57

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

|  |  |  |
|---|---|---|
| NEIL J. CONLEY, | : | |
| Plaintiff, | : | Case No. _____ _____ |
| v. | : | **2 : 10 CV  444** |
| THE UNITED STATES, | : | |
| U.S. DEPARTMENT OF DEFENSE, | | **JUDGE SARGUS** |
| U.S. ARMY, | : | |
| SECRETARY OF THE ARMY, JOHN MCHUGH, | | |
| U.S. DEPARTMENT OF STATE, and | : | **MAGISTRATE JUDGE KING** |
| PHILIP J. MCGUIRE, | | |
| in his official capacity as Director, USACRC, | : | |
| | : | |
| Defendants. | | |
| | : | |

### COMPLAINT

Plaintiff, acting *pro se*, complains against Defendants as follows:

### I. PRELIMINARY STATEMENT

1. Plaintiff, Neil J. Conley, a U.S. citizen and civilian, is not now a member of the U.S. Military, nor has he ever been a member of the U.S. Military. In the year 2000, Plaintiff was a twenty-five-year-old, low-level, U.S. civilian employee of the Department of Defense ("DOD") at the DOD's Armed Forces Recreation Center ("AFRC") in Garmisch, Germany. Just after midnight, on January 19, 2000, Plaintiff was exiting the conference center of the Abram's Complex, an Army installation located in Garmisch, where AFRC management had held an annual employee party for employees of AFRC Garmisch and AFRC Chiemsee, Germany.

As Plaintiff exited the Abram's Complex conference center, approximately five Chiemsee employees, whom Plaintiff had never spoken to or met, physically attacked Plaintiff at least six times with snowballs and their fists. Plaintiff will hereinafter refer to this January 19, 2000 incident as the "Snowball Incident."

Mr. Shane Stewart, the civilian security guard at the Abram's Complex, extracted Plaintiff from the group of approximately five Chiemsee employees surrounding and attacking him, and took Plaintiff to safety inside the Abram's Complex. Mr. Stewart spoke to Plaintiff and then told him to go home. As Plaintiff exited the door to attempt to go home again, the Chiemsee employees ambushed Plaintiff, attacking him yet again. Plaintiff was again pulled to safety. Mr. Stewart later drove Plaintiff down to the Garmisch military police station.

The U.S. Army ("Army") military police in Garmisch questioned Plaintiff about the Snowball Incident. Plaintiff made a sworn statement regarding the Snowball Incident. Plaintiff does not recall the Army reading him his constitutional rights. Army regulations, however, required the Garmisch military police to inform Plaintiff of his constitutional rights. Army regulations also required the Garmisch military police to fill out a Rights Waiver Form, documenting the fact that they had informed Plaintiff of his constitutional rights. Army regulations required, and still require, this Rights Waiver Form to accompany Plaintiff's sworn statement. The Army, however, has admitted, in writing, on two separate occasions, that it has found no Rights Waiver Form in Plaintiff's records.

Plaintiff returned home from the Garmisch military police station in the early morning of the same day—January 19, 2000. Neither the Garmisch military police, nor an Army lawyer, ever contacted Plaintiff regarding the Snowball Incident. More specifically, and most importantly, Army officials never informed Plaintiff that they had secretly labeled him a

common criminal in military criminal records by charging him with, convicting him of, and sentencing him for "committing," two crimes: the Army crime 5C2B, based on the Uniform Code of Military Justice ("UCMJ"), and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code).

Unbeknownst to Plaintiff, the Army created a military police report ("MPR") on the Snowball Incident, MPR 00-MPC937-0607T-5C2B, which the Army labeled a "criminal" report. Unbeknownst to Plaintiff, the Army "titled" (i.e., accused and charged) Plaintiff, a U.S. civilian and citizen, in this MPR with the Army crime 5C2B, based on the UCMJ. Unbeknownst to Plaintiff, the Army created another document, DA Form 4833, in which the Army charged Plaintiff with, and convicted him of (i.e., made a final determination that Plaintiff committed) a *German* crime! Unbeknownst to Plaintiff, the Army retains and disseminates these military *criminal* records upon request, and allows countless individuals to view them upon request, for a period of at least forty years. Unbeknownst to Plaintiff, the Army also placed information regarding its titling (i.e., accusing and charging) of Plaintiff, along with Plaintiff's personal information, in the Defense Clearance and Investigations Index ("DCII"). This information is viewable to numerous agencies and countless individuals for at least forty years. The DCII is a centralized database that contains the names and information of over thirty million individuals whom agencies have investigated at some point.

"Titling" is a process created by the DOD, which the military branches, to include the Army, were obligated to adopt and implement. Titling requires a determination that "credible information" exists to believe that a person committed a crime. No finding of probable cause is required. In addition, DOD instructions forbid a person to be "de-titled" if military authorities

had "credible information" *at the time* of titling. Evidence brought forth later, which shows the "titled" person to be innocent of the alleged crime(s), is irrelevant.

Furthermore, DOD titling regulations "officially" claim that titling "shall not connote any degree of guilt," is "not a legal decision," and is primarily "administrative." This is the Smokescreen Version of what titling means. The *Real* Version of what titling means, however, is that titling *does* connote guilt, and that it *is* a legal determination of guilt. The real meaning of "titling" persons with crimes is "charging" persons with crimes. This is how everyone in the Army has interpreted the Army's titling of Plaintiff. This is how the State Department's Bureau of Diplomatic Security has interpreted the Army's titling of Plaintiff. This is how everyone who views the information in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII will view the Army's "titling" of Plaintiff.

Count I: The United States, through the Army, violated Clauses 14 and 18 of Article I, Section 8 of the U.S. Constitution. These clauses only allow the United States to make laws that are "necessary and proper" "for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cls. 14 and 18. The Supreme Court of the United States has repeatedly held that these clauses of the U.S. Constitution do not allow the U.S. Military to exercise military jurisdiction over U.S. civilians. See Reid v. Covert, 354 U.S. 1, 20-21 (1957) (plurality opinion), and its subsequent line of cases: Grisham v. Hagan, 361 U.S. 278 (1960); Kinsella v. United States, 361 U.S. 234 (1960); and McElroy v. United States, 361 U.S. 281 (1960). Despite the U.S. Constitution and the Supreme Court's repeated holdings, the Army unconstitutionally exercised military jurisdiction over Plaintiff, a U.S. civilian and citizen, by charging (i.e., titling) Plaintiff with crimes, convicting him of these crimes (i.e., finding him guilty of these crimes),

and sentencing him for these crimes. The Army secretly did all of this within hours of Plaintiff's visit to the Garmisch military police station.

Count II: The Army failed to inform Plaintiff of his constitutional rights before making him the subject of a military criminal investigation, charging (i.e., titling) him with crimes, convicting (i.e., finding him guilty) of these crimes, and sentencing him to a three-day suspension for "committing" these crimes.

Count III: The Army violated Plaintiff's Fifth, Sixth, and Eighth Amendment rights as a result of its unconstitutional exercise of military jurisdiction over Plaintiff.

Count IV: The Army's charging (i.e., titling) of Plaintiff with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), was an unconstitutional exercise of military jurisdiction, in addition to being unjust, unethical, and unlawful.

Count V: The Army's charging (i.e., titling) of Plaintiff with the Army crime 5C2B, which is based on the UCMJ, was an unconstitutional exercise of military jurisdiction, in addition to being unjust, unethical, and unlawful.

Count VI: The Army's creation of MPR 00-MPC937-0607T-5C2B and DA Form 4833, the Army's retention and dissemination of these records, the Army's indexing of Plaintiff in the DCII, and the Army's repeated refusals to amend any of the errors, injustices, or inaccuracies in these records and the DCII, resulted in the Army unlawfully, and intentionally and willfully, violating the Privacy Act.

Count VII: The Department of State violated the Privacy Act by refusing to make a decision on Plaintiff's Privacy Act amendment request for **two years**—and counting.

Count VIII: The Army has systematically violated the Freedom of Information Act ("FOIA") by refusing to answer Plaintiff's valid FOIA requests.

Count IX: Mr. Philip J. McGuire, Director of the U.S. Army Crime Records Center ("USACRC"), criminally violated the Privacy Act by pilfering records from Plaintiff's files and disseminating both redacted and un-redacted copies of these records pertaining to Plaintiff to third parties, without Plaintiff's knowledge or permission.

It is a gross injustice that Plaintiff must now live with the Army's unjust, unethical, unlawful, and unconstitutional exercising of military jurisdiction over him, and the various repercussions of this unjust, unethical, unlawful, and unconstitutional activity, as it maligns his reputation, limits his professional pursuits, and unjustly, unethically, unlawfully, and unconstitutionally portrays him as a common criminal for at least forty years—essentially the rest of his life, and probably longer.

## II. PARTIES TO THE ACTION

2. Plaintiff, Mr. Neil J. Conley, presently resides in Muskingum County, at 6755 Sugargrove Road, Chandlersville, Ohio 43727.

**DEFENDANTS**

3. The United States.

4. The Department of Defense, located at 1400 Defense Pentagon, Washington, DC 20301-1400.

5. The U.S. Army, located at 1400 Defense Pentagon, Washington, DC 20301-1400.

6. The Secretary of the Army, Mr. John McHugh. Mr. McHugh's military address is 1400 Defense Pentagon, Washington, DC 20301-1400. Whenever Plaintiff states that Lieutenant

Colonel Howard T. Yates, the Department of the Army Privacy Act Review Board

("DAPARB"), or the Army Board for the Correction of Military Records ("ABCMR") acted,

Plaintiff also intends to state that the Secretary of the Army acted, through the named person or

board.

     7. The U.S. Department of State, located at 2201 C Street NW, Washington, DC 20520.

     8. Philip J. McGuire, Director, USACRC, is located at 6010 6th Street, Fort Belvoir, VA

22060-5506.


## III. SUBJECT MATTER JURISDICTION AND VENUE

     9. This Court has subject matter jurisdiction over this matter pursuant to:

        a. 5 U.S.C. § 555(a)(4)(B), (E), and (F);

        b. 5 U.S.C. § 552a(g)(1) – (5);

        c. 5 U.S.C. § 706(1) and (2);

        d. 28 U.S.C. § 1331;

        e. 28 U.S.C. § 1346(a)(2);

        f. 28 U.S.C. § 1361;

        g. 28 U.S.C. § 2201(a); and

        h. 28 U.S.C. § 2202.

The only monetary claims in excess of $10,000 made by Plaintiff against the United

States are pursuant to the Privacy Act. Although these claims exceed $10,000, the Court of

Federal Claims does not have exclusive jurisdiction over these claims. This Court also has

jurisdiction over these claims pursuant to sub-paragraph 552a(g)(5) of the Privacy Act, which

states:

An action to enforce any liability created under this section [552a] may be brought in the district court of the United States in the district in which the complainant resides, . . . *without regard to the amount in controversy* . . . ."

5 U.S.C. § 552a(g)(5) (emphasis added).

10. Venue lies in this District pursuant to 28 U.S.C. § 1391(e)(3).


## IV. STATUTES OF LIMITATION

11. There is no statute of limitation for declaratory relief under 28 U.S.C. § 2201. See, e.g., Luckenbach Steamship Co. v. United States, 312 F. 2d 545, 548 (2nd Cir. 1963) (stating, "There are no statutes which provide that declaratory relief will be barred after a certain period of time").

12. For the claims in this Complaint based on the Army's actions occurring in the year 2000, where such claims are subject to a statute of limitation, the applicable statutes of limitation did not begin to run until August 26, 2009.

13. The Administrative Procedure Act does not contain a statute of limitation. See 5 U.S.C. § 701 *et seq*. This Sixth Circuit has applied the six year statute of limitation contained in 28 U.S.C. § 2401(a). Friends of Tims Ford v. TVA, 585 F.3d 955, 964 (6th Cir. 2009).

14. A person must bring a Privacy Act claim "within two years from the date on which the cause of action arises . . . ." 5 U.S.C. § 552a(g)(5).

15. The FOIA does not contain a statute of limitation. Therefore, this Court should apply the six year statute of limitation contained in 28 U.S.C. § 2401(a). See, e.g., Spannaus v. Department of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987).

**A. PLAINTIFF DID NOT DISCOVER, AND COULD NOT HAVE REASONABLY DISCOVERED, IN JANUARY OF 2000, THE INJURIES AND HARM INFLICTED UPON HIM BY THE ARMY**

16. Plaintiff incorporates paragraphs 1-15 by reference.

17. The statute of limitation applicable to any claim based on the events that occurred on January 19, 2000 (the day of the Snowball Incident), January 24, 2000 (the day Sergeant First Class Ronald S. Cox signed the MPR on the Snowball Incident), or February 9, 2000 (the day Mr. Edward Fagan signed DA Form 4833) did not begin to accrue on those days. This is because Plaintiff could not have reasonably discovered the injuries upon which this Complaint is based—which injuries were documented in these records—until June 10, 2007. Med. Mut. of Ohio v. k. Amalia Enters., 548 F.3d 383, 391 (6th Cir. 2008).

18. Plaintiff was a low-level, U.S. civilian employee of the DOD, working at a military base in Germany that served U.S. troops. The Army briefed Plaintiff neither before beginning employment, nor during employment, that the Army could subject Plaintiff to military jurisdiction. Specifically, the Army did not inform Plaintiff that it could charge (i.e., title) him with crimes, much less with Army crimes and German crimes. The Army did not inform Plaintiff, a U.S. civilian and citizen, that it could charge (i.e., title) him with crimes without applying the constitutional safeguard of probable cause. The Army did not inform Plaintiff, a U.S. civilian and citizen, that it could charge (i.e., title), convict, and sentence him with crimes without reading him his constitutional rights. Finally, the Army did not inform Plaintiff, a U.S. civilian and citizen, that it could charge (i.e., title) him with crimes, and label him, for at least forty years, as a criminal who the Army determined had committed crimes, with no final determination by a neutral, U.S. (or German) civilian decision maker that Plaintiff was actually guilty of committing these crimes.

19. After the Snowball Incident, Mr. Shane Stewart, the Army civilian security guard at the Abrams Complex, which is where the Snowball Incident took place, drove Plaintiff down to the Garmisch military police station to give a statement regarding the Snowball Incident. Army records show that Army investigators failed to inform Plaintiff of his constitutional rights, as required by Army regulations and the U.S. Constitution, before questioning him, charging (i.e., titling) him, convicting him, and then sentencing him.

20. After Plaintiff spoke with the Garmisch military police in the early morning of January 19, 2000, Plaintiff went back to his room at the Abram's Complex. After leaving the Garmisch military police station that morning, the Army never informed Plaintiff: (1) that it had placed his name in a MPR (MPR 00-MPC937-0607T-5C2B), which the Army labeled a "criminal" report, Exhibit 1, at 1, Section I – Administration, Box 1, Report Type;[1] (2) that it had labeled Plaintiff as a "subject" in this criminal MPR, i.e., "titled" him, Exhibit 1, at 2, Section III – Subject, Box 1.b, Name; (3) that it had "titled" Plaintiff with the Army crime 5C2B, which is based on the UCMJ, Exhibit 1, at 1, Section II – Offense, Box 1.g, Offense; Section VII - Narrative; (4) that it had "titled" Plaintiff with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), Exhibit 1, at 1, Section I – Offense, Box 1.h; Exhibit 2, at 1, Box 11.a, Offense(s); (5) that it would retain MPR 00-MPC937-0607T-5C2B and DA Form 4833, and quickly disseminate copies of them to, or allow them to be viewed, copied, and/or downloaded by, numerous agencies and countless individuals, for at least forty years; (6) that it would index Plaintiff's personal information and evidence of its charging (i.e., titling) of

---

1. MPR 00-MPC937-0607T-5C2B and other records that the Army sent Plaintiff were un-redacted, meaning that the personal information of individuals involved were not blacked out, as required by the Privacy Act and personal privacy exemptions of the FOIA. Plaintiff has redacted individuals' personal information, to the extent that he believes necessary, in order to fix the Army's violations of these individuals' privacy rights.

Plaintiff in the DCII, which is viewable by numerous agencies and countless individuals for at least forty years; (7) that it had an administrative amendment process by which Plaintiff could have attempted to "de-title" himself from the MPR and "de-index" himself from the DCII; or (8) that it had created DA Form 4833, in which it had charged Plaintiff with an Army crime and a German crime, convicted Plaintiff (i.e., found Plaintiff guilty) of those crimes, and sentenced Plaintiff for "committing" those crimes by stating it suspended Plaintiff for three days (the suspension never took place). Exhibit 2; see also ¶¶ 486-511 infra, (showing that Army convicted and sentenced Plaintiff in DA Form 4833); ¶¶ 538-547, infra (showing that the Army never suspended Plaintiff).

21. Even Army regulations required the Army to: (1) inform Plaintiff that it had titled him in a MPR; (2) inform Plaintiff of titling's negative repercussions; and (3) inform Plaintiff of the amendment process by which Plaintiff could request the Army to "de-title" and "de-index" him. See Army Regulation 195-2, Criminal Investigation Activities, (October 30, 1985) ("AR 195-2(1985)"), ¶ 1-4(f)(1)(b) (Exhibit 3)[2] (stating that Mr. Fagan, as Plaintiff's Commander, was required to inform Plaintiff of the "titlings" and to warn Plaintiff of the fact that use of MPR 00-MPC937-0607T-5C2B, in which Plaintiff was titled, may, for various reasons, "have an impact upon [Plaintiff's] military or civilian career[]"). Plaintiff, in January of 2000, signed a memorandum from his supervisor in which the Army stated that it was going to suspend Plaintiff for being involved in a fight for which the Garmisch military police "charged" Plaintiff with assault. Exhibit 4. This, however, did not constitute "notice" to Plaintiff of the existence and

---

2. This version of AR 195-2 was, as far as Plaintiff has been able to determine, in force as of the Snowball Incident.

cause of the injury that is the basis of Plaintiff's actions.[3] This memorandum did not give

Plaintiff notice of the Army's *titling* of him with the *Army* crime 5C2B, based on the UCMJ,

with the *German* crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal

Code), or anything else enumerated in this paragraph, or the previous paragraphs, 19-20, <u>supra</u>.

Therefore, the cause of action did not accrue in January of 2000.

22. In addition, a finding that the statute of limitation accrued in January of 2000 for any

claim brought in this Complaint would be a grave injustice because such a finding would enable,

encourage, and validate this unjust, unethical, unlawful, and unconstitutional behavior by the

United States, through the Army. By not informing Plaintiff of the various things enumerated in

paragraphs 19-20, <u>supra</u>, the Army allowed (perhaps intentionally) Plaintiff to remain unaware

for years (it could have been decades) to what it had subjected Plaintiff. Moreover, such a

finding would allow the Army—who documented its violations of the U.S. Constitution, and

Plaintiff's rights thereunder, in numerous "military criminal records" that it disseminates and

allows to be viewed, copied, and downloaded for at least forty years—to continue to portray

Plaintiff, for essentially the rest of Plaintiff's life, as a criminal who the Army charged with

crimes, and who the Army found to have committed crimes.

### B. JUNE 10, 2007: DISCOVERY OF THE ARMY'S UNCONSTITUTIONAL ACTIONS

23. Plaintiff incorporates paragraphs 1-22 by reference.

24. At the start of November 2006, Plaintiff filed forms to obtain a secret security

clearance from the State Department, in anticipation of an externship with the State Department

---

3. In fact, the Army Board for the Correction of Military Records—a group of select, high-level Army experts claimed that the Army did not charge Plaintiff. <u>Exhibit 10</u>, at 7.

beginning in January of 2007. The State Department, after completing its "investigation," drafted a letter in which it informed Plaintiff that it was going to deny Plaintiff his secret security clearance. Exhibit 5. One of the reasons the State Department cited was "Criminal Conduct." Id. at 2. The State Department alleged that Plaintiff was "apprehended by Military Police for assault on 01/19/2000" and indicated that Plaintiff committed the offense of assault when it stated that Plaintiff "was suspended for three days [sic], and given a written reprimand [sic] for this offense." Id. Plaintiff received this letter, dated April 5, 2007, on May 10, 2007, at his then residence in Carlisle, Pennsylvania.

25. Plaintiff, not having understood the basis for the State Department's findings and conclusions, immediately contacted individuals at AFRC Garmisch and the Garmisch military police station. A military police investigator at the Garmisch military police station suggested to Plaintiff that he should make a Privacy Act request to the U.S. Army Crime Records Center ("USACRC") for what apparently was a military police record on him. Exhibit 6, at 1. Plaintiff immediately made such a request. Exhibit 7.

26. Plaintiff, therefore, first discovered what the Army had subjected him to on approximately June 10, 2007, the day he received a copy of MPR 00-MPC937-0607T-5C2B and DA Form 4833 from the USACRC (the letter from the USACRC was dated June 5, 2007; Plaintiff believes he received the letter on June 10, 2007). Exhibit 8 (letter from USACRC accompanying MPR 00-MPC937-0607T-5C2B and DA Form 4833); see ¶¶ 19-20, supra (listing the things to which the Army had secretly subjected Plaintiff).

### C. TOLLING FOR EXHAUSTION OF ADMINISTRATIVE REMEDIES

27. Plaintiff incorporates paragraphs 1-26 by reference.

28. Although Plaintiff discovered some of the injuries perpetrated against him by the Army on June 10, 2007, the applicable statutes of limitation were then tolled until August 26, 2009,—the day Plaintiff exhausted his administrative remedies.

29. The jurisprudential exhaustion doctrine is a "long settled rule of judicial administration [which mandates] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938).

30. A cause of action against an administrative agency first accrues as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court. A person cannot maintain a suit in court until the person has exhausted the agency's administrative remedies. Reiter v. Cooper, 507 U.S. 258, 269 (1993) (stating, "Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed").

31. On July 27, 2007, the Army first informed Plaintiff of the amendment procedure by which Plaintiff could request the Army to remove his name from the subject block of MPR 00-MPC937-0607T-5C2B (i.e., de-title himself), and to have his identifying information removed from the DCII (i.e., de-index himself). Exhibit 6, at 2.

32. After receiving this July 27, 2007 letter, Plaintiff filed, as instructed in the letter, an amendment request with Captain, Military Police, Victoria L. Peters, on August 22, 2007. Exhibit 9.

33. This amendment request began Plaintiff's two-year period of exhausting administrative remedies. See ¶¶ 74-87, infra (detailing Plaintiff's exhaustion of administrative remedies).

34. Plaintiff felt the Army's titling (i.e., accusing and charging) of him was unjust, unethical, unlawful, and unconstitutional for various reasons. Plaintiff, therefore, sought administrative relief by asking the Army, pursuant to Army amendment procedures, to amend what Plaintiff felt were errors, injustices, and inaccuracies in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII. Plaintiff's last administrative recourse, the ABCMR, denied Plaintiff's request to correct these errors, injustices, and inaccuracies on August 26, 2009. Exhibit 10. Having exhausted his administrative remedies, Plaintiff now brings this Complaint.

### D. EQUITABLE TOLLING

35. Plaintiff incorporates paragraphs 1-34 by reference.

36.  Under the doctrine of equitable tolling, this Court may also toll the applicable statutes of limitation until June 10, 2007, and then further toll them until August 26, 2009, which is when Plaintiff exhausted his administrative remedies.

37. The Sixth Circuit applies a five factor test (which is not comprehensive, and not all factors are determinative in each case) to determine whether to equitably toll a statute of limitation. Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 560 (6th Cir. 2000).

38. The five-factor test is as follows: "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4)

absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." Id.

39. Plaintiff lacked notice, until June 10, 2007, of what the Army had done. See ¶¶ 19-20, supra (explaining everything that the Army had done to, and concealed from, Plaintiff); ¶¶ 23-26, supra (showing that Plaintiff first discovered the harms and injuries, upon which this Complaint arises on June 10, 2007). For example, the Army Board for the Correction of Military Records ("ABCMR")—a select group of high-level Army experts—stated, in 2009, that the Army's records on Plaintiff showed that the Army had determined that Plaintiff "committed the criminal offense of bodily injury under German law." Exhibit 10, at 3. The Army never told Plaintiff that it had charged and convicted him of a German crime under the German Criminal Code. Plaintiff first discovered this on June 10, 2007—seven years after the Snowball Incident.

40. Plaintiff also lacked notice of the Army's amendment process until July 27, 2007. Exhibit 6, at 2. This is because the Army failed to inform Plaintiff of the amendment process, in violation of its own regulations. AR 195-2(1985), ¶¶ 1-4(f)(1)(b) (Exhibit 3).

41. Therefore, Plaintiff lacked notice and constructive knowledge of the filing requirement for any administrative remedy and applicable statute of limitation.

42. In addition, Plaintiff has diligently pursued his rights, once he discovered that the Army secretly titled (i.e., charged) him with, and found him guilty of, an Army crime and a German crime. See ¶¶ 73-87 (showing Plaintiff's exhaustion of administrative remedies).

43. In addition, tolling any applicable statute of limitation would not prejudice the United States, or its named agencies.

44. Finally, based on paragraphs 19-20, supra, and the evidence in this Complaint, Plaintiff's ignorance of any statute of limitation is more than reasonable.

### E. FRAUDULENT CONCEALMENT

45. Plaintiff incorporates paragraphs 1-44 by reference.

46. Under the doctrine of "fraudulent concealment," this Court may also toll the applicable statutes of limitation until June 10, 2007, and then further toll them until August 26, 2009, which is when Plaintiff exhausted his administrative remedies.

47. The Sixth Circuit looks at four factors to determine whether fraudulent concealment existed: "1) defendants concealed the conduct that constitutes the cause of action; 2) defendants' concealment prevented plaintiffs from discovering the cause of action within the limitations period; and 3) until discovery, plaintiffs exercised due diligence in trying to find out about the cause of action." Egerer v. Woodland Realty, Inc., 556 F.3d 415, 422 (6th Cir. 2009).

48. Plaintiff has shown that the Army concealed from Plaintiff that it had titled (i.e., charged) Plaintiff with an Army crime, based on the UCMJ, and with a German crime, based on the German Criminal Code. See ¶¶ 19-20, supra (explaining how the Army concealed from Plaintiff "the conduct that constitutes the cause of action").

49. The Army also concealed from Plaintiff that it had convicted him (i.e., made a final determination that he had committed) an Army crime, based on the UCMJ, and a German crime, based on the German Criminal Code. Plaintiff first discovered this on June 10, 2007, when he received a copy of the military police report and DA Form 4833 that the Army had secretly created on the Snowball Incident.

50. For example, the ABCMR—a select group of high-level Army experts—stated, in 2009, that the Army's military police report, in which the Army labeled Plaintiff a criminal, showed that the Army had determined that Plaintiff "committed the criminal offense of bodily injury under German law." Exhibit 10, at 3. The Army never told Plaintiff that it had charged and

convicted him of a German crime under the German Criminal Code. Plaintiff first discovered this on June 10, 2007—seven years after the Snowball Incident.

### F. CONTINUING VIOLATIONS

51. Plaintiff incorporates paragraphs 1-50 by reference.

52. The United States, through the DOD and the Army, violated the U.S. Constitution and Plaintiff's constitutional rights by charging (i.e., titling) Plaintiff, a U.S. civilian and citizen, with an Army crime and a German crime, by finding Plaintiff guilty of these crimes, and by sentencing Plaintiff to a three-day suspension for allegedly "committing" these crimes. See 95-140, infra (explaining "titling").

53. The Army recorded these "titlings" and the alleged suspension (which never took place) in a military *criminal* report (MPR 00-MPC937-0607T-5C2B), a DA Form 4833, and the DCII. The MPR, DA Form 4833, and DCII contain numerous errors and injustices, in addition to the fact that they record the Army's unjust, unethical, unlawful, and unconstitutional charging (i.e., titling), convicting, and sentencing of Plaintiff with two crimes: Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code).

54. The Army, however, also disseminates these records to, and allows these records to be viewed, downloaded, and copied by, numerous agencies and countless individuals for at least forty years. These disseminations constitute continuing violations because they perpetuate the Army's unjust, unethical, unlawful, and unconstitutional charging, conviction, and sentencing of Plaintiff with crimes. See Broom v. Strickland, 579 F. 3d 553, 555 (6th Cir. 2009) (explaining the Sixth Circuit's application of the continuing violations doctrine). These records and their

continued existence and dissemination, therefore, will repeatedly portray Plaintiff as a criminal, and they will repeatedly have negative impacts on Plaintiff's career and reputation.

55. One recent injury occurred on May 10, 2007. This is when Plaintiff discovered that the State Department initially denied Plaintiff's secret security clearance, in part, because the State Department believed that the Army had "charged" Plaintiff with the crime of assault, convicted Plaintiff (i.e., made a final determination that Plaintiff committed assault), and then sentenced Plaintiff to a three-day suspension for committing assault. Exhibit 12. The State Department came to these conclusions because it had viewed MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or the information the Army had entered into the DCII regarding Plaintiff. The State Department later granted Plaintiff his clearance after Plaintiff sent the State Department eight separate letters, explaining to the State Department that "titling" does not connote any guilt according to DOD instructions and Army regulations. The damage to Plaintiff, however, had already been done, and is continuing to be done.

56. Another recent injury to Plaintiff occurred on August 26, 2009, when the ABCMR, in its August 26, 2009 denial of Plaintiff's request to amend MPR 00-MPC937-0607T-5C2B, stated that Plaintiff was a criminal under German law. Exhibit 10, at 3 (stating that Plaintiff "had committed the criminal offense of bodily injury under German law"). The ABCMR stated that Plaintiff was a criminal under German law after it had reviewed MPR 00-MPC937-0607T-5C2B. The ABCMR consists of high-level Army "experts" who are charged with amending "errors and injustices" in Army records. AR 15-185 (March 31, 2006), Army Board for Correction of Military Records ("AR 15-185(2006)"), ¶ 1-8(b) (Exhibit 13).

57. If experts such as the ABCMR and the State Department's investigators believe that the Army's "titling" of Plaintiff with crimes indicates that the Army "charged" Plaintiff with

crimes, that Plaintiff "committed" these crimes, and that the Army suspended (i.e., sentenced) Plaintiff for committing these crimes, then *everyone* viewing MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or Plaintiff's information in the DCII will believe the same.

58. Therefore, there is also imminent danger of recurring injuries because it is certain that someone will again view MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or the DCII during Plaintiff's life.

59. In fact, the last time (as far as Plaintiff has been able to determine) that MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached), was viewed was on January 26, 2010. Exhibit 11. MPR 00-MPC937-0607T-5C2B has actually been viewed and downloaded at least twelve separate times. Id. (stating that MPR 00-MPC937-0607T-5C2B was viewed on January 26, 2010, December 9, 2008, November 7, 2008, July 29, 2008, July 20, 2008, July 7, 2008, June 16, 2008, February 28, 2008, October 6, 2007, July 24, 2007, May 23, 2007, and January 8, 2007).

60. The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.

61. Therefore, the last known injury to Plaintiff occurred on January 26, 2010—the last time, as far as Plaintiff knows, that someone viewed MPR 00-MPC937-0607T-5C2B and DA Form 4833, discovering that the Army charged Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code).

62. In addition, the Army has placed Plaintiff's identifying information, and information regarding the Army's titling of Plaintiff, into the DCII. Plaintiff discovered that, as of 1998, more than twenty-seven agencies had access to the DCII and Plaintiff's information, and a

working group had been formed to determine whether more agencies should have access. Major

Patricia A. Ham, *The CID Titling Process – Founded or Unfounded*, The Army Lawyer, Aug.

1998, DA-Pam 27-50-309, at 5 n.34 [hereinafter Ham Article] (Exhibit 21) (Note: Most internal

citations for Major Ham's article have been omitted throughout this Complaint). As of 1998,

there were over 1,300 computer terminals where countless individuals could access the DCII. Id.

These statistics, of course, are twelve years old. They were before desktop and laptop computers

became ubiquitous, as they are now. Plaintiff has made a FOIA request for the current number of

agencies and individuals with access to the DCII, but that FOIA request has yet to be answered.

Nevertheless, it is safe to say that, currently, over thirty agencies have access to Plaintiff's

information in the DCII, that many thousands of employees from these agencies have access to

Plaintiff's information in the DCII, and that each of these many thousands of employees has at

least one computer where they can access Plaintiff's information in the DCII.

64. 63. Moreover, Plaintiff, who recently received his J.D. and LL.M., has been, and likely

will continue to be, required to fill out character and fitness questionnaires for bar exams, and

questionnaires for security clearances for possible employment opportunities. Plaintiff must state

on these forms whether he was ever charged with a crime. Investigators for these organizations

and agencies are certain to have access to the DCII and Plaintiff's information therein.

64. Finally, the Army's unjust, unethical, unlawful, and unconstitutional titling of

Plaintiff has created a self-perpetuating and self-replicating injustice. For example, the Army

"titled" (i.e., charged) Plaintiff by listing him as the subject of a military criminal report MPR

00-MPC937-0607T-5C2B. Exhibit 1, at 2, Section III – Subject. The Army titled (i.e., charged)

Plaintiff with the Army crime 5C2B, which is based on the UCMJ. Exhibit 1, at 1, Section II -

Offense, Box 1.g, Offense Code. The Army, in violation of Army regulations, used the German

crime Körperverletzung, pursuant to section 223 of the Staatsgesetzbuch (German Criminal

Code), to describe the Army crime 5C2B. Exhibit 1, at 1, Section II – Offense, Box 1.h, Offense

Description; see ¶¶ 329-331 (explaining how the Army violated its own regulations by using a

German crime to describe an Army crime).

65. Then, the Army official who filled in the DA Form 4833 pertaining to Plaintiff stated,

based on MPR 00-MPC937-0607T-5C2B, that the Army had determined that Plaintiff committed

(i.e., the Army had charged Plaintiff) with the *German* crime Körperverletzung, pursuant to

section 223 of the Staatsgesetzbuch (German Criminal Code). Exhibit 2, at 1, Box 11.a. The

Army official who created DA Form 4833, therefore, believed that Plaintiff had committed a

German crime because of the Army's unlawful *description* in MPR 00-MPC937-0607T-5C2B of

the Army crime 5C2B with the German crime. MPR 00-MPC937-0607T-5C2B, therefore,

replicated itself and perpetuated the injustices it contained, by causing the same (and new)

injustices to be transcribed in DA Form 4833. DA Form 4833 is now another unjust, unethical,

unlawful, and unconstitutional document.

66. The Army permanently attaches DA Form 4833 to, and disseminates it with, MPR

00-MPC937-0607T-5C2B. DA Form 4833, therefore, will now self-perpetuate and self-replicate

the Army's constitutional harms against Plaintiff. Individuals will view DA Form 4833 and see

that the Army charged Plaintiff with two crimes: Army crime 5C2B, based on the UCMJ, and the

German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code).

67. Another example of the Army's "criminal" records on Plaintiff self-perpetuating and

self-replicating harm against Plaintiff occurred in the ABCMR's decision denying Plaintiff his

request for amendment. The ABCMR held that MPR 00-MPC937-0607T-5C2B showed that

Plaintiff "had committed the criminal offense of bodily injury under German law." Exhibit 10, at

3. The Army, however, had no authority or competence to charge Plaintiff, a U.S. civilian and citizen, with a German crime, much less state, in a military criminal record, that it determined that Plaintiff committed a German crime. The ABCMR's decision is viewable by numerous Army and governmental officials, and perhaps non-governmental individuals. This decision is itself now another Army record that not only records, but also self-perpetuates and self-replicates the Army's unjust, unethical, unlawful, and unconstitutional exercise of military jurisdiction over Plaintiff, and the harm that such exercise caused Plaintiff.

68. Another example of the Army's "military criminal records" on Plaintiff self-perpetuating and self-replicating harm against Plaintiff occurred with the State Department. In approximately November or December of 2006, the State Department viewed MPR 00-MPC937-0607T-5C2B and the DA Form 4833 pertaining to Plaintiff. The State Department then, in its investigative materials, stated that the Army "charged" Plaintiff with assault. Exhibit 12.

69. Therefore, the Army's records have self-perpetuated and self-replicated themselves by creating more unjust, unethical, unlawful, and unconstitutional records—the State Department's investigative findings. These investigative findings themselves are self-perpetuating and self-replicating because they will be disseminated upon request.

70. An employee of the State Department's Bureau of Diplomatic Security, the branch of the State Department that undertook Plaintiff's security clearance investigation, told Plaintiff that the Bureau would, if requested, disseminate its findings and investigative records pertaining to Plaintiff to other government agencies. Exhibit 16. Other agencies can discover that the State Department has investigative records on Plaintiff through the Joint Personnel Adjudication System ("JPAS").

71. Plaintiff has not been able to determine how the DCII, the JPAS, and the index operated by the USACRC are cross-referenced, or exactly what kind of information about Plaintiff is contained in these indexes. Regardless, these indexes, and perhaps others, allow numerous agencies and countless individuals to either have access to Plaintiff's "military *criminal* records" and their progeny, or easily find out where to retrieve them.

72. Therefore, not only is the Army's charging (i.e., titling) of Plaintiff with crimes unjust, unethical, unlawful, and unconstitutional, but the Army's retention and dissemination of MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the information in the DCII has created, and is continuing to create, a never-ending, ever widening swath of unjust, unethical, unlawful, and unconstitutional *criminal* records. These *criminal* records then create a never-ending, ever widening swath of injustice as they portray Plaintiff as a criminal for essentially the rest of his life, maligning his reputation, and hindering his professional pursuits.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

73. Plaintiff has exhausted all administrative remedies.

### A. INITIAL DENIAL AUTHORITY

74. On August 22, 2007, Plaintiff sent a request to amend MPR 00-MPC937-0607T-5C2B to Captain, Military Police, Victoria L. Peters ("CPT Peters") who was located in Stuttgart, Germany. Exhibit 9. Plaintiff did so in response to a July 27, 2007 letter from CPT Peters stating that Plaintiff could request to amend MPR 00-MPC937-0607T-5C2B by submitting to her a request to amend. Exhibit 6.

75. Apparently, Mr. Philip J. McGuire, Director, USACRC, in Ft. Belvoir, VA, then ordered CPT Peters to forward Plaintiff's request for amendment records to him because the

USACRC coordinates requests to amend MPRs that are older than five years. AR 190-45 (March 30, 2007), Law Enforcement Reporting, ("AR 190-45(2007)"), ¶ 3-6(b)(2) (Exhibit 17).

76. On February 20, 2008, Plaintiff received a letter from Mr. McGuire stating that "Provost Marshal, Law Enforcement Branch, HQ USAREUR, APO AE GM," had denied Plaintiff's request for amendment "in accordance with Army Regulation 190-45." Exhibit 18. Mr. McGuire's letter also informed Plaintiff that he could appeal the Provost Marshal's denial to the Department of the Army Privacy Act Review Board ("DAPARB").

77. The Provost Marshal who denied Plaintiff's request for amendment was Lieutenant Colonel, Military Police, Howard T. Yates ("LTC Yates"). Exhibit 57. Mr. McGuire did not tell Plaintiff LTC Yates's name. On April 7, 2009,—over a year later—Plaintiff discovered, through a FOIA request, that it was LTC Yates who had denied his request for amendment. Exhibit 59.

78. In addition, Mr. McGuire, along with LTC Yates, violated federal law. Federal regulations regarding "Amendment of records" clearly state, "If the Denial Authority [LTC Yates] determines that the amendment is not warranted, he or she *will provide the requester* . . . reason(s) for not amending." 32 C.F.R. § 505.6(c)(6) (emphasis added).

79. Neither LTC Yates, nor Mr. McGuire, sent Plaintiff any reasons as to why LTC Yates denied Plaintiff's request to amend MPR 00-MPC937-0607T-5C2B. Exhibit 17. Mr. McGuire appears to have been ultimately at fault for this violation because he was coordinating Plaintiff's amendment request and, therefore, was responsible for proper dissemination and retention of all relevant records. AR 190-45 (2007), ¶ 3-6(b)(2) (Exhibit 17).

80. This unlawful activity by Mr. McGuire unjustly handicapped Plaintiff in his subsequent appeal to the DAPARB. This is because Mr. McGuire forced Plaintiff to appeal to the DAPARB within thirty days, without any knowledge as to the reasons why LTC Yates had

denied Plaintiff's amendment request, and without any time to make a FOIA/Privacy Act request

for such information—and expect to receive from Mr. McGuire a timely response.

## B. DEPARTMENT OF THE ARMY PRIVACY ACT REVIEW BOARD ("DAPARB")

81. On March 14, 2008, Plaintiff appealed LTC Yates's denial of his request to amend

MPR 00-MPC937-0607T-5C2B to the DAPARB. Exhibit 44.

82. On August 13, 2008, the DAPARB denied Plaintiff's appeal, citing 32 C.F.R. § 505.6

as its basis for denial, not AR 190-45. Exhibit 19.

83. Mr. McGuire, Director, USACRC, had informed Plaintiff that AR 190-45 was the

basis upon which Plaintiff's request for amendment and appeal would be determined. Exhibit 18.

No one had mentioned to Plaintiff, before the DAPARB's letter of denial, that the DAPARB

would only apply 32 C.F.R. § 505.6.

84. In addition, the DAPARB violated federal regulations. The DAPARB was required to

provide Plaintiff "with the reasons for denial." 32 C.F.R. § 505.6 (e)(6)(ii). The DAPARB did

not provide Plaintiff with its reasons for denial. Exhibit 19.

85. Plaintiff finally discovered the DAPARB's "reasons for denial" through a FOIA

request that the Army answered on April 7, 2009—eight months after the DAPARB should have

sent Plaintiff its reasons for denial. Exhibit 59. Among the records sent with this April 7, 2009

answer were the DAPARB's minutes, which contained the DAPARB's reasons for denying

Plaintiff's request. Exhibit 58.

### C. ARMY BOARD FOR THE CORRECTION OF MILITARY RECORDS ("ABCMR")

86. On January 20, 2009, Plaintiff filed an application with the ABCMR to correct MPR 00-MPC937-0607T-5C2B and DA Form 4833. Exhibit 20.

87. On August 26, 2009, the ABCMR denied Plaintiff's application to correct MPR 00-MPC937-0607T-5C2B and DA Form 4833. Exhibit 10.


## VI. "TITLING" AS OF THE DATE OF THE SNOWBALL INCIDENT: THE TITLING PROCESS AND THE DOD'S SMOKESCREEN VERSION OF WHAT TITLING MEANS

88.  "Titling" is at the core of this Complaint. Specifically, what "titling" actually *means* is at the core of this Complaint.

89. Titling is a process unique to the U.S. Military.

90. Instructions promulgated by the DOD govern titling. The Army, and all other military branches, is obligated to implement these DOD instructions by incorporating these instructions into its regulations.[4]

91. DOD instructions explain the titling process, i.e., *how* a person is titled.

92. DOD instructions also claim what titling "officially" means. This is the Smokescreen Version of what titling means. The DOD and the Army only put this Smokescreen Version on parade when someone challenges the purpose and constitutionality of their titling process (e.g., in federal courts).

93. Behind this Smokescreen Version is the *Real* Version of what titling means—what it *really* represents and what it *really* connotes.

---

4. DOD instructions ultimately govern titling procedures and supersede any conflicting Army regulations. Escobedo v. Green, 602 F. Supp. 2d 244, 250 (D.D.C. 2009) (citation omitted).

94. The *Real* Version of what titling means is the version that the Army implements and propagates. It is the *Real* Version that the Army forces everyone to understand and accept, causing everyone to then implement and propagate the *Real* Version, too.

### A. THE TITLING PROCESS

95. Plaintiff incorporates paragraphs 1- 94 by reference.

96. "Titling: Placing the name(s) of a person(s), corporation(s), other legal entity, organization(s) or occurrence(s) in the subject block for a *criminal*[5] investigation." DOD Instruction 5505.7 (May 14, 1992) ("DODI 92"),[6] ¶ E1.1.8, "Titling" (Exhibit 14) (emphasis added); Exhibit 1, at 2, Section III – Subject, Box 1.b (naming Plaintiff's as a "subject").

97. The "Subject Block" is the section of a MPR (Section III of DA Form 3975) where Army investigators list a person as being a "subject" in the *criminal* investigation, i.e., where the Army "titles" the person.

98. The Army "titled" Plaintiff by placing Plaintiff's name in the "subject block" of MPR 00-MPC937-0607T-5C2B. Exhibit 1, at 2, Section III – Subject, Box 1.b.

99. A "subject" is:

> A person, corporation, other legal entity, or organization about which credible information exists that would cause a reasonable person to suspect the person, corporation, other 1ega1 entity, or organization may have committed a *criminal* offense, or otherwise make a person, corporation, legal entity, or organization the object of a *criminal* investigation.

5. Plaintiff is emphasizing the use of "criminal" and "crime" in the DOD's titling instructions to highlight titling's very negative connotation, which the DOD claims, in its Smokescreen Version, does not exist. "The act of titling . . . *shall not*, in and of itself, connote *any* degree of guilt or innocence." DODI 92, ¶ F.1 (Exhibit 14) (emphasis added).

6. Plaintiff is citing DODI 92 because it was in force during the Snowball Incident. DODI 03, which superseded DODI 92, and which is currently in force, contains the same provisions, in addition to further clarifications and some re-wording of the Smokescreen Version. An Interim Change to AR 190-45(1988) implemented the DOD's titling changes. Exhibit 25.

DODI 92, ¶ E1.1.6, "Subject" (<u>Exhibit 14</u>) (emphasis added).

100.    The Army may "title" a person with a crime if:

a determination that credible information exists that a person or entity may have committed a *criminal* offense or is otherwise made the object of a *criminal* investigation.

DODI 92, ¶ D.3 (<u>Exhibit 14</u>) (emphasis added).

101.    "Credible information" is:

Information disclosed or obtained by an investigator that, considering the source and nature of the information and the totality of the circumstances, is sufficiently believable to indicate *criminal* activity has occurred and would cause a reasonable investigator under similar circumstances to pursue further the facts of the case to determine whether a *criminal* act occurred or may have occurred.

DODI 92, ¶ E1.1.1, "Credible Information" (<u>Exhibit 14</u>) (emphasis added).

102.    The Army "titled" Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code). <u>Exhibit 1</u>, at 1, Section II – Offense, Boxes 1.g and h; <u>Exhibit 2</u> (DA Form 4833), at 1, Box 11.a.

103.    The Army retains and disseminates (upon request) military *criminal* reports, in which titlings are recorded (e.g., MPR 00-MPC937-0607T-5C2B), for at least forty years. Ham Article, <u>supra</u> ¶ 62, at 4-5 (<u>Exhibit 21</u>).

**B. THE SMOKESCREEN VERSION (i.e., THE "OFFICIAL" VERSION) OF WHAT TITLING MEANS: THE LEGAL FICTION AND THE MEANINGLESS FAÇADE**

104.    Plaintiff incorporates paragraphs 1- 103 by reference.

105.     "The act of titling . . . *shall not*, in and of itself, connote *any* degree of guilt or innocence." DODI 92, ¶ F.1 (<u>Exhibit 14</u>) (emphasis added).

106.    "Titling is an operational rather than a legal decision." DODI 92, ¶ D.4 (Exhibit 14).

107.    "The Primary Purpose for titling . . . an individual or entity as the subject of a criminal investigation is to ensure that information in a report of investigation can be retrieved at some future time for law enforcement and security purposes." DODI 92, ¶ D.1 (Exhibit 14).

108.     "The acts of titling . . . are administrative in nature and shall not connote any degree of guilt or innocence." Exhibit 22 (letter from Lieutenant Colonel Paul T. Salussolia ("LTC Salussolia"), on behalf of Brigadier General Rodney L. Johnson ("BG Johnson"), Commander, U.S. Army Criminal Investigation Command).[7]

## VII. THE *REAL* VERSION OF WHAT TITLING MEANS: AN UNCONSTITUTIONAL EXERCISE OF MILITARY JURISDICTION AND ITS UNJUST, UNETHICAL, UNLAWFUL, AND UNCONSTITUTIONAL REPERCUSSIONS

### 1. COUNT I: THE ARMY'S "TITLING" (i.e., CHARGING) OF PLAINTIFF, A U.S. CIVILIAN AND CITIZEN, WITH CRIMES WAS AN UNCONSTITUTIONAL EXERCISE OF MILITARY JURISDICTION

109.    Plaintiff incorporates paragraphs 1- 108 by reference.

110.    The Smokescreen Version (i.e., the "official" version) of what titling means is a meaningless façade that rings true only in sound, not substance. The DOD concocted this Smokescreen Version to allow the military branches to hide their unconstitutional exercises of military jurisdiction by creating the legal fiction that titling is something that it clearly is not—a harmless, administrative procedure, void of any hint of guilt.

---

7. LTC Salussolia was likely citing DODI 03, which superseded DODI 92, and which is currently in force. DODI 03 states, "The acts of titling and indexing are administrative procedures and shall not connote any degree of guilt or innocence." DODI 03, ¶ 6.5 (Exhibit 15). This provision of DODI 03 is the same as paragraphs D.4 and F.1 of DODI 92. DODI 92, ¶¶ D.4 and F.1 (Exhibit 14).

Behind the Smokescreen Version, however, is the *Real* Version of what titling means. The *Real* Version is the version understood, accepted, implemented, and propagated by the Army. It is the *Real* Version of what titling means—the only version of what it *really* means—that is the primary basis of this Complaint, and the primary source of the harms suffered by Plaintiff.

### a. THE *REAL* VERSION OF WHAT TITLING MEANS: CLEARING AWAY THE SMOKESCREEN

111.    Plaintiff incorporates paragraphs 1-110 by reference.

112.    Plaintiff will begin the explanation of the *Real* Version of what titling means by citing the words of the Army's elite experts on titling: the Army Board for the Correction of Military Records ("ABCMR").

113.    The ABCMR is a board comprised of select, high-level civilian employees who work in the executive part of the Department of the Army. AR 15-185 (2006), ¶ 2-1 (Exhibit 13). The Secretary of the Army appoints select, high-level civilian employees to the ABCMR. Id. The ABCMR is the "court of last resort," so-to-speak, for the correction of errors and injustices in Army records. Id. ¶¶ 1-8(b) and 2-2.

114.    The ABCMR encapsulated the *Real* Version of what titling means in one sentence:

> **Titling is an administrative action based on credible information <u>showing that a subject committed a *criminal* offense</u>.**

Exhibit 10, at 7 (emphasis added).

115.    Therefore, the *Real* Version of what titling means is what the ABCMR stated it is: "[a] showing that a subject *committed* a *criminal* offense." Exhibit 10, at 7 (emphasis added).

116.    In other words, when the Army has "titled" a person, the Army has simultaneously "charged" that person with a crime and made a final determination that the person "committed" the crime. The Army then retains, disseminates, and propagates this final determination of guilt for at least forty years. Ham Article, supra ¶ 62, at 4-5 (Exhibit 21).

117.    The ABCMR further clarified the *Real* Version of what titling means when it stated that the Army's "titling" of Plaintiff with crimes in MPR 00-MPC937-0607T-5C2B showed that Plaintiff:

> . . . then a nonappropriated fund employee while working for the Army in the Federal Republic of Germany *committed the criminal offense of bodily injury under German law*, between 0016 and 0026 hours (military time), on 19 January 2000.

Exhibit 10, at 3 (emphasis added).

118.    Therefore, according to the ABCMR, the Army's elite experts on titling, the Army uses "titling" to simultaneously charge U.S. civilians with, and convict them of, German crimes!

119.    The ABCMR's clarifications of the *Real* Version are, of course, in complete contradiction with the Smokescreen Version (i.e., the "official" version) of what titling means: "titling *shall not* connote *any* degree of guilt," and is *not* "a legal decision." DODI 92, ¶¶ D.4 and F.1 (emphasis added) (Exhibit 14).

120.    The ABCMR, perhaps inadvertently, helped to further contrast the *Real* Version and the Smokescreen Version when it made the following Smokescreen-based claim, "There is no evidence showing the applicant [Plaintiff] was ever charged, tried or convicted of any crime by either Federal Republic of Germany authorities or by the U.S. Army." Exhibit 10, at 7.

121.    In fact, this Smokescreen claim that Plaintiff was never "charged, tried, or convicted" of crimes is made by the ABCMR right before its primary clarification of the *Real*

Version of what titling *really* means: "[a] showing that a subject committed a criminal offense."

Exhibit 10, at 7.

122.    The full effect of the ABCMR's contrasting statements may be better realized when shown in their original format, which is the following:

> There is no evidence showing the applicant [Plaintiff] was ever charged, tried or convicted of any crime by either Federal Republic of Germany authorities or by the U.S. Army. However, it is not necessary that the person titled face prosecution. Titling is an administrative action based on credible evidence showing that a subject committed a criminal offense. Once titled, the person remains titled even if it is later determined the person did not commit the offense under investigation.

Exhibit 10, at 7.

123.    According to the ABCMR, therefore, the Army can: (1) charge an individual with a crime, i.e., claim that someone committed a crime—as long as the Army calls it "titling"; (2) label an individual a criminal who the Army determined actually committed a crime—as long as the Army calls it "titling"; (3) forego an individual's constitutional right to "face prosecution," where an individual can attempt to disprove the Army's charge and simultaneous determination of guilt—as long as the Army calls it "titling"; and (4) retain, disseminate, and propagate the charge and simultaneous determination of guilt for as long as the Army wishes—as long as the Army calls it "titling."

124.    Clearly, the *Real* Version, as the ABCMR explicitly stated—twice—*does* connote guilt and *is* a legal determination that a person is a criminal who the Army determined committed a crime.

125.    Furthermore, the DOD and the Army's spurious claim that "titling" is simply "an administrative" action is highly unethical. See DODI 92, ¶¶ D.4 and F.1 (Exhibit 14); DODI 03,

¶ 6.5 (Exhibit 15) (stating, "The acts of titling . . . are administrative procedures and shall not connote any degree of guilt or innocence")

126.    "Titling" an individual with a crime is no more "administrative" than civilian law enforcement officials "charging" an individual with a crime. The difference is that civilian law enforcement officials call it "charging," and they do not have a smokescreen of meaningless provisions to hide behind; they actually have to abide by the U.S. Constitution when charging and convicting U.S. civilians with crimes.

127.    The high-level Army experts on the ABCMR, however, are not the only experts who understand and apply the *Real* Version of what titling means. Plaintiff shall provide five more examples of Army experts, and experts from other government agencies, who also understand, accept, implement, and propagate the *Real* Version of what titling means. These experts never mention the Smokescreen Version (i.e., the "official" version) of what titling means.

128.    *First*, Plaintiff's supervisor at AFRC Garmisch provided Plaintiff with a Notice of Proposed Suspension on January 20, 2000. An unethical Army lawyer wrote the Notice, or at the least reviewed the Notice. AR 215-3 (August 29, 2003), NAF Personnel Policy, ¶ 7-8(a)[8] (requiring all notices of suspension to be created "in coordination with the servicing legal office") (Exhibit 39). The Notice stated the following:

> The following specific information is furnished in support of the reason: On 18 Jan 00 [sic; 19 Jan 00], you were involved in a fight outside the Abram's Complex, Garmisch Recreation Area, which resulted in *your being charged with assault by the Garmisch Military Police*. Fighting on AFRC property simply will not be tolerated.

---

8. Plaintiff was not able to obtain the version of AR 215-3, NAF Personnel Policy, that was in force as of the Snowball Incident.

Exhibit 4 (emphasis added).[9]

129.    *Second*, on approximately February 9, 2000, Mr. Edward Fagan, Assistant

Manager at AFRC Garmisch, signed a Commander's Report of Disciplinary Action (DA Form

4833). Exhibit 2, at 2. The Army attached DA Form 4833 to, and disseminates it with, MPR 00-

MPC937-0607T-5C2B. AR 190-45(2007), ¶ 4-8 (Exhibit 17).

130.    On DA Form 4833, the Army officially documented the charging and convicting

(i.e., titling) of Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime

"Körperverletzung," section 223 of the Staatsgesetzbuch (German Criminal Code), and the

sentencing of Plaintiff to an alleged three-day suspension for "committing" these crimes. Exhibit

2, at 2.

131.    The Smokescreen Version (i.e., the "official" version) of what titling means states

that titling "*shall not* connote *any* guilt." DODI 92, ¶ F.1 (emphasis added) (Exhibit 14).

132.    Applying the *Real* Version of what titling means, however, the Army concluded

that its "titling" of Plaintiff with an Army crime and a German crime constituted enough guilt to

convict Plaintiff of these crimes (i.e., make a final determination that Plaintiff committed these

---

9. Plaintiff received his Notice of Proposed Suspension ("Notice") on January 20, 2000.
The Garmisch military police concluded their report on the Snowball Incident on January
24, 2000. Exhibit 1, at 1. The Army, therefore, charged, convicted, and sentenced
Plaintiff four days before it had officially concluded its investigation of the Snowball
Incident. Of course, this is not taking into consideration the fact that someone in the
Army was likely ordered to draft the Notice on January 19, 2000, just hours after the
Snowball Incident occurred, because a commanding officer ordered everyone involved in
the Snowball Incident to be charged (i.e., titled) with crimes for having fought on his
installation. The Army then had until January 24, 2000, to concoct the Narrative of the
Snowball Incident (i.e., the official summary; Exhibit 1, at 9, Section VII - Narrative) in
an unjust, unethical, unlawful, and unconstitutional way to attempt to portray Plaintiff as
the instigator of the Incident, thereby allegedly supporting the unjust, unethical, unlawful
and unconstitutional charging (i.e., titling) of Plaintiff with a UCMJ crime and a German
crime.

crimes), and sentence Plaintiff to a three-day suspension for "committing" these crimes. <u>Exhibit</u> <u>2</u>.

133.    *Third*, in 2007, Plaintiff applied for a secret security clearance at the State Department. The State Department's Bureau of Diplomatic Security initially denied Plaintiff's secret security clearance. The highly paid employee investigators and independent contract investigators in the Bureau of Diplomatic Security, who conduct background investigations of individuals seeking security clearances, review thousands of military criminal records, and the "titlings" within these records.

134.    The investigators in the Bureau Diplomatic Security reviewed the Army's titling of Plaintiff in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or the DCII. They came to the following conclusions:

> *Criminal Conduct*: Garmisch Military Police records reflect *Conley was* *charged with assault* and received a three-day suspension. Local German police agencies were notified but declined to become involved (AUl8/00).
>
> \*\*\*
>
> [Conley's records] . . . reference his assault charge by the Garmisch Military Police, (01/18/00).

<u>Exhibit 12</u> (emphasis added).

135.    *Fourth*, Captain, Military Police, Victoria L. Peters ("CPT, MP Peters"), Director of Emergency Services, U.S. Army Installation Management Command, Europe Region, stated:

> As to your question regarding "title," the military police will list a person's name in the title block of a military police report as the subject when there is probable cause to believe that person has committed an offense. *So, a person/subject is accused or charged with an offense.*

<u>Exhibit 6</u>, at 2 (emphasis added).

136.    Note that CPT, MP Peters (a trained military police investigator) had (in 2007) not yet gotten the memo that, in 1992, the DOD replaced "probable cause" with "credible information" as the evidentiary standard required to "title" someone. DODI 92 (Exhibit 14). Of course, the Army does not make it easy to understand the regulatory smokescreen/mish-mash that is "titling." This is because the Army, in direct contradiction with DODI 03, retains the "probable cause" standard in its current definitions for "subject."[10]

137.    It is not that relevant, however, that CPT, MP Peters—a trained military police investigator, like the ones who "titled" Plaintiff—does not understand the DOD's regulatory smokescreen called "titling," and the fact that "credible information" had been "officially" in use for the fifteen years prior to her 2007 email to Plaintiff.

138.    What *is* relevant, however, is that she, like everyone else, understands the *Real* Version of what titling means: "a person/subject is *accused or charged* with an offense." Exhibit 6, at 2 (emphasis added).

139.    *Fifth*, Ms. Anita Jordan-Young, Director, Human Resources, at the Army's Edelweiss Lodge and Resort (formerly AFRC Garmisch) told Plaintiff, "The MPs (Military

---

10. The Army, after eighteen years, still has residual effects of the probable cause era of titling. See generally Ham Article, supra ¶ 62 (Exhibit 21) (detailing the DOD's lowering of the evidentiary standard for titling from probable cause to credible information). Definitions in Army regulations, in violation of DODI 03, still claim that a person shall be labeled a "subject" (i.e., titled) after a determination of *probable cause*. AR 190-45(2007), Section II – Terms, "Subject," p. 139 (Exhibit 17); AR 195-2 (May 5, 2009), Criminal Investigation Activities, Section II – Terms, "Subject," p. 41 (Exhibit 24). Most disturbing is the fact that the Army has amended these regulations numerous times since 1992, but it has never removed the probable cause requirement. In fact, the Army has amended AR 190-45 *three times* since 1992: October of 2000, June of 2005, and, most recently, in March of 2007. The Army has amended AR 195-2 at least once—in May of 2009. Federal district court judges have even noted the discrepancies and confusion among Army regulations and DOD Instructions. See Holz v. Westphal, 217 F. Supp. 2d 50, 53 n.1 (D.C. Cir. 2002) (noting the contradiction between DOD instructions and Army regulations pertaining to titling); Escobedo v. Secretary of the Army, 602 F. Supp. 2d. 244, 250 (D.D.C. 2009) (noting the same discrepancies).

Police) can charge you . . . ." Exhibit 23. Ms. Jordan-Young is a career employee for the DOD whose previous job title was Director, Civilian Personnel, AFRC Europe.

140.    If "experts," such as the ABCMR, Army lawyers, and highly-trained investigators at the State Department's Bureau of Diplomatic Security, believe that the Army's "titling" of Plaintiff means that Plaintiff is a criminal who the Army charged with crimes, found guilty of committing crimes, and sentenced for committing crimes, then everyone who views MPR 00-MPC937-0607T-5C2B, DA Form 4833, or the DCII[11] will think the same.

141.    Even the DOD Inspector General (promulgator of the credible information standard and titling procedure) has recognized the negative connotation and stigma associated with being titled. Ham Article, supra ¶ 62, at 9 (Exhibit 21) (citing historical files on titling retained at the Office of Criminal Investigative Policy and Oversight, DOD Inspector General, 400 Army Navy Drive, Alexandria, Virginia and Office of Criminal Investigations Policy and Oversight, and the Review of Titling and Indexing Procedures Utilized by the Defense Criminal Investigative Organizations, DOD IG No. 91FBD013, at 13 (1991)).

142.    The DCII is an index in which the Army listed its investigation on Plaintiff, and the fact that it "titled" Plaintiff with crimes. In addition, the Army indexed Plaintiff's personal

---

11. The DOD describes the DCII as:

> [a] centralized database, organized in a searchable format, of selected unique identifying information and security clearance data utilized by security and investigative agencies in the Department of Defense, as well as selected other Federal agencies, to determine security clearance status and the existence/physical location of criminal and personnel security investigative files. The DCII database is physically maintained by the Defense Security Service; however, the data it contains is the responsibility of the contributing agencies.

DOD 03, ¶ E1.1.3 (Exhibit 15).

information in the DCII: name, social security number, and date, state, and country of birth. See Ham Article, supra ¶ 62, at 3 (Exhibit 21).[12]

143.    The Army will retain its indexing of Plaintiff's personal information and notice of its titling (i.e., charging) of Plaintiff in the DCII for at least forty years. Ham Article, supra ¶ 62, at 4-5 (Exhibit 21).

144.    As far as Plaintiff has been able to determine, many thousands of individuals are able to log onto the DCII. Ham Article, supra ¶ 62, at 4 (Exhibit 21).[13]

145.    Major Ham provides a clear explanation of the how the DCII works:

> To search the DCII, a requester must enter personal identifying data of an individual or entity, for example, a social security number. The DCII indices identify, consolidate, and provide a list of all investigations conducted in the DOD on the individual or entity concerned. The DCII then refers the requester to the appropriate agency or agencies (the CRC for Army criminal investigations) from which the complete file(s) of the investigation(s) may be obtained. "The files are owned, maintained, and controlled by the contributing user organizations." The

---

12. "The information indexed in the DCII is 'personal identifying data of individuals or entities who appear as the subjects, victims, or incidentals in the investigative reports of DOD criminal, counterintelligence, fraud, and personnel security investigative activities.'" Ham Article, supra ¶ 62, at 3 (Exhibit 21). "The personal identifying data includes names; aliases; social security numbers; and the date, state, and country of birth of individuals." Id. at 3-4. The DCII does not disclose the results of an investigation or the action taken against the titled individual. Id at 4.

13. "As of 1994, . . . the DCII contained over twenty-nine million indices on approximately nineteen million individuals, and it was growing at a rate of about two million indices per year." Id. "As of March 2000, the DCII had approximately 24 million individuals indexed, with approximately 30 million investigative dossiers and security clearance eligibility tracings." Exhibit 103.

Access to information in the DCII is widespread. Ham Article, supra ¶ 62, at 5 (Exhibit 21). As of 1998, the DCII received an average of 35,000 requests per day. Id. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into the DCII. Id. at 5 n.34. Around 1998, a working group had been established to examine whether access should be extended to an even greater number of agencies. Id. Plaintiff has not been able to discover the conclusions of this working group. These agencies had over 1,300 terminals with which to access the DCII, and to input data into the DCII. Id. This, of course was twelve years ago and before computers were ubiquitous.

agency that contributes and maintains the investigative files determines the length of time during which a file is retrievable from the DCII files. For Army criminal investigations, the information is kept at the CRC and the DCII and is retrievable for forty years.

Ham Article, <u>supra</u> ¶ 62, at 4-5 (<u>Exhibit 21</u>) (citations omitted).

146. "The information retrieved [from the DCII] may be used to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations, and to assist criminal investigators in subsequent investigations." Ham Article, <u>supra</u> ¶ 62, at 5 (<u>Exhibit 21</u>).

147. The Army also indexed Plaintiff in the USACRC database, which contains a copy of (at least) MPR 00-MPC937-0607T-5C2B and the DA Form 4833 pertaining to Plaintiff. Ham Article, <u>supra</u> ¶ 62, at 9 (<u>Exhibit 21</u>); <u>see also</u> <u>Exhibit 11</u> (showing twelve separate viewings (and sometimes downloadings) of Plaintiff's "military criminal records," which are indexed in the USACRC database).

### b. THE ARMY INTENTIONALLY FORCES PEOPLE TO BELIEVE THAT IT CHARGED, CONVICTED, AND SENTENCED PLAINTIFF

148. Plaintiff incorporates paragraphs 1-147 by reference.

149. The Army charged (i.e., titled) Plaintiff, a U.S. civilian and citizen, in the military police report MPR 00-MPC937-0607T-5C2B, by placing his name in the subject block of this MPR. <u>Exhibit 1</u>, at 2, Section III – Subject, Box 1.b.

150. The Army labeled MPR 00-MPC937-0607T-5C2B a *criminal* report. <u>See</u> <u>Exhibit 1</u>, at 1, Section I – Administration, Box 1 (emphasis added).

151. The Army charged (i.e., titled) Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code) in this MPR. Exhibit1, at 1, Section II – Offense, Boxes 1.g and 1.h.

152. The Army charged Plaintiff with these same crimes in DA Form 4833. Exhibit 2, at 1, Box 11.a.

153. MPR 00-MPC937-0607T-5C2B and DA Form 4833 are stored at the Army's *Crime* Records Center (emphasis added).

154. The Army then retains its "military criminal records" on Plaintiff, and, upon request, disseminates them to, or allows them to be viewed, copied, or downloaded by, countless agencies and individuals, for at least forty years. Ham Article, supra ¶ 62, at 4-5 (Exhibit 21).

155. The Army's *Crime* Record Center disseminates MPR 00-MPC937-0607T-5C2B and DA Form 4833, and allows these records to be viewed, copied, and/or downloaded by countless agencies and individuals.

156. The Army, for example, has allowed MPR 00-MPC937-0607T-5C2B to be viewed and downloaded at least twelve separate times. Exhibit 11 (stating that MPR 00-MPC937-0607T-5C2B was viewed (and sometimes downloaded) on January 26, 2010, December 9, 2008, November 7, 2008, July 29, 2008, July 20, 2008, July 7, 2008, June 16, 2008, February 28, 2008, October 6, 2007, July 24, 2007, May 23, 2007, and January 8, 2007).

157. The Army, however, provides *no* disclaimer or notice on disseminated, viewed, or downloaded copies of MPR 00-MPC937-0607T-5C2B and DA Form 4833 to inform the recipient of these records of the Smokescreen Version (i.e., the "official" version) of what the DOD and the Army claim titling is, or what they claim it "officially" means: "Titling an individual or entity is an operational rather than a legal decision. The acts of titling and indexing

are administrative procedures and *shall not* connote *any* degree of guilt or innocence." DODI 03, ¶ 6.5 (emphasis added) (<u>Exhibit 15</u>).

158.    In sum, the Army not only charged Plaintiff, it is intentionally *forcing* people to believe that it "charged" Plaintiff with the Army crime 5C2B, which is based on the UCMJ, and with the German crime Körperverletzung, pursuant to section 223 of the Staatsgesetzbuch (German Criminal Code), because: (1) the Army placed Plaintiff's name in "military *criminal* records" (i.e., records the Army labeled as *criminal*); (2) the Army labeled Plaintiff as a "subject" in these "military *criminal* records" (i.e., the Army "titled" Plaintiff); (3) the Army, in these "military *criminal* records," continuously and intentionally associated Plaintiff's name with the Army crime 5C2B, and the German crime Körperverletzung; (4) the Army retains these "military *criminal* records' at, and disseminates them from, the *Crime* Records Center; and (5) the Army disseminates these "military *criminal* records" from the *Crime* Records Center without any disclaimer or notice concerning "titling" such that recipients of these records would understand: (a) these "military *criminal* records," according to the Smokescreen Version (i.e., the "official version") of what titling means, only indicate that the Army "titled" Plaintiff; and (b) according to the Smokescreen Version, "titling" is administrative, and "shall not" connote any guilt. DODI 03, ¶ 6.5 (<u>Exhibit 15</u>).

159.    For example, the ABCMR, a group of select, high-level Army experts, stated that Plaintiff's "military records" documented his "criminal activity." <u>Exhibit 10</u>, at 2. The ABCMR went on to claim that MPR 00-MPC937-0607T-5C2B indicates that Plaintiff "committed the criminal offense of bodily injury under German law." <u>Exhibit 10</u>, at 3.

### c. ARMY REGULATIONS CLEARLY SHOW THAT THE ARMY UNDERSTANDS, ACCEPTS, IMPLEMENTS, AND PROPAGATES THE REAL VERSION OF WHAT TITLING MEANS

160.    Plaintiff incorporates paragraphs 1-159 by reference.

161.    Army regulations require military investigators to coordinate with staff judge advocates (i.e., Army lawyers) to obtain a legal opinion as to whether there existed the requisite amount of evidence to "title" a person with a crime. AR 190-30 (June 1, 1978), Military Police Investigations, ("AR 190-30(1978)"),[14] ¶ 4-1 (stating, "Legal advice should be obtained from the supporting staff judge advocate's office whenever required" to determine the "legal sufficiency" of the titling) (Exhibit 27); see also AR 190-30 (November 1, 2005), Military Police Investigations ("AR 190-30(2005)"),[15] ¶ 4-13(c) (Exhibit 28) (stating that military police investigators shall coordinate with staff judge advocates "for the purpose of establishing a legal opinion as to whether sufficient credible evidence has been established to title an individual in a report"); MPR 00-MPC937-0607T-5C2B (Exhibit 1, at 9, Section VII - Narrative) (stating that the military police investigators of the Snowball Incident coordinated with staff judge advocate Captain Dennis, "who opined that there was sufficient evidence to title Conley").[16]

---

14. This version of AR 190-30 was, as far as Plaintiff has been able to determine, in force as of the Snowball Incident.

15. This is the version of AR 190-30 that is currently in force, as far as Plaintiff has been able to determine.

16. Captain Dennis and other Army lawyers who have allowed the Army to charge (i.e., title) U.S. civilians, such as Plaintiff, with crimes checked their ethics at the door when they joined the Army. These lawyers know the *Real* Version of titling. They also know the U.S. Constitution and the Supreme Courts decisions in the Reid v. Covert line of cases, foreclosing the exercise of military jurisdiction by the U.S. Military over U.S. civilians. Nevertheless, these Army lawyers are complicit in violating the constitutional rights of U.S. civilians, such as Plaintiff, by allowing the Army to charge U.S. civilians with crimes, find U.S. civilians guilty of crimes, and punish U.S. civilians for allegedly committing crimes, without affording U.S. civilians their rights under the U.S. Constitution.

162. The Army requirement of obtaining a "legal opinion" as to whether there is enough evidence to support a "titling" contradicts the Smokescreen Version regulation that states, "Titling is an operational rather than a *legal decision*." DODI 92, ¶ D.4 (emphasis added) (Exhibit 14); DODI 03, ¶ 6.5 (same) (Exhibit 15).

163. Furthermore, the Army acknowledges in its regulations the negative repercussions that a titling will have on an individual's future military and/or civilian career(s). Army regulations require commanders to:

> [n]otify all persons listed in the title block, who have no action taken against them, that their name will remain in the title block of the report and that the report will be indexed, and, therefore, retrievable by their name. Individuals will also be informed of the purposes for which the reports are used (e.g., other investigations, security clearances, other purposes as authorized by the Privacy Act AR 340–21) and the fact that *such use may have an impact upon their military or civilian careers*."

See AR 195-2(2009), ¶ 1-4(e)(2) (Exhibit 24) (emphasis added).[17]

164. By requiring commanders to notify individuals who have been titled (i.e., listed in the title/subject block of a criminal report) that the titling "may have an impact on their military or civilian careers," the Army clearly shows that it is aware of the negative connotation that being titled carries.

165. Moreover, the Army has stated, "Army experience is that being titled and indexed [in the DCII] does carry a very negative connotation." Ham Article, supra ¶ 62, at 10 n.90 (citing MG John C. Heldstab, Director of Operations, Readiness, and Mobilization) (Exhibit 21).

166. Therefore, the Army deemed Plaintiff, a U.S. citizen and civilian, part of the military[18] for the purpose of "titling" him and labeling him a criminal for essentially his entire

---

17. This version of AR 195-2 is currently in force. See also AR 195-2(1985), ¶ 1-4(f)(1)(b) (Exhibit 3) (stating the same). AR 195-2(1985) was in force as of the Snowball Incident.

life. The Army, however, did not deem Plaintiff a part of the military for purposes of receiving a conference with his "commander" to warn Plaintiff that the Army had "titled" him, and that this "titling" would have future, negative repercussions for the rest of his life.

### d. SUPREME COURT PRECEDENT

167. Plaintiff incorporates paragraphs 1-166 by reference.

168. Plaintiff, a U.S. civilian and citizen, has shown that the Army exercised military jurisdiction over him by charging him with crimes while simultaneously determining that Plaintiff "committed" these crimes.

169. The Supreme Court, however, has repeatedly held that the United States may not exercise military jurisdiction over U.S. civilians, such as Plaintiff. See Reid v. Covert, 354 U.S. 1, 20-21 (1957) (plurality opinion) and its subsequent line of cases: Grisham v. Hagan, 361 U.S. 278 (1960); Kinsella v. United States, 361 U.S. 234 (1960); and McElroy v. United States, 361 U.S. 281 (1960).

170. Reid v. Covert involved two cases, which the Supreme Court consolidated, where U.S. civilian women, who were married to members of the U.S. military (i.e., they were "civilian dependents"), allegedly murdered their service member husbands while they were living overseas on military installations. Reid, 354 U.S. at 5. One civilian wife, Mrs. Covert, allegedly murdered her service member husband on a U.S. Air Force base in England. Id. at 3. The U.S.

---

18. The Army investigator who took Plaintiff's statement, cited Article 136(b)(4) of the UCMJ as providing him authority to administer an oath to Plaintiff. Exhibit 30, at 3. This Article of the UCMJ is to be cited by investigators when administering oaths to members of the military. Plaintiff, however, was not a member of the U.S. Military. Plaintiff was a U.S. civilian and citizen. Therefore, the Army investigator, pursuant to Army regulations and the U.S. Code, only had authority under 5 U.S.C. § 303(b) to administer an oath to Plaintiff. AR 195-2(1985), ¶¶ 3-18 and 3-23 (Exhibit 3); AR 190-30(2005), ¶ 4-12 (Exhibit 28). The citation of the UCMJ, instead of the U.S. Code, is further evidence that the Army treated Plaintiff, a U.S. civilian and citizen, as a member of the U.S. Military.

Air Force charged Mrs. Covert for murder pursuant to the UCMJ. Id. The Air Force court-martialed Mrs. Covert, id., found her guilty, and sentenced her to life in prison. Id. at 4. The other civilian wife was Mrs. Smith, who allegedly murdered her service member husband on an Army base in Japan. Id. The Supreme Court held that the military's exercise of jurisdiction over Mrs. Covert and Mrs. Smith was unconstitutional. Id. at 5.

171.    The Supreme Court in Reid v. Covert stated:

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

Id. at 5-6.

> The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government.

Id. at 14.

> "[The Fifth Amendment] clearly distinguishes the military from the civil class as separate communities. It recognizes no third class which is part civil and part military . . . and it cannot be perceived how Congress can create such a class, without a disregard for the letter and spirit of the organic law."

Id. at 19 n.38 (citing "Colonel Winthrop, who has been called the 'Blackstone of Military Law,'"; Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 106).

> [The U.S. Constitution] expressly grants Congress power to make all rules necessary and proper to govern and regulate those persons who are serving in the "land and naval Forces," . . . the Necessary and Proper Clause cannot operate to extend military jurisdiction to any group of persons beyond the "land and naval Forces."

Id. at 20-21.

172.     The "land and naval Forces" only include members of the armed services. Id. at 19-20. Therefore, the Necessary and Proper Clause only grants the government military jurisdiction over members of the armed services. This grant of military jurisdiction "does not extend to civilians." Id. at 19.

173.     The Supreme Court in Reid v. Covert further stated:

> Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States. And to protect persons brought before these courts, *Article III and the Fifth, Sixth, and Eighth Amendments establish the right to trial by jury, to indictment by a grand jury and a number of other specific safeguards.*
>
> ***
>
> Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of . . . treasured constitutional protections. Having run up against the steadfast bulwark of the Bill of Rights, the Necessary and Proper Clause cannot extend the scope of Clause 14.

Id. at 21 (emphasis added).

174.     Furthermore, "a statute cannot be framed by which a civilian can lawfully be made amenable to military jurisdiction in time of peace." Id. at 35. "[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." Id. at 16. Furthermore, the Constitution has supremacy over a treaty. Id. at 18.

175.     The DOD and Army claim, in their Smokescreen Version (i.e., their "official" version) of what titling means, that the "titling" and "indexing" of civilians, and the retention and dissemination for at least forty years of the records in which these titlings are documented, is simply an administrative procedure required "to ensure that information in a report of investigation can be retrieved at some future time for law enforcement and security purposes." DODI 92, ¶ D.1 (Exhibit 14).

176.    The Supreme Court, however, specifically dismissed similar claims by the United States that its exercise of jurisdiction over civilians is only "slight" and that such jurisdiction is a "practical necessity."

It is urged that the expansion of military jurisdiction over civilians claimed here is only slight, and that the practical necessity for it is very great. The attitude appears to be that a slight encroachment on the Bill of Rights and other safeguards in the Constitution need cause little concern.

***

Slight encroachments create new boundaries from which legions of power can seek new territory to capture. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but *illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.* A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Moreover[,] we cannot consider this encroachment a slight one. *Throughout history[,] many transgressions by the military have been called "slight" and have been justified as "reasonable" in light of the "uniqueness" of the times.* We cannot close our eyes to the fact that today the peoples of many nations are ruled by the military.

Reid, 354 U.S. at 39-40 (citation omitted) (emphasis added).

177.    In Grisham v. Hagan, 361 U.S. 278 (1960), a civilian employee of the U.S. Army stationed overseas allegedly committed murder. Id. at 279. The Army court-martialed the civilian employee, Mr. Grisham, and found him guilty pursuant to the UCMJ. Id. The Supreme Court, adhering to its reasoning and holding in Reid v. Covert, held that civilian employees of the military, such as Mr. Grisham, have the same constitutional right to trial as civilian dependents. Id. at 280.

178.    In <u>Kinsella v. United States</u>, 361 U.S. 234 (1960), the United States argued that it had military jurisdiction to court-martial civilian dependents in non-capital cases. <u>Id</u>. at 239. The United States recognized <u>Reid v. Covert</u>, but insisted that the holding therein only applied to cases where the military attempted to court-martial a civilian for a capital offense. <u>Id</u>. The United States, in other words, was claiming that its jurisdiction over civilians depended solely on the nature of the crime, as opposed to the status of the individual (i.e., whether the individual was a member of the military or a civilian). The Supreme Court in <u>Kinsella</u>, however, stated:

> Without contradiction, the materials furnished show that *military jurisdiction has always been based on the "status" of the accused, rather than on the nature of the offense*. To say that military jurisdiction "defies definition in terms of military 'status'" is to defy unambiguous language of art. I, § 8, cl. 14, as well as the historical background thereof and the precedents with reference thereto.

<u>Id</u>. at 243 (emphasis added).

179.    The Supreme Court in <u>Kinsella</u> held that the military's jurisdiction did not extend to U.S. civilian dependents of military personnel who committed non-capital offenses. <u>Id</u>. at 248.

180.    In <u>McElroy v. United States</u>, 361 U.S. 281 (1960), the incident at issue involved a U.S. civilian employee of the military who allegedly committed a non-capital offense while stationed at an overseas Air Force base. <u>Id</u>. at 282. The Air Force court-martialed the civilian employee and found him guilty. <u>Id</u>. The Supreme Court held that the Air Force's exercise of military jurisdiction over the U.S. civilian employee for a non-capital offense was unconstitutional. <u>See id</u>. at 284.

## e. CONCLUSION

181.     Plaintiff incorporates paragraphs 1-180 by reference.

182.     The Army's charging (i.e., titling) of Plaintiff, a U.S. civilian and citizen, with crimes is a violation of Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution, which only allow the United States to make "laws necessary and proper" to "make rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cls. 14 and 18.

183.     Plaintiff, a U.S. civilian and citizen, was not part of the "land and naval Forces" during the Snowball Incident. Therefore, the U.S. Constitution and all the rights pursuant to the Constitution still applied to Plaintiff. Nevertheless, the United States, through the DOD and the Army, violated the U.S. Constitution, and Plaintiff's rights thereunder, by charging (i.e., titling) Plaintiff with crimes, and by labeling Plaintiff as a common criminal, for essentially his entire life.

184.     The *Real* Version of what titling means is very clear, as the ABCMR, the Army's elite experts on titling, succinctly and clearly pointed out: Titling is "[a] showing that a subject committed a criminal offense." Exhibit 10, at 7.

185.     Everyone who discovered that the Army "titled" Plaintiff with crimes understood that the Army actually "charged" Plaintiff with crimes (as everyone explicitly stated), and that the Army simultaneously made a final determination that Plaintiff was guilty of committing these crimes.

186.     The Army will continue to retain and disseminate MPR 00-MPC937-0607T-5C2B, DA Form 4833, and Plaintiff's information in the DCII for at least forty years. This will allow countless individuals and agencies to view, copy, download, and re-disseminate these military *criminal* records, for essentially the rest of Plaintiff's life.

187.    Each dissemination and view of MPR 00-MPC937-0607T-5C2B, DA Form 4833, and Plaintiff's information in the DCII, propagates the Army's unconstitutional exercise of military jurisdiction over Plaintiff, the Army's violations of Plaintiff's Fifth, Sixth, and Eighth Amendment rights, and the Army's labeling of Plaintiff as a criminal.

188.    In addition, MPR 00-MPC937-0607T-5C2B, DA Form 4833, and Plaintiff's information in the DCII self-replicate themselves by causing individuals and agencies who receive them to create new, unjust, unethical, unlawful, and unconstitutional records that are themselves then retained and disseminated (e.g., the State Department's investigative records and the ABCMR's decision in which it stated that Plaintiff "committed the criminal offense of bodily injury under German law").

189.    Finally, Plaintiff has been required to fill out, and will likely be required to do so in the future, job, test, and membership applications asking whether he was ever "charged" with a crime. Plaintiff should be able to confidently answer "No" to such a question. If Plaintiff would answer "No" to such a question, however, persons who later discover the "titling" of Plaintiff in MPR 00-MPC937-0607T-5C2B, DA Form 4833, the DCII, or another record created as a result of these records, will question Plaintiff's integrity and honesty. This is because they will think, as everyone else has, that Plaintiff is a common criminal whom the Army charged with crimes, found guilty of committing crimes, and then sentenced for committing crimes.

190.    Therefore, the Army's retention and dissemination of MPR 00-MPC937-0607T-5C2B, DA Form 4833, and Plaintiff's information in the DCII will, for essentially the rest of Plaintiff's life, malign his reputation, hinder his professional pursuits, cause him distress and embarrassment, and force him to continually try to explain that the Army "officially" claims that "titling *shall not* connote *any* guilt."

191. In sum, "titling" is a Trojan horse within which the DOD hides from view the *Real* Version of what titling means. The Army then commandeered this Trojan horse and wheeled it past the gates of the U.S. Constitution. Once past, the Army, with complete impunity, used "titling" and the *Real* Version of what titling means to secretly exercise military jurisdiction over Plaintiff, a U.S. civilian and citizen, by charging him with an Army crime and a German crime, making a final determination that Plaintiff committed these crimes, and labeling Plaintiff as a criminal for essentially the rest of his life, and probably longer. The Army continues to exercise military jurisdiction over Plaintiff, a U.S. civilian and citizen, and the Army continues to harm Plaintiff, by disseminating its unjust, unethical, unlawful, and unconstitutional "military criminal records" on Plaintiff for essentially the rest of Plaintiff's life. Whenever someone questions the Army about "titling," (in federal court, for example), the Army attempts to deny the existence of the *Real* Version of what titling means by trying to force it back into the Trojan horse, which it then wheels out, shrouded in the fog of the Smokescreen Version of what titling means.

192. In other words, titling is a regulatory smokescreen concocted by the United States, through the DOD, to allow military investigators to charge persons with crimes without being burdened by the U.S. Constitution. Army experts have clearly shown, and explicitly stated, on numerous occasions, that the *real* purpose of "titling" is to "charge" persons, such as Plaintiff, with crimes, and to label them as criminals who have committed crimes. Such an exercise of military jurisdiction over U.S. civilians, such as Plaintiff, however, is unconstitutional. The DOD and the Army understand this. In fact, they have understood this since June 10, 1957—the day the Supreme Court handed down its decision in <u>Reid v. Covert</u>, 354 U.S. 1 (1957) (plurality opinion).

193.    Therefore, after the Supreme Court told the United States, at least four times, that it could not charge, court-martial, and find U.S. civilians guilty of crimes, the United States, through the DOD, finally realized that it could no longer "officially" charge U.S. civilians and find them guilty using the long, drawn out, semi-public process of a military court-martial. The United States, through DOD and the Army, however, had "titling" in its unconstitutional arsenal. "Titling" allowed the Army to skip the attention-grabbing court-martial and, within a matter of minutes, secretly charge Plaintiff, a U.S. civilian and citizen, with an Army crime, based on the UCMJ, and a German crime, find him guilty of committing these crimes, and sentence him to a three-day suspension for "committing" these crimes.

194.    By concocting the term "titling," the DOD sought to cloak the primary purpose behind "titling"—"charging" persons with crimes, and finding them guilty of crimes. The DOD then replaced the constitutionally charged term "probable cause" with a constitutionally meaningless term—"credible information." Finally, to bring it all together, and to deflect attention away from what it was *really* doing, the DOD concocted its Smokescreen Version (i.e., its "official" version) of what titling means: "The act of titling . . . *shall not*, in and of itself, connote *any* degree of guilt or innocence." DODI 92, ¶ F.1 (Exhibit 14) (emphasis added); and, "Titling is an operational rather than a legal decision." Id. ¶ D.4. With the pieces of its regulatory smokescreen in place, the DOD allowed the U.S. Military to continue with the *status quo* of charging U.S. civilians, such as Plaintiff, with crimes, but with one, very important difference— the DOD and the Army believed they could now side-step the U.S. Constitution and Plaintiff's rights thereunder.

195.    "Titling," and the DOD's Smokescreen Version of what titling means, allowed the Army, in a matter of minutes, to charge Plaintiff, a U.S. civilian and citizen, with the Army

crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), find him guilty of these crimes, and sentence him, thereby labeling him a criminal for essentially the remainder of his life (if not longer). The Army did all of this within minutes, with a belief that it did not have to be burdened, in any way, by the limits imposed on it by the U.S. Constitution and Plaintiff's rights thereunder.

WHEREFORE, Plaintiff requests the Court to:

1.  declare, pursuant to 28 U.S.C. § 2201, that the United States, through the DOD and the Army, has violated Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution by unconstitutionally extending the Necessary and Proper Clause to Plaintiff, a U.S. civilian and citizen, who was not part of the "land and naval Forces," by charging (i.e., titling) Plaintiff with the Army crime 5C2B, based on the UCMJ, and with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), by finding Plaintiff guilty of having committed these crimes, and by sentencing Plaintiff for having "committed" these crimes.;

2.  enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, Plaintiff's information in the DCII, and any other military record pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have been amended or destroyed, as described below;

3.  hold unlawful, and set aside as "contrary to constitutional right [and] privilege," the Army's "titling" of Plaintiff with crimes, 5 U.S.C. § 706(2)(B);

4. compel the United States, through the Army, pursuant to either 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), to:

      a. destroy MPR 00-MPC937-0607T-5C2B (which only involves Plaintiff and other U.S. civilians);

      b. remove from all military records (including the minutes and decisions of LTC Yates, the DAPARB, and the ABCMR), and all disseminated records, any mention that the Army "titled," "accused," "cited," or "charged" Plaintiff with a crime, any mention that Plaintiff "committed" a crime, any mention that the Army made Plaintiff the "subject" of the Army's investigation into the Snowball Incident, and any mention that the Army "suspended" Plaintiff for being involved in the Snowball Incident;

      c. inform, in writing, all persons who viewed or received any record pertaining to Plaintiff and his involvement in the Snowball Incident, that the Army's "titling" of Plaintiff was unconstitutional and must be disregarded;

      d. destroy the DA Form 4833 pertaining to Plaintiff;

      e. remove Plaintiff's name and personal information from the DCII;

5. compel, pursuant to 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), each person (i.e., individual or agency) who viewed any of the Army's records pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies of such records, to destroy both those Army records, and any records these persons generated as a result of their receipt and viewing of those Army records;

6. compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

a.  amend or destroy Plaintiff's records within a definite time;

b.  notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed; and

c.  send Plaintiff, within twenty business days of amending, a copy of the amended record, or proof, in writing, that a record was destroyed.


## 2. COUNT II: THE ARMY FAILED TO INFORM PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS

196.    Plaintiff incorporates paragraphs 1-195 by reference.

197.    The Army was required to apprise Plaintiff of his constitutional rights before questioning him in regards to the Snowball Incident, labeling him a "subject" in its criminal report of the Snowball Incident, charging (i.e., titling) him with crimes, convicting him of these crimes, and sentencing him for these crimes.

198.    The Army was required to inform Plaintiff of his constitutional rights under the Fifth and Sixth Amendments of the U.S. Constitution. U.S. Const. amends. V and VI; see, e.g., Miranda v. Arizona, 384 U.S. 436 (1966) (outlining a person's rights under the Fifth Amendment and Sixth Amendment, which law enforcement officials are constitutionally required to apprise a person of, prior to any questioning).

199.    Even Army regulations required the Army to inform Plaintiff of his constitutional rights. The applicable Army regulation stated:

> Prior to any questioning, a suspect or accused person must be given a proper warning of his rights. The individual must first be informed of the official position of the person questioning him, the general nature of the offense(s), and the fact that he is a suspect. Then he must be given this warning: "BEFORE I ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS."

AR 190-30(1978), App. C. at ¶ C-1 (Exhibit 27) (emphasis in original). AR 190-30(1978) was in force as of the Snowball Incident.

200.    After Army investigators had told a suspect or accused person their rights (see id., generally, for a list of the rights Army investigators were to have read Plaintiff), Army investigators were to ask the suspect or accused person if they would like a lawyer. Id. ¶ C-2(a).

201.    "If the suspect/accused says 'Yes,' stop the questioning until he has a lawyer. If the suspect/accused says 'No,' ask him the following question." Id.

202.    "AT THIS TIME, ARE YOU WILLING TO DISCUSS THE OFFENSE(S) UNDER INVESTIGATION?" Id. ¶ C-2(b) (emphasis in original).

203.    "If the suspect/accused says 'Yes,' have him read and sign the waiver section of the waiver certificate on DA Form 3881." Id.

204.    "If the suspect/accused says 'No,' stop the interview and have him sign the non-waiver section of the waiver certificate on DA Form 3881 (Rights Warning Procedure/Waiver Certificate)." AR 190-30(1978), App. C. at ¶ C-2(b) (Exhibit 27).

205.    If the suspect/accused refuses to sign a waiver, "[n]otations will be made on the waiver certificate to the effect that the accused or suspect has stated that he understands his rights, does not want a lawyer, wants to discuss the offenses under investigation, and refused to sign the waiver certificate." Id. ¶ C-3(b).

206.    "In *all* cases, the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate *before* questioning begins." Id. ¶ C-3(c) (emphasis added).

207.    DA Form 3881 (the Rights Waiver Certificate) "must accompany a DA Form 2823 (i.e., a Sworn Statement) when the individual is a subject or suspect in a military police

report." AR 190-45(1988), ¶ 5-12(b)(2) (Exhibit 26). "A copy of DA Form 3881 must

accompany each copy of the DA Form 2823, if a written statement has been rendered." Id. ¶ 5-

12(c)(1).

208.    If Plaintiff's Rights Waiver (DA Form 3881) existed, it must—to this day—be

attached to his sworn statement (DA Form 2823). Current Army regulations state:

### 7–11. DA Form 3881 (Rights Warning Procedure/Waiver Certificate)

a. General. DA Form 3881 is used to provide a standardized, legally sufficient, narrative rights warning for suspects or subjects.

b. Special instructions. This form must accompany a DA Form 2823 when the individual is a subject or suspect in a MPR.

c. Distribution. The DA Form 3881 must accompany each copy of the DA Form 2823. If a subject declines to be questioned, resulting in no DA Form 2823 being prepared, a copy of the DA Form 3881 will accompany each copy of the DA Form 3975.

AR 190-45(2007), ¶ 7-11(b) and (c) (Exhibit 17). AR 190-45(2007) is currently in force.

209.    Plaintiff does not recall the Army informing him of his rights.

210.    The Army, however, *did* list Plaintiff as a "subject" in an MPR. Exhibit 1, at 2,

Section III – Subject, Box 1.b.

211.    The Army *did* "charge" Plaintiff with a crime. See, e.g., Exhibit 4 (showing that

the Army stated it "charged" Plaintiff with assault).

212.    The Army *did* find Plaintiff guilty of committing crimes, and allegedly sentenced

him to a three-day suspension for committing crimes. Exhibit 2.

213.    Finally, the Army *did* have Plaintiff fill out a DA Form 2823 (a sworn statement).

Exhibit 30.

214.    Therefore, per Army regulations, if a DA Form 3881 for Plaintiff existed, it *mus*t

be attached to Plaintiff's Sworn Statement, DA Form 2823.

215.     There is, however, no DA Form 3881 (Rights Waiver Certificate) in Plaintiff's records.

216.     Plaintiff made a Privacy Act request for any rights waiver certificate (DA Form 3881) in his records created by or for him in relation to the Snowball Incident. Exhibit 31.

217.     Mr. Philip J. McGuire, Director, USACRC, answered Plaintiff's request by stating, "A review of Military Police Report 00-MPC937-0607T-5C did not contain a Rights Waiver Form." Exhibit 32, at 2.

218.     In order to be certain that there was no Rights Waiver Certificate, Plaintiff made a second Privacy Act request for DA Form 3881, the Rights Waiver Certificate, which, according to Army regulations and the MPR itself, the Army must have attached to the MPR. Exhibit 33. Plaintiff asked USACRC to search his entire record for the alleged Rights Waiver Certificate. Id.

219.     Mr. McGuire, however, again stated, "A search of Military Police Report 00-MPC937-0607T-5C revealed no Rights Waiver form pertaining to you." Exhibit 34.

220.     Therefore, the Army failed to apprise Plaintiff of his constitutional rights before questioning him regarding the Snowball Incident, before making him a "subject" of their criminal investigation into the Snowball Incident, before  charging (i.e., titling) him with crimes, before convicting him (i.e., finding him guilty) of having committed crimes, and before sentencing him to a three-day suspension for having "committed" crimes. This failure by the Army constituted a violation of Plaintiff's Fifth and Sixth Amendment Rights, in addition to a violation of the Army's own regulations. U.S. Const. amends. V and VI; AR 190-30(1978), App. C (Exhibit 27).

WHEREFORE, Plaintiff requests the Court to:

1. declare, pursuant to 28 U.S.C. § 2201, that:

a. the Army violated Plaintiff's Fifth and Sixth Amendment rights by failing to apprise Plaintiff of his constitutional rights thereunder;

b. the Army's "titling" (i.e., charging) of Plaintiff with crimes was unconstitutional because the Army failed to apprise Plaintiff of his constitutional rights before it made him the "subject" of a military criminal investigation, charged (i.e., titled) him with crimes, convicted (i.e., found him guilty) of these crimes, and sentenced him for "committing" these crimes;

2. enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, Plaintiff's information in the DCII, and any other military record pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have been amended or destroyed, as described below;

3. hold unlawful, and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, [and] privilege," "in excess of statutory jurisdiction," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A) – (D), the Army's charging (i.e., titling) of Plaintiff, because the Army failed to apprise Plaintiff of his constitutional rights;

4. compel the United States, through the Army, pursuant to either 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), to:

a. remove Plaintiff's name from MPR 00-MPC937-0607T-5C2B;

    b.  remove from all military records (including the minutes and decisions of LTC Yates, the DAPARB, and the ABCMR), and all disseminated records, any mention that the Army "titled," "accused," "cited," or "charged" Plaintiff with a crime, any mention that Plaintiff "committed" a crime, any mention that the Army made Plaintiff the "subject" of the Army's investigation into the Snowball Incident, and any mention that the Army "suspended" Plaintiff for being involved in the Snowball Incident;

    c.  inform, in writing, all persons who viewed or received any military record pertaining to Plaintiff and his involvement in the Snowball Incident, that the Army's charging (i.e., titling) of Plaintiff was unconstitutional;

    d.  destroy the DA Form 4833 pertaining to Plaintiff;

    e.  remove Plaintiff's name and personal information from the DCII;

  5.  compel, pursuant to 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), each person (i.e., individual or agency) who viewed any of the Army's records pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies of such records, to destroy those Army records or send them, and all copies, back to the Army to be amended, as described above, and amend, as described above, any records these persons generated as a result of their receipt and viewing of those Army records;

  6.  compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

    a.  amend or destroy Plaintiff's records within a definite time;

    b.  notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed; and

c. send Plaintiff, within twenty business days of amending, a copy of the amended record, or proof, in writing, that a record was destroyed.

### 3. COUNT III: THE UNITED STATES, THROUGH THE ARMY, VIOLATED PLAINTIFF'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS BY CHARGING (i.e., TITLING) HIM WITH CRIMES

221.     Plaintiff incorporates paragraphs 1 -220 by reference.

222.     In Count I of this Complaint, Plaintiff showed that everyone who has viewed MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII has applied the *Real* Version of what titling means by concluding that: (1) the Army charged Plaintiff with crimes; (2) the Army convicted Plaintiff by making a final determination that Plaintiff committed these crimes; and (3) the Army sentenced Plaintiff to a three-day suspension for committing these crimes. This unconstitutional exercise of military jurisdiction resulted in the United States violating Plaintiff's Fifth, Sixth, and Eighth Amendment rights.

223.     The Army violated Plaintiff's Fifth Amendment right to procedural due process by charging Plaintiff with crimes, absent a finding of probable cause. U.S. Const. amend. V.

224.     In addition, the Army, without due process and, therefore, in violation of Plaintiff's rights under the Fifth Amendment, has deprived, and continues to deprive, Plaintiff of his rights to liberty and property. U.S. Const. amend. V.

225.     Furthermore, the Army violated Plaintiff's Sixth Amendment rights by: (1) failing to notify Plaintiff that it had charged (i.e., titled) Plaintiff with the Army crime 5C2B and the German crime Körperverletzung, pursuant to section 223 of the Staatsgesetzbuch (German Criminal Code); and (2) failing to provide Plaintiff a trial by jury, in front of neutral civilians, to disprove the charges.

226.     Moreover, the DOD and the Army's amendment process violates Plaintiff's Fifth and Sixth Amendment rights, and it violates 32 C.F.R. § 505.6.

227.     Finally, the Army violated, and continues to violate, Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by labeling Plaintiff as a criminal, thereby maligning his reputation and hindering his professional pursuits, for essentially the rest of his life.

### a. FIFTH AMENDMENT VIOLATIONS

#### i.  CHARGING OF PLAINTIFF WITH CRIMES WITHOUT A FINDING OF PROBABLE CAUSE

228.     Plaintiff incorporates paragraphs 1-227 by reference.

229.     The United States, through the Army, violated Plaintiff's Fifth Amendment right to procedural due process by charging Plaintiff, a U.S. civilian and citizen, with crimes, and by labeling him as a criminal who committed crimes, without a finding of probable cause.

230.     Furthermore, the Army, by creating and disseminating MPR 00-MPC937-0607T-5C2B and DA Form 4833, and by indexing Plaintiff in the DCII, violated, and continues to violate, Plaintiff's Fifth Amendment right to procedural due process. If "experts," such as the select, high-level Army employees on the ABCMR, Army lawyers, and the highly trained investigators at the State Department's Bureau of Diplomatic Security state that Plaintiff is a criminal whom the Army charged with crimes, and whom the Army found guilty of having committed crimes, then everyone viewing MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII will believe and state the same.

231.     To charge Plaintiff, a U.S. civilian and citizen, with a crime, the Constitution requires a finding of probable cause. The Supreme Court has stated:

> The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating these often opposing interests [of seeking "to safeguard citizens . . . *from unfounded charges of crime*" and of giving "fair leeway [to law enforcement officials] for enforcing the law in the community's protection"]. Requiring more would unduly hamper law enforcement. *To allow less [e.g., credible information] would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.*

Brinegar v. United States, 338 U.S. 160, 176 (1949) (emphasis and brackets added). The DOD, by concocting titling, with its amorphous standard of "credible information" and the Smokescreen Version of what titling means, has left "[U.S.] citizens at the mercy of [military investigators'] whim or caprice." Id.

232.    DOD instructions required military investigators to find "credible information" that Plaintiff may have committed a criminal offense before charging (i.e., titling) Plaintiff with a crime. DODI 92, ¶ D.3 (Exhibit 14).

233.    "'Credible information' is an evidentiary determination peculiar to the titling area." Ham Article, supra ¶ 62, at 13 (Exhibit 21). Therefore, unlike probable cause, very few people, if any, know what credible information means. See id.

234.    Before 1992, the DOD's evidentiary standard for titling an individual was "probable cause," not "credible information." Ham Article, supra ¶ 62, at 6 (Exhibit 21). Before 1992, the U.S. Military usually did not allow a person to remain titled if probable cause was lacking. Id.

235.    In 1992, the DOD Inspector General lowered the titling standard from probable cause to the very low, and little-known, standard of "credible information." Id. at 7; Exhibit 14 (DODI 92).

236.    The DOD did this despite repeated warnings against the use of the "credible information" standard from the Army's Judge Advocate General of the time, the Housed Armed

Services Committee, and a congressional Advisory Board on the Investigative Capability of the Department of Defense.[19]

237.    For example, the Army's Judge Advocate General at the time stated, "[Credible information] is grossly unfair. With such a widely accessible and multi-purpose system [i.e., criminal records system and the DCII], a probable cause standard with legal review is necessary to ensure fairness." Ham Article, supra ¶ 62, at 11 (Exhibit 21).

238.    The DOD, however, ignored these numerous warnings from the Army and Congress. The DOD proceeded to swap "credible information" for "probable cause"[20] and then concocted its Smokescreen Version of what titling means, in which it claims that titling is a harmless administrative procedure that is an "operational decision rather than a legal decision," and which "*shall not* connote *any* degree of guilt." DODI 92, ¶¶ D.4 and F.1 (Exhibit 14) (emphasis added).

239.    By doing away with the constitutionally charged term of "probable cause," and by claiming that titling is void of any guilt, the DOD felt it could have the U.S. Military continue with the *status quo* of charging U.S. civilians, such as Plaintiff, with crimes, but with one, very

---

19. See Ham Article, supra ¶ 62, at 6-14 (explaining, in detail, the 1992 change made by the DOD Inspector General whereby probable cause was replaced with credible information in titling; detailing also the many criticisms against the use of the credible information standard).

20. The Army, after eighteen years, still has residual effects of the probable cause era of titling. Current Army regulations still claim that a person shall be labeled a "subject" (i.e., titled) after a determination of *probable cause*. AR 190-45(2007), Section II – Terms, "Subject," p. 139 (Exhibit 17); AR 195-2(2009), Section II – Terms, "Subject," p. 41 (Exhibit 24). These regulations are, of course, in direct contradiction to DOD instructions, which have required "credible information" since 1992. In fact, the Army has amended AR 190-45 *three times* since 1992: October of 2000, June of 2005, and, most recently, in March of 2007. The Army has amended AR 195-2 at least once—in May of 2009. Federal district court judges have even noted the discrepancies and confusion among Army regulations and DOD Instructions. See Holz v. Westphal, 217 F. Supp. 2d 50, 53 n.1 (D.C. Cir. 2002) (noting the contradiction between DOD instructions and Army regulations pertaining to titling); Escobedo v. Secretary of the Army, 602 F. Supp. 2d. 244, 250 (D.D.C. 2009) (noting the same discrepancies).

important difference—the U.S. Military was no longer burdened by the U.S. Constitution and U.S. civilians' rights thereunder.

240.     Furthermore, there was no evidence, much less probable cause, to suggest that Plaintiff committed any crime during the Snowball Incident. In fact the evidence "at the time of titling" clearly showed that Plaintiff was the victim whom approximately five, belligerent individuals repeatedly attacked.

241.     Staff Sergeant Randy Clark ("SSG Clark") was the lead investigator of the Snowball Incident. After SSG Clark completed his criminal investigation regarding the Snowball Incident, he filed a sworn statement regarding the Snowball Incident. Exhibit 29. SSG Clark filed this sworn statement after taking the statements, and conducting the questioning, of all individuals involved in the Snowball Incident (except the statements and questioning of Mr. Shane Stewart, the civilian security guard who was one of the two independent witnesses to the Snowball Incident), and after having considered all facts and statements pertaining to the Snowball Incident. In his sworn statement, SSG Clark summarized and explained what had happened in the Snowball Incident from an objective, official point of view of someone who had more knowledge of the Snowball Incident than anyone else.

242.     The following are excerpts from SSG Clark's Sworn Statement, Exhibit 29, regarding the Snowball Incident, unless otherwise indicated: (1) ". . . Conley was departing an AFRC party in the conference room at the Abram's complex in Garmisch, GE."; (2) ". . . the Chiemsee employees [approximately five] . . . , hit Conley with a snowball while he was leaving."; (3) "From talking to all individuals involved, I believe the Chiemsee employees were throwing snowballs at Conley, even after he asked them to stop."; (4) "Conley turned and told them to stop throwing snowballs at him . . . ."; (5) "Conley then turned to leave again and was

once again hit by another snowball."; (6) "[Approximately five Chiemsee employees] started surrounding [Conley]."; (7) Jonathon Larson stated that he then hit Conley in the chest with a snowball from two feet away. Exhibit 35, at 2 (Larson's Sworn Statement).; (8) "Conley then pushed off on Edwards as Edwards, Larson, Perry, and Eoff started surrounding him.";  (9) Edwards then "struck Conley once in the mouth and once in the head at the same time Conley struck Larson . . . ."; (10) "Larson was also seen by Edwards striking Conley an unknown number of times."; (11) "[Mr. Shane Stewart, the AFRC civilian security guard at the Abram's Complex,] claimed that the appearance of the situation was that if he didn't intervene, all four Chiemsee employees would have jumped Conley."; (12) "AFRC Security [Mr. Stewart] took Conley inside . . . .; (13) Mr. Stewart spoke to Conley, and then told Conley to go home. Exhibit 36 (Mr. Stewart's Sworn Statement); (14) "When Conley again attempted to leave to return home, an unknown person struck him on the left side of the head."; (15) Edwards, one of the attackers, stated that someone, probably Eoff or Larson, hit Conley as he left the building to attempt to return home a second time and then he [Edwards] then proceeded to "hit Conley twice." Exhibit 37, at 1. (Edwards' statement); and (16) "I [SSG Clark] also believe . . . that Eoff was the one who struck Conley when he was trying to leave the second time [sic; third time]."

243.    The following are direct quotes from the sworn statement of Jorge Barrofet, one of two independent witnesses to the Snowball Incident. (The other independent witness was Mr. Shane Stewart, civilian security guard at the Abram's Complex). SSG Clark posed the questions.

Q.  Who was actually throwing the snowballs?
A.  The Chiemsee group. They [sic] were approximately 5 of them throwing snowballs at random people, one of them was Neil [Conley]  that was hit. Three of them were making fun of him (Neil).

Q.  Did you see Neil get hit by a snowball or did he tell you he was hit?
A.  I saw him get hit by two, but I didn't see who they came from.

> Q.  Did Neil go to the snowball throwing individuals and confront them?
> A.  No, he stopped where he was hit and the other guys walked up to him.
>
> Q.  Who struck who first?
> A.  The other individual struck Neil first . . . ."

Exhibit 38, at 2.

244.    The ABCMR made a point of summarizing Jorge Barrofet's statement—Mr.

Barrofet being one of the two independent witnesses to the Snowball Incident. The following is

the ABCMR's summarization of Jorge Barrofet's statement:

> A DA Form 2823, dated 19 January 2000, written by a witness to the
> Snowball Incident stated that he saw people throwing snowballs randomly
> at people who were leaving a party. The applicant [Plaintiff] was one of
> the persons leaving the party. After the applicant was hit by two
> snowballs, he asked them why they were throwing the snowballs. The
> individuals walked up to the applicant and during the argument, two
> individuals were sarcastically mocking the applicant by saying, "we're just
> having fun, we don't want to fight you." One of the three approached the
> applicant saying, "shut up bitch, let's see what you got." After this, he
> punched the applicant, who in turn responded with a punch of his own. A
> couple of minutes later, while security was arriving, another individual
> kept instigating the fight with insults and by throwing snowballs. The
> investigator administering the oath to the witness referred to Article 136
> (b)(4) of the Uniform Code of Military Justice (UCMJ).

Exhibit 10, at 3-4. Despite this summarization, which is clearly an admission by the ABCMR

that Plaintiff was the victim whom numerous individuals repeatedly attacked, the ABCMR still

upheld the "titling" of Plaintiff. Exhibit 10, at first page.[21]

245.    The definition for "credible information" requires investigators to consider the

"totality of the circumstances" before titling a person with a crime. DODI 92, Enclosure:

Definitions, "Credible Information" (Exhibit 14). The Army clearly did not "consider the totality

of the circumstances" before it decided to charge (i.e., title) Plaintiff with the Army crime 5C2B,

---

21. The "first page" of Exhibit 10 is the ABCMR's cover letter informing Plaintiff that it had
denied his application. When Plaintiff cites pages 1-8 of Exhibit 10, he is citing the actual
page(s) of the ABCMR decision itself, as they are marked.

based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code).

246. It is clear from the record that the Army's decision (made by CPT Dennis) to charge (i.e., title) Plaintiff with crimes was unjust, unethical, unlawful, and unconstitutional. The Army charged (i.e., titled) Plaintiff with an Army crime and a German crime based solely on the fact that Plaintiff, who was clearly the victim in the Snowball Incident, defended himself after being repeatedly attacked by approximately five belligerent individuals.

247. The Army, therefore, violated Plaintiff's Fifth Amendment right to procedural due process by charging Plaintiff, a U.S. civilian and citizen, with crimes, by labeling him as a criminal who it determined had committed crimes, and by sentencing Plaintiff for having "committed crimes, without any evidence to suggest that Plaintiff committed a crime, much less probable cause to believe that Plaintiff may have committed a crime.

## ii. DEPRIVATION OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS

248. Plaintiff incorporates paragraphs 1-247 by reference.

249. The United States, through the Army, in violation of Plaintiff's rights under the Fifth Amendment, has deprived, and continues to deprive, Plaintiff of his rights to liberty and property without due process. U.S. Const. amend. V.

250. The Army labeled Plaintiff a criminal and charged (i.e., titled) him with crimes without any evidence that Plaintiff committed a crime, much less probable cause. Nevertheless, the Army determined that Plaintiff "committed" crimes, and claimed that it sentenced him to a three-day suspension for "committing" these crimes. See Exhibit 2 (DA Form 4833, which states Plaintiff received a three-day suspension for committing an Army crime and a German crime);

Exhibit 4 (stating that the Army was going to suspend Plaintiff because the Garmisch military

police had "charged" Plaintiff with assault); Exhibit 10, at 3 (showing that the ABCMR, a group

of select, high-level Army experts, claimed that Plaintiff "committed the criminal offense of

bodily injury under German law").

251.    The Army documented its unconstitutional actions in military *criminal* records:

MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII (and perhaps other records that

Plaintiff has yet to discover).

252.    When the Army disseminates these records to, or allows them to be viewed,

copied, or downloaded by, Plaintiff's potential employers, or individuals and agencies making

employment, personnel, or admission decisions, the Army is injuring Plaintiff's reputation such

that it is hindering and depriving him of employment opportunities, promotions, admissions into

organizations, etc., because everyone believes, and everyone will believe, that Plaintiff is a

criminal.[22] This has hindered, and will continue to hinder, Plaintiff's professional and personal

pursuits, thereby depriving him of liberty and property without due process.

253.    The United States, through the Army, is depriving Plaintiff of liberty without due

process because it is limiting, hindering, and foreclosing the number of possible jobs that

Plaintiff will be able to obtain and, therefore, where he will be able to live. This is because

everyone who views the Army's military criminal records on Plaintiff believes that Plaintiff is a

criminal who the Army charged with, convicted of, and sentenced for "committing," two crimes.

See Count I, ¶¶ 111-147, supra (showing that everyone (e.g., the State Department), who has

---

22. "The information retrieved [from the DCII] may be used to determine promotions, to make
employment decisions, to assist in assignment decisions, to make security determinations, and to
assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit
21).

viewed the Army's military *criminal* records on Plaintiff, believes that Plaintiff is a criminal who the Army charged with, convicted of, and sentenced for "committing," two crimes).

254.    The United States, through the Army, is also depriving Plaintiff of property (i.e., income) without due process because it is limiting, hindering, and foreclosing the number of possible jobs that Plaintiff will be able to obtain. This is because everyone who views the Army's military criminal records on Plaintiff believes that Plaintiff is a criminal who the Army charged with, convicted of, and sentenced for "committing," two crimes. See Count I, ¶¶ 111-147, supra (showing that everyone (e.g., the State Department), who has viewed the Army's military criminal records on Plaintiff, believes that Plaintiff is a criminal who the Army charged with, convicted of, and sentenced for "committing," two crimes).

### b. SIXTH AMENDMENT VIOLATIONS

255.    Plaintiff incorporates paragraphs 1-254 by reference.

256.    The United States, through the Army, by creating and disseminating MPR 00-MPC937-0607T-5C2B and DA Form 4833, and by indexing Plaintiff in the DCII, violated, and continues to violate, Plaintiff's Sixth Amendment rights.

257.    The Army violated Plaintiff's Sixth Amendment rights by: (1) failing to notify Plaintiff that it had charged (i.e., titled) Plaintiff with the Army crime 5C2B and the German crime of Körperverletzung, pursuant to section 223 of the Staatsgesetzbuch (German Criminal Code); and (2) failing to provide Plaintiff a trial, in front of a neutral civilian decision maker and jury, to disprove the charges.

258.    The Sixth Amendment required the Army to notify Plaintiff that it had accused and charged (i.e., titled) Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime of Körperverletzung, pursuant to section 223 of the Staatsgesetzbuch (German

Criminal Code). The Army never informed Plaintiff that it had charged (i.e., titled) him with these crimes. The Army's failure to do so constituted a violation of Plaintiff's Sixth Amendment right to be notified of the accusations against him. The constitutional right to be informed of the nature and cause of the accusation against oneself required the Army to apprise Plaintiff of the crimes with which the Army charged him, with such reasonable certainty that Plaintiff could have made his defense and protected himself after judgment. See Bartell v. United States, 227 U.S. 427, 431 (1913); Burton v. United States, 202 U.S. 344, 372-73 (1906); United States v. Simmons, 96 U.S. 360, 362 (1878).

259.    In fact, Army regulations required the Army to: (1) notify Plaintiff that it had titled him; (2) that the titlings would have negative repercussions on Plaintiff's future career; and (3) that Plaintiff could attempt to challenge the "titlings" by way of the Army's so-called amendment process. AR 195-2(1985), ¶ 1-4(f)(1)(b) (Exhibit 3).

260.    Furthermore, the Army violated Plaintiff's Sixth Amendment right to a fair trial in front of a neutral, civilian jury and decision maker. The Army charged Plaintiff with crimes, determined that Plaintiff was guilty of these crimes, and sentenced Plaintiff to an alleged three-day suspension for committing these crimes. The Army, however, never provided Plaintiff a fair trial, in front of a neutral civilian judge and jury, before which Plaintiff could attempt to disprove the Army's charges and determinations of guilt.

261.    In fact, the Army violated its own regulations by finding Plaintiff guilty of crimes and sentencing him to a three-day suspension for "committing" these crimes.

262.    DOD instructions stated, "Judicial or adverse administrative actions shall not be taken SOLELY on the basis of the fact that a person has been titled in an investigation [i.e.,

placed in the subject block of Form 3975(an MPR)]." DODI 92, ¶ F.2 (emphasis in original) (Exhibit 14).

263.    This is part of the DOD's titling smokescreen. The DOD claims that titling "*shall not* connote *any* degree of guilt," and that it is not a "legal decision." DODI 92, ¶¶ F.1  and D.4 (Exhibit 14) (emphasis added). Therefore, the DOD states that the Army shall not take "adverse administrative actions" against a person "SOLELY" because the Army "titled" that person. The DOD made this smokescreen provision because, technically, an adverse action cannot possibly be taken solely against a person based on a "titling" action—a *harmless* "administrative action" that is void of any guilt.

264.    The Army, however, understood that the DOD's regulations pertaining to titling were simply a smokescreen and, therefore, sentenced Plaintiff to a three-day suspension anyway—based SOLELY on the fact that the Army titled (i.e., charged) Plaintiff.

265.    The Army sentenced Plaintiff SOLELY on the basis of the Army's titling (i.e., charging) of Plaintiff with crimes, as shown in the Notice of Proposed Suspension, which stated the following:

> The following specific information is furnished in support of [your proposed suspension]: On 18 Jan 00 [sic; 19 Jan 00], you were involved in a fight outside the Abram's Complex, Garmisch Recreation Area, which resulted in your *being charged with assault* by the Garmisch Military Police. Fighting on AFRC property simply will not be tolerated.

Exhibit 4 (emphasis added). One of the Army's minions of unethical lawyers, at the least, approved this Notice of Proposed Suspension. One of the Army's minions of unethical lawyers, however, likely drafted this Notice of Proposed Suspension, which claims that the Army was going to sentence Plaintiff to a three-day suspension because the Army had simultaneously *charged* Plaintiff, a U.S. civilian and citizen, with, and convicted him of, assault. See AR 215-

3(2003), ¶ 7-8(a) (stating, "Notices of proposed suspension ordinarily will be prepared and signed by the first level supervisor . . . upon . . . coordination with the servicing legal office . . . ) (Exhibit 39).

266.   The Army clearly violated DOD instructions, which stated that the Army shall not take adverse administrative action based "SOLELY" on a titling. DODI 92, ¶ F.2 (Exhibit 14) (emphasis in original).

### c. THE DOD AND THE ARMY'S AMENDMENT PROCESS: A VIOLATION OF PLAINTIFF'S FIFTH AND SIXTH AMENDMENT RIGHTS, AND A VIOLATION OF FEDERAL REGULATIONS

267.   Plaintiff incorporates paragraphs 1-266 by reference.

268.   By charging (i.e., titling) Plaintiff, a U.S. civilian and citizen, with crimes, the Army subjected Plaintiff to its amendment process.[23] The Army's amendment process violates Plaintiff's Fifth and Sixth Amendment rights. The Army's amendment process is also in direct violation of 32 C.F.R. § 505.6, which governs the amendment of Army records.

269.   The Army's amendment process violated Plaintiff's Fifth Amendment right to procedural due process by allowing the Army to retain and disseminate its charging (i.e., titling) of Plaintiff with crimes, where the Army did not base its charges on a finding of probable cause.

270.   Furthermore, the Army's amendment process violates Plaintiff's Fifth Amendment right to procedural due process by allowing the Army to retain its unconstitutional

---

23. Plaintiff shall primarily cite the amendment procedures in the current DOD instruction governing titling: DODI 03 (Exhibit 15). DOD instructions ultimately govern titling procedures and supersede any conflicting Army regulations. Escobedo v. Green, 602 F. Supp. 2d 244, 250 (D.D.C. 2009) (citation omitted).

charging (i.e., titling) of Plaintiff, even if Plaintiff later shows that he is innocent of the charges (i.e., titlings).

271.   In addition, the Army's amendment process violates Plaintiff's Fifth Amendment right to liberty and property. By allowing the Army to retain and disseminate its criminal records on Plaintiff, which state that the Army charged (i.e., titled) Plaintiff with crimes, found him guilty of committing these crimes, and sentenced him for committing these crimes, the Army's amendment process allows the Army to continue to injure Plaintiff's personal and professional reputation by hindering or blocking employment opportunities, promotions, admissions to organizations and associations, etc. In other words, the Army's amendment process allows the Army to deprive Plaintiff of liberty and property without due process for at least forty years— essentially the remainder of Plaintiff's life.

272.   Furthermore, the Army's amendment process is in violation of Plaintiff's Sixth Amendment right to a jury trial. Plaintiff has the right, under the Sixth Amendment, to disprove the charges brought against him by the Army in front of neutral members of the citizenry, or, at the least, in front of a neutral, civilian decision maker. The Army's amendment process, however, is a biased, unjust, unethical, unlawful, and unconstitutional process that does not afford Plaintiff his Sixth Amendment right to a jury trial.

273.   Once a subject is titled, the criminal report in which the person is titled will remain retrievable for at least forty years, and the person's name will be "indexed" in the DCII for at least forty years. Ham Article, supra ¶ 62, at 4-5 (Exhibit 21).

274.   The DOD only allows a person to have their name removed from an MPR and the DCII in two circumstances: mistaken identity or lack of credible information. DODI 03, ¶¶ 6.6.1 and 6.6.2 (Exhibit 15).

275.     "'Mistaken identity' does not mean that someone other than the subject is found to have committed the offense. Rather, it means that someone with the same name as the listed subject should have been entered as the subject instead." Ham Article, supra ¶ 62, at 5 (Exhibit 21).

276.     DODI 03 allows the Army to "de-title" or "de-index" a person if that person can show that there was no credible information *at the time of titling*:

> Identifying information about the subject of a criminal investigation shall be removed from the title block of a report of investigation and the DCII if it is later determined a mistake was made *at the time the titling and/or indexing* occurred in that credible information indicating that the subject committed a *crime* did not exist.

DODI 03, ¶ 6.6.2 (Exhibit 15)[24] (emphasis added). In other words, evidence brought forward *after* the charging (i.e., titling), which proves the charged (i.e., titled) person is innocent, is irrelevant.

277.     The ABCMR, a board of select, high-level Army experts, summarized the Army's "amendment process" by stating, "Once titled, the person remains titled even if it is later determined the person did not commit the offense under investigation." Exhibit 10, at 7.

278.     Furthermore, an Army provision states that a person's name will not be removed from the subject block of a criminal report (i.e., de-titled), or removed from the DCII (i.e., de-indexed) even if "a subsequent investigation determin[es] that the MPR is unfounded." AR 190-45(2007), ¶ 4-3(c) (Exhibit 17).

---

24. AR 190-45(2007), however, in violation of DODI 03, applies a different standard for removing a person's name from a MPR. To remove one's name from an MPR, AR 190-45(2007) states that one may provide evidence of one's innocence at *any time*. "[A] request to remove an individual's name as the subject of a MPR would be proper providing credible evidence was presented to substantiate that a criminal offense was not committed or did not occur as reported." AR 190-45(2007), ¶ 3-6(a) (Exhibit 17). There is no mention that the evidence must show that investigators made a mistake *at the time of titling*.

279.    In sum, DOD instructions and Army regulations state that even if an investigation shows that *no* crime had been committed (i.e., the crime was unfounded; *no one* committed a crime), the person whom the Army charged (i.e., titled) with a crime in the criminal report for that investigation will remain charged (i.e., titled) with the crime for at least forty years!

280.    The DOD and Army amendment procedures, therefore, are patently unconstitutional. The Army is charging (i.e., titling) Plaintiff, a U.S. civilian and citizen, with crimes, and will keep these charges and crimes on his record for at least forty years, even if it is later determined that he is innocent of the charges (i.e., titlings).

281.    In Plaintiff's case, however, the Army unilaterally determined—within minutes—that Plaintiff, a U.S. civilian and citizen, was guilty of the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code). Exhibit 4 (showing, that the Army had, within minutes, charged Plaintiff with assault, determined that he was guilty of committing assault, and sentenced him to a three-day suspension for committing assault).[25]

282.    In addition, Army personnel in charge of amending records are not neutral decision makers. Army personnel in charge of amending records are not going to second-guess

---

25. Plaintiff received his Notice of Proposed Suspension ("Notice") on January 20, 2000. This was four days before the Garmisch MPs had concluded their report on the Snowball Incident, on January 24, 2000. Exhibit 1, at 1. The Army, therefore, charged, convicted, and sentenced Plaintiff before it had officially concluded its investigation of the Snowball Incident. Of course, this is not taking into consideration the fact that someone in the Army was likely ordered to draft the Notice on January 19, 2000, just hours after the Snowball Incident occurred, because a commanding officer ordered everyone involved in the Snowball Incident to be charged (i.e., titled) with crimes for having fought on his installation. The Army then had until January 24, 2000, to concoct the Narrative of the Snowball Incident (i.e., the official summary; Exhibit 1, at 9, Section VII - Narrative) in an unjust, unethical, unlawful, and unconstitutional way to attempt to portray Plaintiff as the instigator of the Incident, thereby allegedly supporting the unjust, unethical, unlawful and unconstitutional charging (i.e., titling) of Plaintiff with a UCMJ crime and a German crime.

or overturn the findings of a fellow Army official who claimed that he or she had "credible information" *at the time* of titling to believe that the titled (i.e., accused and charged) person had committed a crime.

283.    In Plaintiff's case, Army officials, such as the DAPARB and the ABCMR, allegedly "interpreted" a finding of credible information by their fellow Army officials— Garmisch military police and Army lawyers. Credible information is unique to the "titling" process and its nadir is limitless. This allows the DAPARB, the ABCMR, and other Army officials to change what constitutes credible information on a case-by-case basis (i.e., allows them to lower the standard on a case-by-case basis) such that they always find that their fellow friends, colleagues, and Army officials had credible information *at the time of titling* to charge (i.e., title) persons with crimes. This ensures that persons are rarely, if ever, de-titled and de-indexed.

284.    The Deputy Chief of Staff for Operations, Army Criminal Investigation Command ("CID"), also noted that the difficulty in correcting an unjustified titling is unfair to the titled subject. The Deputy Chief of Staff stated:

> It must be remembered that, once titled, with very limited exceptions, the subject's name will remain in the Criminal Records Center [CRC] and the Defense Clearance and Investigations Index [DCII] for 40 years. Questionable titling decisions do a great disservice to the individual and the Army community. Equally undesirable, they cast doubt on the credibility of our investigative processes.

Ham Article, supra ¶ 62, at 12 n.113 (Exhibit 21).

285.    Finally, the DOD and the Army's titling amendment procedures are in direct violation of federal regulations governing the amendment of records.

286.    Federal regulations state, "The standard for amendment is that the records are inaccurate as a matter of fact . . . ." 32 C.F.R. § 505.6(a)(2). Title 32 further states, "Amendment

[of a document] is appropriate if it can be shown that . . . [c]ircumstances leading up to the recorded event were found to be inaccurately reflected in the document . . . ." Id. § 505.6(b)(3)(i).

287. The Army's records on Plaintiff (e.g., MPR 00-MPC937-0607T-5C2B, DA Form 4833, and information in the DCII) "are inaccurate as a matter of fact" and the "circumstances leading up to the [Snowball Incident are] inaccurately reflected" in these records for three reasons.

288. *First*, these records show that the Army charged Plaintiff with crimes, but the Army did not have the constitutional authority to charge Plaintiff, a U.S. civilian, with any crime. See, e.g., Exhibit 4 (showing that the Army stated that it had "charged" Plaintiff with assault); Count I, supra (showing that the Army's charging (i.e., titling) of Plaintiff with crimes was an unconstitutional exercise of military jurisdiction).

289. *Second*, these records show that the Army convicted Plaintiff of both the Army crime 5C2B, which is based on the UCMJ, and the German crime Körperverletzung (bodily injury), section 223 of the Staatsgesetzbuch (German Criminal Code). See, e.g., Exhibit 10, at 3 (showing that the ABCMR, a group of select, high-level Army experts, stated that MPR 00-MPC937-0607T-5C2B showed that Plaintiff "committed the criminal offense of bodily injury under German law").

290. Neither a civilian court of law, nor a neutral, civilian decision maker made a final determination that Plaintiff committed any crime. In addition, the Army did not have any authority to make a final determination that Plaintiff was guilty of having committed any crime, much less a German crime. See Counts I, IV, and V, supra (showing that the Army did not have the authority to charge (i.e., title) Plaintiff with any crime, much less the authority to make a

final determination that he committed (i.e., the authority to convict him of) an Army crime, based on the UCMJ, or a German crime).

291.    *Third*, the Army's "military criminal records" on Plaintiff may be in violation of 32 C.F.R. § 505.6 if Plaintiff is proven innocent of the charges (i.e., titlings).

292.    This is because, if a person is charged (i.e., titled) with crimes by the Army, and evidence is brought forward *after* the charging (i.e., titling) that prove the person is innocent, the innocent person will remain charged (i.e., titled) for at least forty years. In other words, the innocent person will never be able to remove this "titling" if the Army claims it had "credible information" *at the time* of titling. DODI 03, ¶ 6.6.2 (Exhibit 15).

293.    Therefore, if Plaintiff is proven innocent of the charges brought against him by the Army, Plaintiff's "military criminal records" will be in violation of section 505.6, of title 32, because his records will still indicate that the Army charged (i.e., titled) him with crimes, and found him guilty of having committed crimes, although he is innocent. In other words, Plaintiff's records will remain "inaccurate as a matter of fact." 32 C.F.R. § 505.6(a)(2).

294.    All of this is irrelevant to the DOD and the Army, however. All that matters is whether investigators claim they had "credible information" *at the time of the titling* to believe the person committed a crime. DODI 03, ¶ 6.6.2 (Exhibit 15); see also AR 190-45(2007), ¶ 4-3(c) (stating, "*It is emphasized* that the credible information error must occur *at the time of listing* the entity as the subject of the MPR rather than subsequent investigation determining that the MPR is unfounded [i.e., that no crime at all occurred]") (Exhibit 17) (emphasis added).

## d. EIGHTH AMENDMENT VIOLATION

295.    Plaintiff incorporates paragraphs 1-294 by reference.

296.    Finally, the United States, through the Army, is violating Plaintiff's Eighth

Amendment right to be free from cruel and unusual punishment, specifically excessive sanctions.

297.    The Army retains, and disseminates upon request, MPR 00-MPC937-0607T-

5C2B and DA Form 4833 for at least forty years. The Army has also indexed Plaintiff in the

DCII for at least forty years. Any retention, much less for forty years, of these unjust, unethical,

unlawful, and unconstitutional records is an excessive sanction against Plaintiff, a U.S. citizen

and civilian.

298.    The DOD's Smokescreen Version (i.e., the "official" version) of what titling

means claims that titling is "an operational rather than a legal decision" and "*shall not* connote

*any* degree of guilt." DODI 92, ¶¶ D.4 and F.1 (Exhibit 14); see also DODI 03, ¶ 6.5 (Exhibit 15)

(same).[26]

299.    All of these claims, which are made by the DOD in its Smokescreen Version of

what titling means, beg the question, as Major Ham noted in her article on titling: "How does

information that is indicative of nothing assist anything?" Ham Article, supra ¶ 62, at 14 (Exhibit

21). The answer is that titling connotes guilt.

300.    The Army, however, justifies its excessively long retention time of forty years by

stating "experience has shown that recidivism by *criminal* offenders requires the retention of

*criminal* history records for at least 40 years." Ham Article, supra ¶ 62, at 5 n.32 (Exhibit 21)

(emphasis added to show the contradiction with the Smokescreen Version (i.e., the "official"

version) of what titling means, which states that titling is a harmless administrative process void

---

26. DODI 03 is the amended version of DODI 92 that is currently in force.

of any suggestion of guilt). The Army also claims that the purpose of "titling" is to "ensure that information in a report of investigation may be retrieved at some future time for law enforcement or security purposes." DODI 92, ¶ D.1 (Exhibit 14); DODI 03, ¶ 6.2 (Exhibit 15).

301. In other words, the Army claims it "needs" to retain the "*criminal* history records" (e.g., "titlings") of "*criminal* offenders" for forty years because these "*criminal* offenders," whom the Army "titled," will "strike again" within the next forty years. The Army labeled Plaintiff a "*criminal* offender" by listing him as a subject, i.e., by "titling" him, in MPR 00-MPC937-0607T-5C2B, which is a military *criminal* record.

302. By retaining and disseminating MPR 00-MPC937-0607T-5C2B, DA Form 4833, and DCII for at least forty years, the United States, through the Army, is continually portraying Plaintiff as a criminal, guilty of crimes, although: (1) the Army never had the constitutional authority to exercise military jurisdiction over Plaintiff; (2) the Army never informed Plaintiff of his constitutional rights; (3) the Army did not have probable cause to charge Plaintiff with crimes, or label him a criminal; (4) the Army never provided Plaintiff his constitutional right to disprove the charges (i.e., titlings) in a civilian court of law, or even before a neutral civilian decision maker; and (5) a civilian court of law never made a final determination that Plaintiff was guilty of the crimes.

303. The Army's retention and dissemination, for forty years, of its military *criminal* records pertaining to its unjust, unethical, unlawful, and unconstitutional charging (i.e., titling) of Plaintiff for his involvement in the Snowball Incident is an excessive sanction, i.e., punishment, because it allows the Army to do the following for essentially the remainder of Plaintiff's life: (1) malign Plaintiff's reputation and hinder his professional pursuits by unconstitutionally portraying him as a criminal who the Army: (a) charged with crimes; (b) found guilty (i.e.,

convicted) of these crimes; and (c) sentenced for committing these crimes; (2) malign Plaintiff's reputation and hinder his professional pursuits when employers and agencies view MPR 00-MPC937-0607T-5C2B, DA Form 4833, or the DCII, or when agencies and organizations ask Plaintiff to answer questions regarding whether he was ever "charged" with a crime; and (3) force Plaintiff to explain to persons who view MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or the DCII that the DOD and the Army claim titling "*shall not* connote *any* degree of guilt" and that it is used only for "administrative" purposes.

304.    The Army's forty-year retention period, therefore, constitutes cruel and unusual punishment because it is in violation of Plaintiff's Eighth Amendment right to be free from excessive sanctions. See Atkins v. Virginia, 536 U.S. 304, 311 (2002) (stating, "The Eighth Amendment succinctly prohibits 'excessive' sanctions").


WHEREFORE, Plaintiff requests the Court to:

1.    declare, pursuant to 28 U.S.C. § 2201, that the United States, through the DOD and the Army, has:

a.    violated Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution by unconstitutionally exercising military jurisdiction over Plaintiff, a U.S. civilian and citizen, when it charged (i.e., titled) Plaintiff with the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), without the constitutional safeguard of probable cause;

b.    violated Plaintiff's Fifth, Sixth, and Eight Amendment rights, as described above;

2.   declare, pursuant to 28 U.S.C. § 2201, that the Army's amendment process is

unconstitutional and in violation of Plaintiff's Fifth and Sixth Amendment rights;

3.   enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through

the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating

copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833

pertaining to Plaintiff, Plaintiff's information in the DCII, and any other military record

pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have

been amended or destroyed, as described below;

4.   hold unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," "contrary to constitutional right, power, [and] privilege,"

"in excess of statutory jurisdiction," and "without observance of procedure required by law," 5

U.S.C. § 706(2)(A) – (D):

    a.   the Army's charging (i.e., titling) of Plaintiff with crimes because these

    charges, and the records in which these charges are documented, have violated, and

    continue to violate, Plaintiff's Fifth, Sixth, and Eighth Amendment Rights;

    b.   the Army's amendment process;

5.   compel the United States, through the Army, pursuant to either 28 U.S.C. § 1361, 5

U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), to:

    a.   remove Plaintiff's name from MPR 00-MPC937-0607T-5C2B;

    b.   remove from all military records (including the minutes and decisions of LTC

    Yates, the DAPARB, and the ABCMR), and all disseminated records, any mention that

    the Army "titled," "accused," "cited," or "charged" Plaintiff with a crime, any mention

    that Plaintiff "committed" a crime, any mention that the Army made Plaintiff the

"subject" of the Army's investigation into the Snowball Incident, and any mention that the Army "suspended" Plaintiff for being involved in the Snowball Incident;

 c. destroy the DA Form 4833 pertaining to Plaintiff;

 d. remove Plaintiff's name and personal information from the DCII;

 e. inform, in writing, all persons who viewed or received any record pertaining to Plaintiff and his involvement in the Snowball Incident, that the Army's "titling" of Plaintiff was unconstitutional;

6. compel, pursuant to 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. § 555a(g)(2)(A), each person (i.e., individual or agency) who viewed any of the Army's records pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies of such records, to destroy those Army records or send them, and all copies, back to the Army to be amended, as described above, and amend, as described above, any records these persons generated as a result of their receipt and viewing of those Army records;

7. compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

 a. amend or destroy Plaintiff's records within a definite time;

 b. notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed; and

 c. send Plaintiff, within twenty business days of amending, a copy of the amended record, or proof, in writing, that a record was destroyed.

## 4. COUNT IV: THE ARMY'S SECRET CHARGING OF PLAINTIFF, A U.S. CIVILIAN AND CITIZEN, WITH A GERMAN CRIME WAS AN UNCONSTITUTIONAL EXERCISE OF MILITARY JURISDICITON, IN ADDITION TO BEING UNJUST, UNETHICAL, AND UNLAWFUL

305.     Plaintiff incorporates paragraphs 1-304 by reference.

306.     The Army secretly charged (i.e., titled) Plaintiff with the German crime

Körperverletzung (bodily injury), section 223 of the Staatsgesetzbuch (German Criminal Code),

in two places: MPR 00-MPC937-0607T-5C2B and the DA Form 4833 pertaining to Plaintiff.

Exhibit 1, at 1, Section II – Offense, Box 1.h, Offense Description(s); Exhibit 2, at 1, Box 11a.,

Offense Code(s). The Army used the following translation of the German crime: GCC (German

Criminal Code), section 223, page A-70, Bodily Injury. Exhibit 1, at 1, Section II – Offense, Box

1.h, Offense Description(s); Exhibit 2, at 1, Box 11a., Offense Code(s).

307.     The ABCMR, a group of select, high-level Army experts, looked closely at MPR

00-MPC937-0607T-5C2B (and perhaps DA Form 4833) and stated that it showed Plaintiff

"committed the criminal offense of bodily injury under German law." Exhibit 10, at 3.

308.     There are, however, at least three things that show the Army charged Plaintiff

with a German crime, besides the ABCMR clearly stating Plaintiff "committed the crime of

bodily injury under German law." Exhibit 10, at 3.

309.     *First*, no one in the Army thought that the charging (i.e., titling) of Plaintiff with a

German crime in MPR 00-MPC937-0607T-5C2B and DA Form 4833 was in error because the

Army refused to correct it—three times. Plaintiff, in his initial request for amendment to LTC

Yates, in his appeal to the DAPARB, and in his request for amendment to the ABCMR, made it

very clear to the Army that its "titling" of him with a German crime was unjust, unethical,

unlawful, and unconstitutional. See Exhibit 9 (August 22, 2007 amendment request to CPT

Peters); Exhibit 40 (October 12, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 41

(October 16, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 42 (October 17, 2007 letter

to Ms. Carpenter of the USACRC); Exhibit 43 (December 17, 2007 letter to Mr. McGuire);

Exhibit 44 (March 14, 2008 appeal to the DAPARB); Exhibit 20 (January 20, 2009 request to the

ABCMR for amendment of records).

310.     Therefore, LTC Yates, and the Army experts on the DAPARB and the ABCMR,

knew that the Army "titled" and convicted Plaintiff with a German crime in MPR 00-MPC937-

0607T-5C2B and DA Form 4833.

311.     Neither LTC Yates, nor the DAPARB, however, even addressed the Army's

referencing of a German crime, or the Army's "titling" of Plaintiff with a German crime. See

Exhibit 18 (LTC Yates's denial); Exhibit 19 (the DAPARB's denial). They simply decided to

ignore the issue; or they were told by someone, or "advised" by an Army lawyer, to ignore the

issue. The Army's refusal to address the German crime issue is an example of egregious

unethical conduct by Army officials, some of whom were Army lawyers. The Army hoped that

Plaintiff, who had been a low-level, non-career, minimum wage, civilian employee, would

simply "go away," as most civilians without immense financial resources, large amounts of free

time, and/or legal knowledge must do when confronted with trying to overcome *years* of such

blatantly unethical tactics.

312.     The ABCMR—the Army's Beacon of Justice, however, did address the Army's

charging (i.e., titling) of Plaintiff with a German crime. The ABCMR actually validated the

Army's charging (i.e., titling) of Plaintiff with a German crime by stating that MPR 00-MPC937-

0607T-5C2B indicated Plaintiff had "committed the criminal offense of bodily injury under

German law." Exhibit 10, at 3.

313. *Second*, everyone who views MPR 00-MPC937-0607T-5C2B and the Army's use of the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), therein, will believe, just as the ABCMR did, that the Army charged (i.e., titled) Plaintiff with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), and that the Army made a final determination that Plaintiff "committed" the German crime (i.e., that the Army convicted Plaintiff of the German crime).

314. The select, high-level Army "experts" on the ABCMR stated that MPR 00-MPC937-0607T-5C2B shows that Plaintiff:

> . . . then a nonappropriated fund employee while working for the Army in the Federal Republic of Germany *committed the criminal offense of bodily injury under German law*, between 0016 and 0026 hours (military time), on 19 January 2000.

Exhibit 10, at 3 (emphasis added).

315. *Third*, on what appears to be February 9, 2000, Mr. Edward Fagan, Assistant Manager of AFRC Garmisch during the Snowball Incident, signed a DA Form 4833, Commander's Report of Disciplinary Administrative Action. Exhibit 2, at 2.

316. In DA Form 4833, the Army charged[27] Plaintiff with two crimes: 5C2B (an Army crime based on the UCMJ) *and* GCC, Section 223, Page A-70 Bodily Injury, which is the Army's translation for Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code). Exhibit 2, at 1, Box 11a.

---

27. Plaintiff's uses "charged" instead of "charged (i.e., titled)" because DA Form 4833 is not used to "title" individuals because it is not a MPR (i.e., it does not have a "subject block"). Exhibit 2. In addition, the words "title" and "titling" are not used anywhere in DA Form 4833. Id. Therefore, by listing Plaintiff's name in association with two crimes and an allegation that it suspended Plaintiff, the Army forces everyone viewing DA Form 4833 to believe that the Army "charged" Plaintiff with the crimes listed in DA Form 4833, convicted him (i.e., found him guilty) of these crimes, and sentenced him to a three-day suspension for having "committed" these crimes. Id.

317. The Army even listed two dates in DA Form 4833: one date to correspond with the Army crime based on the UCMJ, and one date to correspond to the German crime. Exhibit 2, at 1, Box 11.b.

318. The Army official who created DA Form 4833 was allegedly the provost marshal overseeing the Garmisch installation. AR 190-45(1988), ¶ 4-3(b) (stating, "The installation provost marshal is responsible for preparation and distribution of DA Form 4833 to commanders") (Exhibit 26). The provost marshal is "[t]he senior official . . . directly responsible for law enforcement and security . . . ." Id. at 47, Section II – Terms, "Provost Marshal."

319. The provost marshal, the trained, senior military expert who prepared DA Form 4833, allegedly only had MPR 00-MPC937-0607T-5C2B as a source of information for what crimes the Garmisch military police had charged (i.e., titled) Plaintiff with. This is assuming the provost marshal was not ordered, or "advised," by someone else as to what crimes he or she should charge (i.e., title) Plaintiff with in DA Form 4833. This provost marshal, therefore—a trained, senior military expert—believed (or was told to believe) that MPR 00-MPC937-0607T-5C2B showed that the Garmisch military police had charged Plaintiff with, and determined that Plaintiff committed, a German crime.

320. The Army attached DA Form 4833 to, and disseminates it with, MPR 00-MPC937-0607T-5C2B. AR 190-45(2007), ¶ 4-8 (Exhibit 17).

321. Therefore, everyone viewing DA Form 4833, which the Army attaches to, and disseminates with, MPR 00-MPC937-0607T-5C2B, will believe that the Army charged Plaintiff, a U.S. civilian and citizen, with Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code). These individuals will also believe that the Army convicted Plaintiff of this German crime, i.e., that the Army made a final determination that Plaintiff "committed" this

German crime, just as the experts on the ABCMR believed. See Exhibit 10, at 3 (ABCMR decision) (stating that MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached) indicates that Plaintiff "committed the crime of bodily injury under German law").

322.    In sum, the Army charged Plaintiff, a U.S. civilian and citizen, with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code), and simultaneously determined that Plaintiff "committed" this German crime. No one in the Army, or the entire U.S. Military, however, had, or has, the authority or competence to decide what may or may not constitute a German crime. More specifically, and most importantly, however, the Army cannot lawfully state, in an official, military criminal report, that a U.S. citizen committed a German crime. See, e.g., Exhibit 10, at 3 (ABCMR decision) (showing that the ABCMR, a group of select, high-level Army experts, stated that the Army's "military criminal records" on Plaintiff showed that the Army had determined that Plaintiff "committed the criminal offense of bodily injury under German law"). Army officials are not qualified or competent German law enforcement or legal officials. Therefore, the Army's charging (i.e., titling) of Plaintiff with a German crime was unjust, unethical, unlawful, and unconstitutional.


323.    In addition, there are four things, including acts, omissions, and regulations, which show that the German authorities had jurisdiction over the Snowball Incident and Plaintiff, and that the Army knew the German authorities had jurisdiction.

324.    *First*, the Army claims that it contacted the Garmisch Polizei (i.e., the German police in Garmisch) to determine if the Polizei wanted to investigate the Snowball Incident. The Army claims that the Polizei "declined to investigate." Exhibit 1, at 9, Section VII – Narrative.

This shows that the Army knew the German authorities had jurisdiction over the Snowball Incident and Plaintiff.

325.    The Army claims that the Garmisch Polizei "declined to investigate." Exhibit 1, at 9, Section VII – Narrative.

326.    The German authorities, however, claim otherwise.

327.    Plaintiff, who speaks fluent German, contacted both the local German prosecutor's office for the area in which Garmisch is located, and the senior public prosecutor in Munich, Germany, regarding the Snowball Incident. Plaintiff contacted these authorities because CPT Peters informed Plaintiff that these offices would have information on the Snowball Incident, if any information existed. Exhibit 6, at 2.

328.    These German authorities, after searching their records, stated that they had no record of the Snowball Incident. In other words, German authorities have neither a record of the alleged call made by the Army to the Garmisch Polizei regarding the Snowball Incident, nor any record of the Snowball Incident itself. Exhibit 45 (letter to the Traunstein public prosecutor's office), Exhibit 46 (response from the public prosecutor's office in Traunstein), Exhibit 47 (letter to Rosenheim branch office); Exhibit 48 (reply from the senior public prosecutor's office in Munich, to the Rosenheim letter); Exhibit 49 (Plaintiff's translation of the German responses).[28]

329.    When, according to the Army, the Germans were not interested in investigating the Snowball Incident, the Army decided it could then take the place of the German Polizei by

---

28. The ABCMR, perhaps intentionally, incorrectly "translated" the Munich senior public prosecutor's letter, dated June 16, 2008. Exhibit 10, at 4. The ABCMR claimed the letter stated that "there was insufficient information upon which to base any charges." Id. The correct translation is the following: "It is noted that the incident described in your August 6, 2007 letter could not be verified." In other words, the Germans had *no record* of the Snowball Incident, much less any record of an alleged call from the Army regarding the Snowball Incident.

determining, in a matter of minutes, that Plaintiff, a U.S. civilian and citizen, committed a crime under German law. Exhibit 1, at 1, Section II – Offense, Box 11.h; Exhibit 2, at 1, Box 11.a.[29]

330.    The Army, however, had no authority to reference a German crime in MPR 00-MPC937-0607T-5C2B. Army regulations *require* military investigators to use Army crime descriptions to describe Army crimes. Army regulations state:

> Enter the best description of the criminal offense that took place. For example, simple assault. *This description can be obtained from the offense code table 4–1* [located in AR 190-45]).

AR 190-45(2007), App. B-2(c)(8), at 124; Table 4-1 at 26 (Exhibit 17)[30] (Note: The same offense code table was contained in AR 190-45(1988), at Table 4-2 (Exhibit 26)).

331.    Table 4-1 provides the following "Primary Description" for Army crime 5C2B: "Simple Assault Consummated by a Battery." AR 190-45(2007), Table 4-1 (Exhibit 17); see also AR 190-45(1988), Table 4-2 (providing the same description) (Exhibit 26).

332.    "Simple Assault Consummated by a Battery," therefore, was the description that the Army was *required* to use in MPR 00-MPC937-0607T-5C2B.

333.    Therefore, the use of a German crime in MPR 00-MPC937-0607T-5C2B, to describe the Army crime 5C2B, was in direct violation of Army regulations.

---

29. See note 25, supra (showing how the Army had charged, convicted, and sentenced Plaintiff within minutes of the Snowball Incident taking place).

30. Plaintiff is citing AR 190-45(2007), which is currently in force, and not AR 190-45(1988), which was in force during the Snowball Incident, because the "Directions for completing DA Form 3975 [a MPR]" in AR 190-45(1988) pertained to an old, out-dated version of the MPR. See AR 190-45(1988), Figure 4-1, "Directions for completing DA form 3975" (Exhibit 26). The directions for completing DA Form 3975 in AR 190-45(2007) correspond to the newer version of the MPR, which the Army used in the Snowball Incident.

334.     Furthermore, LTC Salussolia told Plaintiff that a sub-paragraph of the NATO

SOFA provided Army Personnel with the authority to title Plaintiff, a U.S. civilian and citizen,

with crimes in Germany. Exhibit 22. The sub-paragraph of NATO SOFA cited by LTC

Salussolia states:

> military authorities of the sending State [the United States in this instance]
> shall have the primary right to exercise jurisdiction over . . . a civilian
> component in relation to offences [Brit. spelling] solely against . . . the
> person or property of another member of the force or civilian component
> of that State . . . .

NATO SOFA, art. VII, para. 3.a.1.

335.     The United States, however, signed the NATO SOFA in 1951, and ratified it in

1953.[31] Germany joined NATO in 1955, and signed a treaty implementing the NATO SOFA in

1959.[32] The Supreme Court handed down its Reid v. Covert decision in 1957—six years after the

U.S. signed the NATO SOFA. Reid v. Covert, 354 U.S. 1, 20 (1957) (plurality opinion). The

Supreme Court handed down its subsequent line of cases in 1960—one year after Germany and

the United States signed a treaty implementing the NATO SOFA. Grisham v. Hagan, 361 U.S.

278 (1960); Kinsella v. United States, 361 U.S. 234 (1960); McElroy v. United States, 361 U.S.

281 (1960).

336.     Therefore, the Supreme Court in Reid v. Covert, and its subsequent line of cases,

essentially held paragraph 3.a.1, Article VII, NATO SOFA (cited above), unconstitutional when

it held that the military cannot exercise jurisdiction over U.S. civilians. See Count I, ¶¶ 167-180 ,

supra (detailing the Supreme Court's holdings in Reid v. Covert and its subsequent line of cases);

---

31. Eyskens v. United States, 140 F. Supp. 2d 553, 557 (E.D. N.C. 2000); Agreement Between
the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951,
[1953 pt. 2] 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective Aug. 23, 1953).

32. CRS Report for Congress, at CRS-11, *available at*,
http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL34531_06162008.pdf

see, e.g., U.S. v. Morton, 314 F. Supp. 2d 509, 514-15 (D. Md. 2004) (stating that any authority over U.S. civilians in Germany, which the NATO SOFA gave to the U.S. Military, "was foreclosed by the Supreme Court's decision in Reid v. Covert"; the court held that the United States lacked jurisdiction to charge a U.S. civilian with federal crimes for incidents that occurred on a U.S. housing facility leased from Germany).

337.    The Supreme Court in Reid v. Covert also stated:

> [N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.

Reid, 354 U.S. at 16.

> This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty.

Id. at 17 (citation omitted).

338.    *Second*, Plaintiff informed CPT Peters of what had happened during the Snowball Incident, and that the Snowball Incident happened on a U.S. military installation in Germany. See Exhibit 6, at 1-2 (showing that CPT Peters acknowledged Plaintiff's June 13, 2007 email in which he informed her that he had been titled by the military police while a DOD employee in Germany, for an incident that occurred on a military installation (AFRC installation) in Garmisch, Germany; she mistakenly states that the incident occurred at the AFRC "Chiemsee" installation).

339.    On July 27, 2007, CPT Peters stated, "Pursuant to the NATO SOFA, you were expected to comply with the laws of the receiving state, in this case Germany, and Germany retained exclusive jurisdiction over members of the civilian component with respect to any offenses committed within its territory and punishable by its laws." Exhibit 6, at 2.

340.   This statement by an experienced military investigator shows that the German authorities, not the Army, had exclusive jurisdiction over both the Snowball Incident and Plaintiff, and, most importantly, that the Army knew that.

341.   *Third*, the U.S. military base in Garmisch, Germany, where the Snowball Incident occurred, was leased from the Federal Republic of Germany, and, as such, was the sovereign territory of Germany, over which German authorities. See, e.g., U.S. v. Spelar, 338 U.S. 217, 221-22 (1949) (stating that a U.S. air base in Newfoundland, leased to the United States by Great Britain, remained the sovereign territory of Great Britain).[33] Furthermore, the Supreme Court has noted that when the United States is occupying a foreign land for general military purposes, the occupied area remains foreign soil and "cannot be regarded in any constitutional, legal, or international sense, a part of the territory of the United States." Neely v. Henkel, 180 U.S. 109, 119 (1901).

342.   Therefore, the German authorities had jurisdiction over the Snowball Incident because it happened in Germany, on German soil.

343.   In addition, the incident occurred in the Abram's Complex—a U.S. housing facility in Germany. German authorities retained exclusive jurisdiction over the Abram's Complex and, therefore, both the Snowball Incident and Plaintiff.

344.   In U.S. v. Morton, the U.S. District Court for Maryland held that the United States lacked jurisdiction to charge a U.S. civilian with federal crimes, where the civilian had allegedly committed the crimes on a U.S. Air Force housing facility in Germany, while he was a civilian

---

33. See Report 4: Restructuring U.S. Military Bases in Germany, at 10-11, *available at*, http://www.bicc.de/uploads/pdf/publications/reports/report04/report4.pdf (explaining how the United States has leased its military bases from the Federal Republic of Germany, beginning at some point shortly after WWII).

employee of the U.S. Air Force. U.S. v. Morton, 314 F. Supp. 2d 509, 510-11, 514 (D. Md. 2004).

345.    The government brought federal charges against Morton in Maryland, and a grand jury charged him with aggravated sexual abuse and abusive sexual contact with a minor, under the statutory provision for "special maritime and territorial jurisdiction of the United States." Id. at 511.

346.    Section 7 of Title 18 grants "special maritime and territorial jurisdiction" to the United States. 18 U.S.C. § 7. Section 7 states, in pertinent part:

> *Any lands reserved or acquired for the use of the United States*, and *under the exclusive or concurrent jurisdiction thereof*, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

Id. § 7(3).

347.    The Morton court held that the Landstuhl housing facility, where the offenses occurred, qualified as "land[] reserved or acquired for the use of the United States," which satisfied the first jurisdictional pre-requisite of the "special territorial jurisdiction" grant. Id. at 513 (noting, however, that there is a split among the circuits as to whether 18 U.S.C. § 7(3) can even be applied extraterritorially, id. at 513 n.6).

348.    The Morton court, however, held that the second jurisdictional pre-requisite was not met because the United States could not show, and in fact the United States admitted that it could not show, that it had either " exclusive or concurrent jurisdiction" over the housing facility, pursuant to the lease terms with Germany for the facility. Id. at 514. Germany, therefore, retained exclusive jurisdiction over the facility and Morton's alleged criminal acts occurring inside the facility. Id.

349. The <u>Morton</u> court held, therefore, that the United States did not have the authority to prosecute Morton in U.S. courts—only German authorities had authority to do so. <u>Id</u>. at 515.

350. Similar to <u>Morton</u>, the Abram's Complex in Garmisch, where the Snowball Incident occurred, was a U.S. housing facility leased from Germany.[34]

351. Applying the reasoning of <u>Morton</u>, the United States would not have had jurisdiction to charge Plaintiff, a U.S. civilian and citizen, with federal crimes, in U.S. courts, for the alleged crimes that occurred at the Abram's Complex during the Snowball Incident (if there existed applicable federal law criminalizing the alleged conduct).

352. The United States, therefore, certainly did not have the authority to subject Plaintiff to *military* jurisdiction by secretly charging him with an *Army* crime, based on the *UCMJ*, and a *German* crime, based on the *German Criminal Code*, for the alleged crimes that occurred at the Abram's Complex during the Snowball Incident.

353. Most importantly, the <u>Morton</u> decision shows that Germany retained exclusive jurisdiction to accuse, charge (i.e., title), prosecute, convict, and sentence Plaintiff for any alleged "crimes" committed during the Snowball Incident.

354. *Fourth*, Army regulations clearly stated that Army investigators did not have jurisdiction over the Snowball Incident.

355. Army regulations clearly and concisely state, just as the Supreme Court stated in <u>Reid v. Covert</u>, 354 U.S. 1, 35 (1957) (plurality opinion), "In peacetime, host-nation authorities

---

34. <u>See</u> Report 4, note 33 <u>supra</u>, at 10-11 (explaining how the United States has leased its military bases from the Federal Republic of Germany, beginning at some point shortly after WWII).

have exclusive criminal jurisdiction over U.S. civilians-citizens in the host country." AER 27-9, Misconduct by Civilians, (October 27, 2003) ("AER 27-9(2003)"), ¶ 5(c) (Exhibit 50).[35]

356.    Army regulations also stated that Army investigators only had "the legal authority to conduct a criminal investigation" on U.S. civilians, such as Plaintiff, when "[t]here is a reasonable basis to believe that a suspect may be a civilian employee of DOD who has committed an offense in connection with his or her assigned duties." AR 195-2(1985), ¶ 3-1(a) and (b)(3) (Exhibit 3). Plaintiff, a U.S. civilian and citizen, was not performing his "assigned duties" on the night of January 19, 2000, when he exited an employee party and approximately five individuals repeatedly attacked him. Exhibit 29.

357.    Furthermore, Army regulations stated, "[c]ivilians committing offenses on Army installations may be detained until they can be released to the appropriate Federal, state, or local law enforcement agency." AR 190-30 (1978), ¶ 4-8 (Exhibit 27); AR 195-2(1985), ¶ 3-21(b) (Exhibit 3).

358.    In sum, the foregoing evidence shows that the Army clearly charged Plaintiff with the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code). In fact, the ABCMR made it clear that the Army simultaneously charged Plaintiff with, and convicted him of (i.e., made a final determination that he "committed"), a German crime when it stated that Plaintiff's military *criminal* records showed that Plaintiff "committed the criminal offense of bodily injury under German law." Exhibit 10, at 3.

359.    In addition, the foregoing evidence clearly shows that the German authorities had, and that the Army knew the German authorities had, jurisdiction over the Snowball Incident.

---

35. Plaintiff was unable to find a similar provision in Army regulations in force at the time of the Snowball Incident. Regardless the language in the cited provisions is exactly what the Supreme Court stated in 1957, in Reid v. Covert. Reid v. Covert, 354 U.S. 1, 35 (1957) (plurality opinion).

Most importantly, the foregoing evidence clearly shows that the German authorities had, and that the Army knew the German authorities had, the sole legal authority to make Plaintiff the subject of a criminal investigation, and to accuse Plaintiff of, charge him with, convict him of, and sentence him for committing, a German crime.

WHEREFORE, Plaintiff requests the Court to:

1. declare, pursuant to 28 U.S.C. § 2201, that the United States, through the DOD and the Army, violated Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution by unconstitutionally exercising military jurisdiction over Plaintiff, a U.S. civilian and citizen, when it charged (i.e., titled) Plaintiff with a German crime;

2. enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, Plaintiff's information in the DCII, and any other military record pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have been amended or destroyed, as described below;

3. hold unlawful, and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, [and] privilege," "in excess of statutory jurisdiction," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A) – (D), the Army's:

    a. referencing of a German crime in MPR 00-MPC937-0607T-5C2B;

    b. referencing of, charging of Plaintiff with, and determination that Plaintiff committed, a German crime in DA Form 4833;

4.   compel the United States, through the Army, pursuant to either 5 U.S.C. §
552a(g)(2)(A), 28 U.S.C. § 1361, or 5 U.S.C. § 706(1), to:

    a.   remove from MPR 00-MPC937-0607T-5C2B, DA Form 4833, the DCII, and
all other military records (including the minutes and decisions of LTC Yates, the
DAPARB, and the ABCMR)—including all records that have been disseminated by the
Army—any reference to a German crime, any mention that the Army "titled," "accused,"
"cited," or "charged" Plaintiff with a German crime, any mention that Plaintiff
"committed" or "may have committed" a German crime, any mention that the Army
"apprehended" Plaintiff for a German crime, and any mention that the Army suspended
Plaintiff for "committing" a German crime;

    b.   inform, in writing, all persons who viewed or received any record pertaining to
Plaintiff and his involvement in the Snowball Incident, that the Army did not charge
Plaintiff with, and that Plaintiff did not commit, a German crime, and that the Army's use
of a German crime in its records was unethical, unlawful and unconstitutional;

5.   compel, pursuant to 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. §
555a(g)(2)(A), each person (i.e., individual or agency) who viewed any of the Army's records
pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies
of such records, to destroy those Army records or send them, and all copies, back to the Army to
be amended, as described above, and amend, as described above, any records these persons
generated as a result of their receipt and viewing of those Army records;

6.   compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all
individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as
requested above, or as the Court orders, to:

a.  amend or destroy Plaintiff's records within a definite time;

b.  notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed; and

c.  send Plaintiff, within twenty business days of amending, a copy of the amended record, or proof, in writing, that a record was destroyed.

### 5. COUNT V: THE ARMY'S SECRET CHARGING (i.e., TITLING) OF PLAINTIFF, A U.S. CIVILIAN AND CITIZEN, WITH AN ARMY CRIME BASED ON THE  UCMJ WAS AN UNCONSTITUTIONAL EXERCISE OF MILITARY JURISDICTION, IN ADDITION TO BEING UNJUST, UNETHICAL, AND UNLAWFUL

360.    Plaintiff incorporates paragraphs 1-359 by reference.

361.    The Army secretly charged Plaintiff, with an Army crime, based on the UCMJ, in two places: MPR 00-MPC937-0607T-5C2B and the DA Form 4833 pertaining to Plaintiff. Exhibit 1, at 1, Section II – Offense, Box 1.g; Exhibit 2, at 1, Box 11a. As far as Plaintiff has been able to determine, the Army indexed Plaintiff in the DCII, where it stated that it "titled" Plaintiff with Army crime 5C2B (and perhaps the German crime Körperverletzung, too).

362.     The Army, however, did not have the authority to exercise military jurisdiction over Plaintiff by charging (i.e., titling) Plaintiff, a U.S. civilian and citizen, with any crime, much less an Army crime based on the UCMJ. Plaintiff was not, and is not now, a member of the U.S. Military.

363.    The Army explicitly stated that it "charged" Plaintiff with the Army crime 5C2B. See, e.g., Exhibit 4 (showing that the Army stated that it had "charged" Plaintiff with assault). The Army also convicted and sentenced Plaintiff to a three-day suspension for "committing" Army crime 5C2B, which is based on the UCMJ. Id.; Exhibit 2, at 2.

364.    The State Department's Bureau of Diplomatic Security believed that the Army "charged" Plaintiff with, convicted him of, and sentenced him to a three-day suspension for committing, the Army crime 5C2B, which is based on the UCMJ. See, e.g., Exhibit 12 (stating that the State Department believed that the Army "charged" Plaintiff with, convicted him of (i.e., found him guilty of), and sentenced him to a three-day suspension for committing the Army crime 5C2B).

365.    Therefore, if the Army itself believes, and if the State Department's highly trained investigators in its Bureau of Diplomatic Security believe, that the Army "charged" Plaintiff with, convicted him of (i.e., found him guilty of committing), and sentenced him to a three-day suspension for "committing, the Army crime 5C2B, which is based on the UCMJ, then everyone viewing MPR 00-MPC937-0607T-5C2B, DA Form 4833, and/or the DCII will believe the same.

366.    As of January 19, 2000 (the day of the Snowball Incident), however, there existed no Army regulation, DOD instruction, U.S. statute, or treaty that gave the Army the authority to make Plaintiff, a U.S. civilian and citizen, the subject of a military criminal investigation and then to charge (i.e., title) Plaintiff with, convict him of, or sentence him for committing, any crime, much less an Army crime, based on the UCMJ.

367.    Even if such a treaty, statute, or regulation existed, it would have been unconstitutional. See Count I, supra.

368.    Plaintiff made five requests (not counting appeals and complaints) to various Army agencies, requesting the Army regulations and DOD instructions that gave the Army authority to title U.S. civilians, such as Plaintiff, with crimes. The Army dismissed every single request by refusing to answer them. See Count VII, ¶¶ 661-701 (listing Plaintiff's FOIA requests for Army regulations that the Army unlawfully denied).

369.    On March 26, 2008, LTC Salussolia, on behalf of BG Johnson, Commander, U.S. Army Criminal Investigation Command, sent Plaintiff a letter claiming that Army regulations 190-45, Law Enforcement Reporting, and 190-30, Military Police Investigations, gave the Army the authority to "title" Plaintiff with a crime. Exhibit 22.

370.    Plaintiff, however, has scanned these regulations and found no provision that states Army investigators may subject U.S. civilians, such as Plaintiff, to military criminal jurisdiction by titling or charging them with any crimes, much less crimes Army crimes, based on the UCMJ.

371.    LTC Salussolia also told Plaintiff that a sub-paragraph of the North American Treaty Organization Status of Forces Agreement ("NATO SOFA") provided Army personnel with the authority to title Plaintiff, a U.S. civilian and citizen, with crimes in Germany. Exhibit 22. The sub-paragraph of NATO SOFA cited by LTC Salussolia states:

> military authorities of the sending State [the United States in this instance] shall have the primary right to exercise jurisdiction over . . . a civilian component in relation to offences [Brit. spelling] solely against . . . the person or property of another member of the force or civilian component of that State . . . .

NATO SOFA, art. VII, para. 3.a.1.

372.    The United States, however, signed the NATO SOFA in 1951, and ratified it in 1953.[36] Germany joined NATO in 1955, and signed a treaty implementing the NATO SOFA in 1959.[37] The Supreme Court handed down its Reid v. Covert decision in 1957—six years after the U.S. signed the NATO SOFA. Reid v. Covert, 354 U.S. 1, 20 (1957) (plurality opinion). The

---

36. Eyskens v. United States, 140 F. Supp. 2d 553, 557 (E.D. N.C. 2000); Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, [1953 pt. 2] 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective Aug. 23, 1953).

37. CRS Report, supra note 32, at CRS-11.

Supreme Court handed down its subsequent line of cases in 1960—one year after Germany and the United States signed a treaty implementing the NATO SOFA. Grisham v. Hagan, 361 U.S. 278 (1960); Kinsella v. United States, 361 U.S. 234 (1960); McElroy v. United States, 361 U.S. 281 (1960).

373.    Therefore, the Supreme Court in Reid v. Covert, and its subsequent line of cases, essentially held paragraph 3.a.1, Article VII, NATO SOFA (cited above), unconstitutional when it held that the military cannot exercise jurisdiction over U.S. civilians. See Count I, ¶¶ 167-180 , supra (detailing the Supreme Court's holdings in Reid v. Covert and its subsequent line of cases); see, e.g., U.S. v. Morton, 314 F. Supp. 2d 509, 514-15 (D. Md. 2004) (stating that any authority over U.S. civilians in Germany, which the NATO SOFA gave to the U.S. Military, "was foreclosed by the Supreme Court's decision in Reid v. Covert"; the court held that the United States lacked jurisdiction to charge a U.S. civilian with federal crimes for incidents that occurred on a U.S. housing facility leased from Germany).

374.    In addition, the Supreme Court in Reid v. Covert noted:

> [N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.

Reid v. Covert, 354 U.S. 1, 16 (1957) (plurality opinion).

> This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty.

Id. at 17 (citation omitted).

### a. ARMY CRIME 5C2B IS A SUBCATEGORY OF ARTICLE 128, ASSAULT, OF THE UCMJ

375. Plaintiff incorporates paragraphs 1-374 by reference.

376. Before deciding to secretly "title" Plaintiff, Garmisch military police allegedly spoke with Captain Dennis ("CPT Dennis"), a staff judge advocate ("SJA") (i.e., military lawyer) stationed in Stuttgart, Germany. CPT Dennis allegedly told the Garmisch military police that there was "sufficient evidence" to title Plaintiff with a crime. Exhibit 1, at 9, Section VII – Narrative.

377. The military police, allegedly per CPT Dennis's recommendation, secretly "titled" Plaintiff with the Army crime 5C2B. Exhibit 1, at 1, Section II – Offense, Box 1.g.

378. The designation 5C2B represents a subcategory of Article 128, Assault, of the UCMJ. AR 190-45(1988), Table 4-2, at 5C2B (Exhibit 26).[38] Specifically, Army crime 5C2B represents the sub-category of "simple assault consummated by a battery" of Article 128, Assault, UCMJ. Id.

379. In addition, Army regulation AR 190-30(1978) listed the "Offenses Investigated By Military Police." AR 190-30(1978), App. B (Exhibit 27).[39]

380. One of the "offenses investigated" by military police is Article 128 of the UCMJ. AR 190-30(1978), App. B (Exhibit 27).

381. The Army defines one of the sub-categories of "offenses" under Article 128 of the UCMJ, which the military police can investigate, as "simple assault consummated by a battery." Id. This is the same crime, 5C2B, with which the Army charged (i.e., titled) Plaintiff.

---

38. AR 190-45(1988) was in force as of the Snowball Incident.

39. AR 190-30(1978) was in force as of the Snowball Incident.

382.    In sum, the foregoing clearly shows that 5C2B, which is defined as "simple assault consummated by a battery"—is a crime based on the UCMJ.


### b. THE ARMY LABELED MPR 00-MPC937-0607T-5C2B A "CRIMINAL" REPORT, SIGNIFYING THAT CRIME 5C2B IS A CRIME UNDER THE UCMJ

383.    Plaintiff incorporates paragraphs 1-382 by reference.

384.    The Army marked MPR 00-MPC937-0607T-5C2B a "Criminal" report. Exhibit 1, at 1, Section I - Administration, Box 1, Report Type.

385.    A MPR is only to be marked "Criminal" where the MPR is meant "to identify criminal incidents under the UCMJ or crimes falling within the Assimilative Crimes Act [18 U.S.C. § 13]." AR 190-45(2007), App. B-2(b)(1), at 123 (Exhibit 17).[40]

386.    Therefore, the alleged assaults that occurred during the Snowball Incident were either "criminal incidents under the UCMJ or crimes falling within the Assimilative Crimes Act." AR 190-45(2007), App. B-2(b)(1), at 123 (Exhibit 17).

387.    The Assimilative Crimes Act ("Act") states, in pertinent part:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the *State, Territory, Possession, or District in which such place is situated*, by the laws thereof in force at the time of

---

40. Plaintiff is citing AR 190-45(2007), which is currently in force, and not AR 190-45(1988), which was in force during the Snowball Incident, because the "Directions for completing DA Form 3975 [a MPR]" in AR 190-45(1988) pertained to an old, out-dated version of the MPR. See AR 190-45(1988), Figure 4-1, "Directions for completing DA form 3975," at 32-33 (Exhibit 26). The directions for completing DA Form 3975 in AR 190-45(2007) correspond to the newer version of the MPR, which the Army used in the Snowball Incident.

such act or omission, shall be guilty of a like offense and subject to a like punishment.

Id. § 13(a) (emphasis added).

388.    The alleged assaults, i.e., criminal incidents, during the Snowball Incident did not fall under the Assimilative Crimes Act ("Act").

389.    The Supreme Court stated, "The federal Assimilative Crimes Act (ACA) assimilates into federal law, and thereby makes applicable on federal enclaves such as Army bases, certain criminal laws of the [U.S.] State in which the enclave is located." Lewis v. United States, 523 U.S. 155, 158 (1998). "The ACA applies [U.S.] state law to a defendant's acts or omissions that are 'not made punishable by *any enactment* of Congress.'" Id. at 159 (emphasis in original) (holding that a Louisiana murder statute did not apply where there existed an applicable federal statute). "The ACA's basic purpose is one of borrowing [U.S.] state law to fill gaps in the federal criminal law that applies on federal enclaves." Id. at 160.

390.    The Snowball Incident occurred on a U.S. installation located in Germany, not on a U.S. installation (i.e., a "federal enclave") located on a U.S. "State, Territory, Possession, or District." The United States leases from the German government all the lands in Germany on which a U.S. military base is found.[41]

391.    Therefore, the "criminal incidents" that allegedly occurred during the Snowball Incident did not fall within the Act because the "criminal incidents" did not occur on federally acquired land that was "situated . . . within the jurisdiction" of a U.S. "State, Territory, Possession, or District." See 18 U.S.C. § 13.

---

41. See Report 4, supra note 33, at 10-11 (explaining how the United States has leased it military bases from the Federal Republic of Germany, beginning at some point shortly after WWII).

392.    Therefore, if the "criminal incidents" did not fall within the Act, the "criminal incidents" must have fallen "under the UCMJ." AR 190-45(2007), App. B-2(b)(1), at 123 (Exhibit 17).

393.    The foregoing evidence shows that the Army charged Plaintiff with the Army crime 5C2B—a crime based on the UCMJ. Plaintiff, however, was, and is, a U.S. civilian and citizen and, therefore, was not subject to military jurisdiction, or being charged by the Army with Army crimes based on the UCMJ.


WHEREFORE, Plaintiff requests the Court to:

1.   declare, pursuant to 28 U.S.C. § 2201, that the United States, through the Army, violated Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution by unconstitutionally exercising military jurisdiction over Plaintiff, a U.S. civilian and citizen, when it subjected Plaintiff to military law and jurisdiction by charging and "titling" Plaintiff, a U.S. civilian and citizen, with the Army crime 5C2B, which is based on the UCMJ;

2.   enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, Plaintiff's information in the DCII, and any other military record pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have been amended or destroyed, as described below;

3.   hold unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, [and] privilege," "in excess of statutory jurisdiction," and "without observance of procedure required by law," 5

U.S.C. § 706(2)(A) – (D), the Army's charging (i.e., titling) of Plaintiff with the Army crime

5C2B—a crime based on the UCMJ;

4.  compel the United States, through the Army, pursuant to either 5 U.S.C. §

552a(g)(2)(A), 28 U.S.C. § 1361, or 5 U.S.C. § 706(1), to:

a.  remove Plaintiff's name from the MPR 00-MPC937-0607T-5C2B;

b.  remove Plaintiff's name from the DCII;

c.  remove from all other military records (including the minutes and decisions of

LTC Yates, the DAPARB, and the ABCMR)— including all records that have been

disseminated by the Army—any mention that the Army "titled," "cited," "accused," or

"charged" Plaintiff with Army crime 5C2B, any mention that the Army "suspected"

Plaintiff, "apprehended" Plaintiff, or "suspended" Plaintiff in regards to Army crime

5C2B;

d.  inform, in writing, all persons who viewed or received any record pertaining to

Plaintiff and his involvement in the Snowball Incident, that the Army's charging and

"titling" of Plaintiff with the Army crime 5C2B was unjust, unethical, unlawful, and

unconstitutional;

e.  destroy the DA Form 4833 pertaining to Plaintiff because it does not contain

one true fact or accurate piece of information, except for Plaintiff's name, birth date, and

social security number.

5.  compel, pursuant to 28 U.S.C. § 1361, 5 U.S.C. § 706(1), or 5 U.S.C. §

555a(g)(2)(A), each person (i.e., individual or agency) who viewed any of the Army's records

pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies

of such records, to destroy those Army records or send them, and all copies, back to the Army to

be amended, as described above, and amend, as described above, any records these persons generated as a result of their receipt and viewing of those Army records;

6. compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

a. amend or destroy Plaintiff's records within a definite time;

a. notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed; and

b. send Plaintiff, within twenty business days of amending, a copy of the amended record, or proof, in writing, that a record was destroyed.


## 6. COUNT VI: PRIVACY ACT VIOLATIONS, AND VIOLATIONS OF FEDERAL REGULATIONS, BY THE ARMY AND THE SECRETARY OF THE ARMY

394. Plaintiff incorporates paragraphs 1-393 by reference.

395. The Army, by creating, retaining, disseminating, and refusing to amend its records on its charging (i.e., titling) of Plaintiff, is unlawfully, and intentionally and willfully, violating the following provisions of the Privacy Act:

a. Sub-paragraph (e)(5): requiring agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

b. Sub-paragraph (e)(6): requiring agencies to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C. § 552a(e)(6).

c. Sub-paragraph (g)(1)(C): providing a claim where an agency has failed to:

> maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

5 U.S.C. § 552a(g)(1)(C).

396.     This Court has jurisdiction over these claims pursuant to 5 U.S.C. § 552a(g)(1)(C) and (D), and (g)(2), (4), and (5).

397.     The Army, by refusing to amend its records pertaining to its unconstitutional exercise of military jurisdiction over Plaintiff, is also violating 32 C.F.R. § 506.6, which states, "The standard for amendment is that the records are inaccurate as a matter of fact rather than judgment, irrelevant, untimely, or incomplete." 32 C.F.R. § 505.6(a)(2). Title 32 further states, "Amendment [of a document] is appropriate if it can be shown that . . . [c]ircumstances leading up to the recorded event were found to be inaccurately reflected in the document . . . ." Id. § 505.6(b)(3)(i).

398.     The Army created three, main, military criminal records pertaining to its "titling" of Plaintiff: MPR 00-MPC937-0607T-5C2B, DA Form 4833, and its indexing of Plaintiff in the DCII. In addition, other records, such as the decisions of LTC Yates, the DAPARB, and the ABCMR, have been created because of these three, main records. The Army's creation, retention, and dissemination of these records is in violation of the Privacy Act.

399. These military *criminal* records are inaccurate and unjust because they memorialize the Army's unconstitutional exercise of military jurisdiction over Plaintiff, a U.S. civilian and citizen, which resulted in the Army's violation of Plaintiff's Fifth, Sixth, and Eighth Amendment rights. See Counts I and III, supra. In addition, these records contain numerous other errors, injustices, and inaccuracies.

400. The Army will disseminate these military *criminal* records, allowing countless individuals to view, copy, and download these records for at least forty years—essentially the rest of Plaintiff's life.

401. Once Plaintiff discovered the existence of these records, he spent over two years exhausting the Army's "amendment" process. See ¶¶ 73-87, supra (showing Plaintiff's exhaustion of administrative remedies). Plaintiff requested the Secretary of the Army to amend the numerous errors, injustices, and inaccuracies that these records contain, which include the violations of Plaintiff's constitutional rights that these records perpetuate each time the Army allows someone to view, copy, or download these records.

402. After more than two years, the Secretary of the Army, through LTC Yates, the DAPARB, and the ABCMR, refused to correct or amend even one of the numerous errors, injustices, and inaccuracies in Plaintiff's "military criminal records." By doing so, the Army continued to violate the Privacy Act, in addition to violating federal regulations pertaining to the amendment of records.

403. Plaintiff exhausted his administrative remedies. Therefore, Plaintiff brings this Complaint to ask this Court to do what the Army would not.

### a. THE ARMY'S CREATION, RETENTION, AND DISSEMINATION OF MPR 00-MPC937-0607T-5C2B AND DA FORM 4833, AND THE ARMY'S INDEXING OF PLAINTIFF IN THE DCII, CONSTITUTE  UNLAWFUL, AND INTENTIONAL AND WILLFUL, VIOLATIONS OF 5 U.S.C. § 552a(e)(5) AND (6), AND (g)(1)(C)

404.    Plaintiff incorporates paragraphs 1-403 by reference.

405.    There are at least six reasons why the Army unlawfully, and intentionally and willfully, violated 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C) when it created and retained its "military criminal records" on Plaintiff, and when it disseminates or allows them to be viewed, copied, or downloaded.

### i.  REASON ONE

406.    Plaintiff incorporates paragraphs 1-405 by reference.

407.    The Army knew, should have known, or showed utter indifference and disregard for the Supreme Court's decision in Reid v. Covert, and the subsequent line of cases, in which the Supreme Court clearly stated that the U.S. Military may not extend the Necessary and Proper Clause to those individuals not in the "land and naval Forces," i.e., to U.S. civilians such as Plaintiff. See Count I, supra (detailing how the Army unconstitutionally exercised military jurisdiction over Plaintiff by charging (i.e., titling) Plaintiff, a U.S. civilian and citizen, with crimes).

408.    Despite Article I, Section 8, Clauses 14 and 18 of the U.S. Constitution, and despite the Supreme Court's repeated clarifications of these clauses, the United States, through the Army, exercised military jurisdiction over Plaintiff, a U.S. civilian and citizen, by charging (i.e., titling) Plaintiff with crimes, convicting him of these crimes, and sentencing him for "committing" these crimes. See Count I, supra; Exhibit 2.

409.     This unconstitutional exercise of military jurisdiction also violated Plaintiff's Fifth, Sixth, and Eighth Amendment rights. See Count III, supra.

410.     The Army then documented these unconstitutional violations in military *criminal* records pertaining to Plaintiff: the MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII (collectively, "records"). The ABCMR described these records as "military records" that documented "criminal activity." Exhibit 10, at 1.

411.     By documenting and retaining these violations, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5). The Army used these records to make its determination that it was going to sentence Plaintiff to a three-day suspension. Exhibit 2 (DA Form 4833), at 2; Exhibit 4 (Notice of Proposed Suspension) (stating the Army was going to sentence Plaintiff to a three-day suspension because Garmisch military police had "charged" Plaintiff with assault). The Army will use these records to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

412.     This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

413.     By documenting and retaining these violations, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to "make reasonable efforts to assure that such records are accurate . . .  for agency purposes." 5 U.S.C. §

552a(e)(6). This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

414.   By documenting and retaining this information, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the [Plaintiff] that may be made on the basis of such record, and consequently a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

415.   This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C) pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

416.   The State Department made a decision that was adverse to Plaintiff, based on these records. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12 (stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day suspension for committing this crime) (emphasis added; quotations in original).

417.   The ABCMR made a decision that was adverse to Plaintiff, based on these records, by denying Plaintiff his amendment request and labeling him a criminal under German

law. Exhibit 10, at first page (denying Plaintiff's request), and 3 (claiming Plaintiff "committed the criminal offense of bodily injury under German law").

418.    Furthermore, the Secretary of the Army continues to retain and disseminate these records for a period of at least forty years, allowing for continued violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

419.    For example, MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached), has been viewed and downloaded at least twelve separate times. Exhibit 11 (stating that MPR 00-MPC937-0607T-5C2B was viewed on January 26, 2010, December 9, 2008, November 7, 2008, July 29, 2008, July 20, 2008, July 7, 2008, June 16, 2008, February 28, 2008, October 6, 2007, July 24, 2007, May 23, 2007, and January 8, 2007).

420.    The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.[42]

421.    Furthermore, numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him, contained therein. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into to the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The

_____

42. Plaintiff made a Privacy Act request for the names of the agencies who have viewed MPR 00-MPC937-0607T-5C2B, and the agencies to whom the USACRC has sent MPR 00-MPC937-0607T-5C2B. Exhibit 51. Mr. McGuire, Director, USACRC, responded by providing Plaintiff with a redacted list of "views" and some downloads of MPR 00-MPC937-0607T-5C2B. Exhibit 52 (Mr. McGuire's April 20, 2010 response); Exhibit 11 (the alleged number of times MPR 00-MPC937-0607T-5C2B has been viewed and downloaded). Mr. McGuire, however, as he is prone to do, failed to properly answer the FOIA request by not informing Plaintiff how many times copies of MPR 00-MPC937-0607T-5C2B have been *sent* to someone. Mr. McGuire also failed to provide Plaintiff with the names of the agencies who viewed, or received a copy of, MPR 00-MPC937-0607T-5C2B.

Defense Security Service ("DSS"), which manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

422.    "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).


## ii. REASON TWO

423.    Plaintiff incorporates paragraphs 1-422 by reference.

424.    The Army knew, should have known, or showed utter indifference and disregard to the fact that there was no evidence—"credible information" or otherwise—at the time of titling to suggest that Plaintiff committed any crime. Nevertheless, the Army charged (i.e., titled) Plaintiff with crimes, convicted him of these crimes, and sentenced him for "committing" these crimes. The Army documented all of this in military *criminal* records pertaining to Plaintiff: the MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII (collectively, "records").

425.    Army regulations stated, as of the Snowball Incident, that investigators shall only title a person after considering the "totality of the circumstances." DODI 92, Definitions, "Credible Information" (Exhibit 14).

426.    Army investigators, and CPT Dennis—the SJA who "opined there was sufficient evidence to title Conley," Exhibit 1, at 9, Section VII – Narrative—ignored (or were told to ignore) the "totality of the circumstances" before "titling" Plaintiff. See Count III, ¶¶ 240-245, supra (outlining how the sworn statements of SSG Clark (the lead investigator of the Snowball

Incident), Exhibit 29, Mr. Shane Stewart (the civilian security guard at the Abram's Complex during the Snowball Incident, and one of the two independent witnesses), Exhibit 36, and Jorge Barrofet (the other independent witness to the Snowball Incident, besides Mr. Stewart), Exhibit 38, clearly show that there was no evidence, much less probable cause, at the time of titling to suggest that Plaintiff committed any crime).

427.     By labeling Plaintiff a criminal and charging (i.e., titling) him with crimes without any evidence to do so, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5). The Army used these records to make its determination that it was going to sentence Plaintiff to a three-day suspension. Exhibit 2 (DA Form 4833), at 2; Exhibit 4 (Notice of Proposed Suspension) (stating the Army was going to sentence Plaintiff to a three-day suspension because Garmisch military police had "charged" Plaintiff with assault). The Army will use these records to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

428.     This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

429.     By labeling Plaintiff a criminal and charging (i.e., titling) him with crimes without any evidence to do so, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to "make reasonable efforts to assure that such records are accurate . . .  for agency purposes." 5 U.S.C. § 552a(e)(6).

430.    This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

431.    By labeling Plaintiff a criminal and charging (i.e., titling) him with crimes without any evidence to do so, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the [Plaintiff] that may be made on the basis of such record, and consequently a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

432.    This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C) pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

433.    The State Department made a decision that was adverse to Plaintiff, based on these records. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12 (stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day suspension for committing this crime) (emphasis added; quotations in original).

434.    The ABCMR made a decision that was adverse to Plaintiff, based on these records, by denying Plaintiff his amendment request and labeling him a criminal under German

law. Exhibit 10, at first page (denying Plaintiff's request), and 3 (claiming Plaintiff "committed the criminal offense of bodily injury under German law").

435.    Furthermore, the Secretary of the Army continues to retain and disseminate these records for a period of at least forty years, allowing for continued violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

436.    For example, MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached), has been viewed and downloaded at least twelve separate times; the most recent view being on January 26, 2010. Exhibit 11. The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.

437.    Furthermore, numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him, contained therein. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The DSS, which manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

438.    "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).

### iii. REASON THREE

439.     Plaintiff incorporates paragraphs 1-438 by reference.

440.     The Army knew, should have known, or showed utter indifference and disregard to the fact that the referencing of a German crime in MPR 00-MPC937-0607T-5C2B was a violation of Army regulations.

441.     The Army "described" the Army crime 5C2B as a German crime. Exhibit 1, at 1, Section II - Offense, Box 1.h, Offense Description(s). Army regulations clearly state, "Enter the best description of the criminal offense that took place. *** *This description can be obtained from the offense code table 4–1* [located in AR 190-45])." AR 190-45(2007), App. B-2(c)(8),  at 124 (emphasis added) (Exhibit 17); see also ¶¶ 329-331 (explaining in greater detail how the Army violated its own regulations by using a German crime to describe an Army crime in MPR 00-MPC937-0607T-5C2B).

442.     By using a German crime to describe an Army crime in MPR 00-MPC937-0607T-5C2B, which was in violation of Army regulations, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5). The Army used MPR 00-MPC937-0607T-5C2B to make its determination that it was going to sentence Plaintiff to a three-day suspension. Exhibit 2 (DA Form 4833), at 2; Exhibit 4 (Notice of Proposed Suspension) (stating the Army was going to sentence Plaintiff to a three-day suspension because Garmisch military police had "charged" Plaintiff with "assault").

443.     The ABCMR used MPR 00-MPC937-0607T-5C2B to state that Plaintiff is a criminal under German law. Exhibit 10, at 3 (stating that MPR 00-MPC937-0607T-5C2B

showed that the Army determined that Plaintiff "committed the crime of bodily injury under German law").

444.    The Army will continue to use MPR 00-MPC937-0607T-5C2B to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

445.    This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

446.    By using a German crime to describe an Army crime in MPR 00-MPC937-0607T-5C2B, which was in violation of Army regulations, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to "make reasonable efforts to assure that such records are accurate . . .  for agency purposes." 5 U.S.C. § 552a(e)(6).

447.    This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

448.    By using a German crime to describe an Army crime in MPR 00-MPC937-0607T-5C2B, which was in violation of Army regulations, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is
> necessary to assure fairness in any determination relating to the

qualifications, character, rights, or opportunities of, or benefits to the [Plaintiff] that may be made on the basis of such record, and consequently a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

449.    This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C) pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

450.    The State Department made a decision that was adverse to Plaintiff, based on MPR 00-MPC937-0607T-5C2B. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12 (stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day suspension for committing this crime) (emphasis added; quotations in original).

451.    The ABCMR made a decision that was adverse to Plaintiff, based on MPR 00-MPC937-0607T-5C2B, by denying Plaintiff his amendment request and labeling him a criminal under German law. Exhibit 10, at first page (denying Plaintiff's request), and 3 (claiming Plaintiff "committed the criminal offense of bodily injury under German law").

452.    Furthermore, the Secretary of the Army continues to retain and disseminate MPR 00-MPC937-0607T-5C2B for a period of at least forty years, allowing for continued violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

453.    For example, MPR 00-MPC937-0607T-5C2B, has been viewed and downloaded at least twelve separate times; the most recent view being on January 26, 2010. Exhibit 11. The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.

454.     Furthermore, numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him, contained therein. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into to the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The DSS, which manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

455.     "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).


### iv. REASON FOUR

456.     Plaintiff incorporates paragraphs 1-455 by reference.

457.     The Army knew, should have known, or showed utter indifference and disregard to the fact that the Narrative in MPR 00-MPC937-0607T-5C2B omitted, fabricated, and altered facts, thereby unjustly, unethically, unlawfully, and unconstitutionally portraying Plaintiff not only as a criminal, but as an extremely drunken criminal. Exhibit 1, at 9, Section VII – Narrative.

458.     According to AR 190-45, the "Narrative" must accomplish the following objectives:

> (1) Description. Complete a written description on the events and people that resulted in the MPR being prepared.
>
> (2) The narrative must answer the questions who, when, where, how, and why concerning the criminal events and the individuals involved (subject, victim, witness, other persons) as well as property.

AR 190-45(2007), App. B, B-2(h), at 128-29 (Exhibit 17).[43]

459.    The Narrative contained in MPR 00-MPC937-0607T-5C2B is, therefore, also in violation of Army regulations because it is not an accurate description of the events and people involved in the Snowball Incident because it does not properly answer the questions who, when, where, how, and why concerning the Snowball Incident.

460.    Sergeant First Class Ronald S. Cox, MP Station Commander ("SFC Cox"), signed off on the Narrative (either written by him, or for him), and MPR 00-MPC937-0607T-5C2B in general, on approximately January 24, 2000. Exhibit 1, at 1, Date, and 9, Section VII – Narrative, Box 6.

461.    This was more than four days after the Snowball Incident occurred, and more than four days after Staff Sergeant Randy Clark ("SSG Clark") wrote his Investigator's Sworn Statement ("SSG Clark's Sworn Statement"). Exhibit 29. Plaintiff has not been able to determine whether SFC Cox was even in Garmisch, Germany during the Snowball Incident.

462.    The Narrative states:

> At 0030HRS, 19 Jan 00, Stewart telephonically notified the MP station of an assault. Investigation by Clark and Purser revealed that between the above times and on the above date, Conley confronted Larson and Edwards about having snowballs thrown at him. Conley then pushed and struck Larson, breaking Larson's front tooth. Larson and Edwards then struck Conley in the lip and left side of the head. Conley, Larson and Edwards were detained and transported to the MP station and advised of their legal rights, which they waived. Conley rendered a written sworn statement denying throwing snowballs or punches. Edwards rendered a written sworn statement, admitting to striking Conley twice and

_____

43. Plaintiff is citing AR 190-45(2007), which is currently in force, and not AR 190-45(1988), which was in force during the Snowball Incident, because the "Directions for completing DA Form 3975 [a MPR]" in AR 190-45(1988) pertained to an old, out-dated version of the MPR. See AR 190-45(1988), Figure 4-1, "Directions for completing DA form 3975," 32-33 (Exhibit 26). The directions for completing DA Form 3975 in AR 190-45(2007) correspond to the newer version of the MPR, which the Army used in the Snowball Incident.

witnessing Larson strike Conley. Edwards also admitted throwing snowballs at Conley. Garmisch Polizei were notified but declined investigation. Conley was administered a B.A.T. which resulted in a 0.7% promille reading. Larson was administered a B.A.T. with a result of 0.03%. This case was coordinated with SJA (CPT Dennis) who opined that there was sufficient evidence to title Conley, Edwards and Larson with the above offense.

Exhibit 1, at 9, Section VII – Narrative.

463.    The Narrative fails to state even the most basic facts. The Narrative does not mention the time when the Snowball Incident occurred. It only states the time when Mr. Stewart called regarding the Snowball Incident. The Narrative does not mention where the Snowball Incident took place—the Abram's Complex in Garmisch, Germany.

464.    The Narrative fails to mention the two independent witnesses to the Snowball Incident: Mr. Shane Stewart, the civilian security guard for AFRC at the Abram's Complex, and Jorge Barrofet. See Exhibit 1 (MPR 00-MPC937-0607T-5C2B) at 8 and 9 (listing Mr. Barrofet and Mr. Stewart as witnesses, respectively). The Army also listed Luke Eoff and Lance Perry as "witnesses." Exhibit 1, at 3 and 8, respectively. Perry and Eoff, however, were two of the approximately five individuals who attacked Plaintiff with snowballs, surrounded Plaintiff, and then physically attacked Plaintiff with their fists. See Exhibit 29, at 1 (stating that Perry and Eoff were among the approximately five Chiemsee individuals who threw snowballs at Plaintiff and then surrounded Plaintiff). SSG Clark, in his Investigator's Sworn Statement, also stated that he believed Eoff hit Plaintiff as Plaintiff was attempting to leave the third time. Id. at 1.

465.    Mr. Shane Stewart, the AFRC civilian security guard at the Abram's Complex, and one of the two independent witnesses to the Snowball Incident, witnessed much of the Snowball Incident. Exhibit 36. The Narrative failed to mention, but SSG Clark's Sworn Statement did mention, Mr. Stewart's important statement that "the appearance of the situation

was that if he didn't intervene, all four Chiemsee employees [including Perry, Eoff, Larson, and Edwards] would have jumped Conley." Exhibit 29, at 2.

466.   The Narrative also fails to mention that Mr. Stewart pulled Plaintiff away from his attackers, took him inside, spoke with him, and then told Plaintiff to go home. Exhibit 36. Plaintiff, attempting to return home for the third time, was ambushed by Eoff as Plaintiff exited the door of the Abram's Complex. Exhibit 29, at 1. The Army, however, did not "title" Eoff. Instead, the Army labeled Eoff as a "witness." Exhibit 1, at 3.

467.   The Narrative also fails to mention Jorge Barrofet, the second independent witness. The following are direct quotes from the sworn statement of Mr. Barrofet. Questions are posed by the Garmisch U.S. Military Police Investigator, SSG Clark:

> Q.  Who was actually throwing the snowballs?
> A.  The Chiemsee group. They [sic] were approximately 5 of them throwing snowballs at random people, one of them was Neil [Conley]  that was hit. Three of them were making fun of him (Neil).
>
> Q.  Did you see Neil get hit by a snowball or did he tell you he was hit?
> A.  I saw him get hit by two, but I didn't see who they came from.
>
> Q.  Did Neil go to the snowball throwing individuals and confront them?
> A.  No, he stopped where he was hit and the other guys walked up to him.
>
> Q.  Who struck who first?
> A.  The other individual struck Neil first . . . ."

Exhibit 38, at 2.

468.   The Narrative fails to mention, but SSG Clark's Sworn Statement does mention, many crucial facts (i.e., "who, when, where, how, and why") regarding the Snowball Incident. SSG Clark was the lead investigator of the Snowball Incident. He wrote his Investigator's Sworn Statement, which is the only accurate summary of the Snowball Incident, after he interviewed all

individuals involved in the Snowball Incident, except Mr. Shane Stewart, the civilian security guard who was one of the two independent witnesses to the Snowball Incident.

469.    The following are excerpts from SSG Clark's Sworn Statement regarding the Snowball Incident:  (1) ". . . Conley was departing an AFRC party in the conference room at the Abram's complex in Garmisch, GE."; (2) ". . . the Chiemsee employees [approximately five] . . . , hit Conley with a snowball while he was leaving."; (3) "From talking to all individuals involved, I believe the Chiemsee employees were throwing snowballs at Conley, even after he asked them to stop."; (4) "Conley turned and told them to stop throwing snowballs at him . . . ."; (5) "Conley then turned to leave again and was once again hit by another snowball."; (6) "[Approximately five Chiemsee employees] started surrounding [Conley]."; (7) "Conley then pushed off on Edwards as Edwards, Larson, Perry, and Eoff started surrounding him." (Note: The Narrative states that Conley pushed off on Larson.); (8) Edwards then "struck Conley once in the mouth and once in the head at the same time Conley struck Larson . . . ."; (9) "Larson was also seen by Edwards striking Conley an unknown number of times."; (10) "Stewart claimed that the appearance of the situation was that if he didn't intervene, all four Chiemsee employees would have jumped Conley."; (11) "AFRC Security [Mr. Stewart] took Conley inside . . . .; (12) "When Conley again attempted to leave to return home, an unknown person struck him on the left side of the head."; and (13) "I [SSG Clark] also believe . . . that Eoff was the one who struck Conley when he was trying to leave the second time [sic; third time]." Exhibit 29.

470.    By omitting important facts, such as those provided by the two independent witnesses and SSG Clark, who knew more about the Snowball Incident than anyone else, the Narrative creates, perhaps intentionally, the false impression that Plaintiff initiated the Snowball Incident, when in fact Plaintiff was the victim.

471.    The Narrative also fabricates facts. The Narrative alleges, "Conley confronted Larson and Edwards about having snowballs thrown at him. Conley then pushed and struck Larson, breaking Larson's front tooth." This description is inaccurate, unjust, unethical, and unlawful. Plaintiff did *not* "confront" his attackers in this way, i.e., by suddenly attacking *two* individuals because they only threw a snowball at him.

472.    SSG Clark, in his Investigator's Sworn Statement, clearly states, "Approximately *five* AFRC employees from Chiemsee were outside . . . throwing snowballs." Exhibit 1 at, 1 (emphasis added). "The Chiemsee employees . . . *hit* Conley with a snowball while he was leaving." Id. (emphasis added). "Conley turned and told them to stop throwing snowballs at him." Id. "Conley then turned to leave again and was *once again hit* by another snowball." Id. (emphasis added). "Conley once again turned to confront the Chiemsee employees [to tell them to stop throwing snowballs at him] . . . ." Id. "Conley pushed off on Edwards as Edwards, Larson, Perry and Eoff started surrounding him." Id. "Edwards struck Conley once in the mouth and once in the head at the same time Conley struck Larson . . . ." Id. In fact, Larson admitted to hitting Plaintiff in the chest with a snowball from two feet away, after he and his approximately four friends had surrounded Plaintiff, but before he and his friends attacked Plaintiff with their fists. Exhibit 35. By leaving out all of these facts, the Narrative fabricates an inaccurate, unjust, unethical, unlawful, and unconstitutional story that Plaintiff immediately attacked two individuals who had thrown snowballs at him.

473.    Finally, the Narrative alters facts. Box 16.b of MPR 00-MPC937-0607T-5C2B states that Plaintiff's alcohol level was 0.03%. Exhibit 1, at 2, Section III – Subject, Box 16.b, Alcohol/Drug Test Results.

474.     The Narrative, however, falsely states that Plaintiff's alcohol level was 0.7%—twenty-seven times what it actually was. Exhibit 1, at 9, Section VII - Narrative.[44]

475.     In sum, the Narrative omits, fabricates, and alters facts, giving the impression that Plaintiff instigated the Snowball Incident, and that Plaintiff was extremely inebriated at the time of the Snowball Incident.

476.     It is grossly unjust, unethical, unlawful, and unconstitutional for the Army to send MPR 00-MPC937-0607T-5C2B to persons with only this misleading, fabricated Narrative posing as a complete and accurate description of the Snowball Incident.

477.     By creating a Narrative that omits, fabricates, and alters facts, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5). The Army will use MPR 00-MPC937-0607T-5C2B, which contains the Narrative, to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

478.     This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

479.     By creating a Narrative that omits, fabricates, and alters facts, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to

_____

44. The ABCMR, who the Secretary of the Army specifically charged with correcting "errors and injustices" in military records, refused to amend this obvious alcohol level error, because, as it flippantly stated: "[it] appears to be nothing more than a transcription error within the MPR. As such, it has no impact on the overall content of the MPR." Exhibit 10, at 7.

"make reasonable efforts to assure that such records are accurate . . .  for agency purposes." 5 U.S.C. § 552a(e)(6).

480.    This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

481.    By creating a Narrative that omits, fabricates, and alters facts, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the [Plaintiff] that may be made on the basis of such record, and consequently a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

482.    This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C) pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

483.    The State Department made a decision that was adverse to Plaintiff, based on the Narrative, which is part of MPR 00-MPC937-0607T-5C2B. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12 (stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day suspension for committing this crime) (emphasis added; quotations in original).

484.    Furthermore, the Secretary of the Army continues to retain and disseminate MPR 00-MPC937-0607T-5C2B with this unjust, unethical, unlawful, and unconstitutional Narrative for a period of at least forty years, allowing for continued violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

485.    For example, MPR 00-MPC937-0607T-5C2B (which contains the Narrative), has been viewed and downloaded at least twelve separate times; the most recent view being on January 26, 2010. Exhibit 11. The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.

### v.  REASON FIVE

486.    Plaintiff incorporates paragraphs 1-485 by reference.

487.    The Army knew, should have known, or showed utter indifference and disregard to the fact that the DA Form 4833 pertaining to Plaintiff was inaccurate, unjust, unethical, unlawful, and unconstitutional. Exhibit 2.

488.    Mr. Edward Fagan, Assistant Manager of AFRC at the time of the Snowball Incident, signed DA Form 4833, Commander's Report of Disciplinary Administrative Action ("DA Form 4833"), on approximately February 9, 2000. Exhibit 2, at 2. DA Form 4833 was addressed "from" the General Manger, "to" the Commander of the Garmisch MP Station.

489.    The Army official who created DA Form 4833 was allegedly the provost marshal overseeing the Garmisch installation. AR 190-45(1988), ¶ 4-3(b) (stating, "The installation provost marshal is responsible for preparation and distribution of DA Form 4833 to

commanders") (Exhibit 26). The provost marshal is "[t]he senior official . . . directly responsible

for law enforcement and security . . . ." Id. at Section II – Terms, "Provost Marshal."

490.    The Army attached DA Form 4833 to, and disseminates it with, MPR 00-

MPC937-0607T-5C2B. AR 190-45(1988), ¶¶ 5-12(b)(2) and 5-12(c)(1) (in force as of the

Snowball Incident) (Exhibit 26); AR 190-45(2007), ¶ 7-11(b) and (c) (currently in force)

(Exhibit 17).

491.    The purpose of DA Form 4833 is to "[r]ecord actions taken against identified

*offenders*." AR 190-45(2007), ¶ 4-8(a)(1) (emphasis added) (Exhibit 17).[45]

492.    Army regulations define "offender" (same definition as "subject") as:

> Person identified and reported by law enforcement officials as the person
> who *committed an offense*. Determination that a person committed an
> offense is based on *probable cause* supported by corroborating evidence.

AR 190-45(1988), at 47, Section II – Terms, "Offender" (emphasis added) (in force as of the

Snowball Incident) (Exhibit 26); see also AR 190-45(2007), at 137, Section II – Terms,

"Offender" (currently in force) (stating the same) (Exhibit 17); id. at 139, Section II – Terms

"Subject" (stating the same); AR 195-2(2009), at 47, Section II – Terms, "Subject" (currently in

force) (Exhibit 24) (stating the same).

493.    Plaintiff was not an "offender," according to Army regulations in force as of the

Snowball Incident and Army regulations currently in force. This is because the Army did not

label Plaintiff as an offender/subject in MPR 00-MPC937-0607T-5C2B based on "probable

---

45. Plaintiff could find no provision in Army regulations that were in force as of the
Snowball Incident that detailed how to fill out sections of DA Form 4833. Plaintiff is
quite certain that such a regulation or guideline existed at the time of the Snowball
Incident, but he was never able to obtain it. Therefore, Plaintiff is using AR 190-
45(2007), which is currently in force, because it contains how and why DA Form 4833 is
to be completed.

cause," as required by Army regulations. The Army labeled Plaintiff an offender/subject allegedly based on "credible information." Therefore, the Army knew, should have known, or showed utter indifference and disregard to the fact that its listing of Plaintiff's name in DA Form 4833 was in violation of Army regulations.

494.     Furthermore, DA Form 4833 is a two-page form containing the following information, which the provost marshal of Garmisch allegedly typed into the form template: (1) Plaintiff's personal information (name, SSN, date of birth, and employment grade); (2) the MPR number (MPR 00-MPC937-0607T-5C2B); (3) the crimes with which the Army charged Plaintiff: Army crime, 5C2B, based on the UCMJ, and the German crime, GCC, Section 223, Page A-70, Bodily Injury; (4) the dates Plaintiff allegedly committed these crimes: January 19, 2000 (the date is provided twice—once for each crime); and (5) the following statement: "Individual has been counseled and warned about his behavior. He has received a three day [sic] suspension: 2, 3, [and] 4 February 2000." Exhibit 2.

495.     DA Form 4833, which is attached to, and disseminated with, MPR 00-MPC937-0607T-5C2B, contains *no* mention of "titling." Exhibit 2.

496.     Therefore, DA Form 4833 shows that the Army charged Plaintiff with, convicted him of, and sentenced him to a three-day suspension for "committing" the Army crime and the German crime listed in DA Form 4833. Most importantly, the Army, in DA Form 4833, is *forcing* people to believe that it charged, convicted, and sentenced Plaintiff because it lists Plaintiff's name, an Army crime and a German crime, and the allegation that it suspended Plaintiff for committing these crimes.

497.     For example, the ABCMR, a select group of high-level Army experts, took a close look at MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached) and stated

that these records clearly showed that the Army had determined that Plaintiff, a U.S. civilian and citizen, "committed the criminal offense of bodily injury under German law." Exhibit 10, at 3.

498.    The Army knew, should have known, or showed utter indifference and disregard to the fact that it had absolutely no authority to reference a German crime, no authority to charge (or title) Plaintiff with a German crime, and no authority to state that Plaintiff "committed" a German crime in DA Form 4833. This is an error, inaccuracy, and an egregiously unjust, unethical, unlawful, and unconstitutional act by the Army. See ¶¶ IV, supra (showing that the Army unjustly, unethically, unlawfully, and unconstitutionally charged Plaintiff with a German crime).

499.    In addition, the Army knew, should have known, or showed utter indifference and disregard to the fact that it did not have the authority to subject Plaintiff to military jurisdiction and the UCMJ by charging (or titling) Plaintiff in DA Form 4833 with the Army crime 5C2B, which is based on the UCMJ. Exhibit 2, at 1, Box 11.a; see ¶¶ V, supra (showing that the Army unjustly, unethically, unlawfully, and unconstitutionally charged Plaintiff with an Army crime, based on the UCMJ).

500.    By placing Plaintiff's name in a DA Form 4833, with the afore-mentioned information, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5).

501.    The ABCMR made a decision that was adverse to Plaintiff, based on MPR 00-MPC937-0607T-5C2B, by denying Plaintiff his amendment request and labeling him a criminal under German law. Exhibit 10, at first page (denying Plaintiff's request), and 3 (claiming Plaintiff "committed the criminal offense of bodily injury under German law").

502. The Army will use these records to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

503. This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

504. By placing Plaintiff's name in a DA Form 4833, with the afore-mentioned information, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to "make reasonable efforts to assure that such records are accurate . . . for agency purposes." 5 U.S.C. § 552a(e)(6).

505. This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

506. By placing Plaintiff's name in a DA Form 4833, with the afore-mentioned information, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the [Plaintiff] that may be made on the basis of such record, and consequently a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

507.    This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C) pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

508.    The State Department made a decision that was adverse to Plaintiff, based on DA Form 4833, which is attached to MPR 00-MPC937-0607T-5C2B. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12 (stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day suspension for committing this crime) (emphasis added; quotations in original).

509.    The ABCMR made a decision that was adverse to Plaintiff, based on DA Form 4833, by denying Plaintiff his amendment request and labeling him a criminal under German law. Exhibit 10, at first page (denying Plaintiff's request), and 3 (claiming Plaintiff "committed the criminal offense of bodily injury under German law").

510.    Furthermore, the Secretary of the Army continues to retain and disseminate DA Form 4833 for a period of at least forty years, allowing for continued violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

511.    For example, MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached), has been viewed and downloaded at least twelve separate times; the most recent view being on January 26, 2010. Exhibit 11. The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-0607T-5C2B. Exhibit 52.

512.    Furthermore, numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him,

contained therein. Individuals use the DCII to find and access DA Form 4833 and other "military criminal records" the Army created on Plaintiff. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into to the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The DSS, which manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

513.    "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).

## vi. REASON SIX

514.    Plaintiff incorporates paragraphs 1-513 by reference.

515.    The Army listed Plaintiff's identifying information, and information pertaining to its charging (i.e., titling) of Plaintiff with crimes, in the DCII. Ham Article, supra ¶ 62, at 3-4 (Exhibit 21).

516.    This information is a "record" for purposes of the Privacy Act. 5 U.S.C. § 552a(a)(4).

517.    Numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him, contained therein. As of 1998, more than twenty-seven agencies were authorized to access the DCII, and to input data into to the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The DSS, which

manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

518.     Plaintiff has shown that the Army's charging (i.e., titling) of Plaintiff was an unconstitutional exercise of military jurisdiction, Count I, supra, in addition to being a violation of Plaintiff's Fifth, Sixth, and Eighth Amendment rights. Counts II, III, IV, and V, supra.

519.     By documenting these constitutional violations in the DCII, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to maintain its records on Plaintiff "with such accuracy . . . as is reasonably necessary to assure fairness" to Plaintiff. 5 U.S.C. § 552a(e)(5). The Army indexed in the DCII the same information that the Army used to make its determination that it was going to sentence Plaintiff to a three-day suspension. The Army will use this record to make "any determination" about Plaintiff in the future. 5 U.S.C. § 552a(e)(5).

520.     This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(5) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally and willfully violated sub-paragraph (e)(5). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

521.     By documenting these constitutional violations in the DCII, the Army knew, should have known, or showed utter indifference and disregard to the fact that it was failing to "make reasonable efforts to assure that such records are accurate . . .  for agency purposes." 5 U.S.C. § 552a(e)(6).

522.     This Court has jurisdiction over an unlawful violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, Plaintiff claims that the Army intentionally

and willfully violated sub-paragraph (e)(6). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has

jurisdiction over an intentional and willful violation of claims brought under sub-paragraph

(g)(1)(D).

523.    By documenting these constitutional violations in the DCII, the Army knew,

should have known, or showed utter indifference and disregard to the fact that it was failing to

maintain Plaintiff's records:

> with such accuracy, relevance, timeliness, and completeness as is
> necessary to assure fairness in any determination relating to the
> qualifications, character, rights, or opportunities of, or benefits to the
> [Plaintiff] that may be made on the basis of such record, and consequently
> a determination is made which is adverse to [Plaintiff].

5 U.S.C. § 552a(g)(1)(C).

524.    This Court has jurisdiction over an unlawful violation of sub-paragraph (g)(1)(C)

pursuant to 5 U.S.C. § 552a(g)(1)(C) itself. Plaintiff also claims that the Army's violation of

paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4),

has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

525.    The State Department made a decision that was adverse to Plaintiff, based in part

on the DCII. Exhibit 5 (stating Plaintiff's secret security clearance had been denied); Exhibit 12

(stating the Army had "*charged*" Plaintiff with assault and sentenced him to a three-day

suspension for committing this crime) (emphasis added; quotations in original).

526.    Furthermore, the Secretary of the Army continues to retain this information in the

DCII for a period of at least forty years. Numerous agencies and countless individuals have

access to the DCII and Plaintiff's information therein. This will allow for continued violations of

5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

527. "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).

### b. THE ARMY'S, THROUGH THE SECRETARY OF THE ARMY'S, REFUSALS TO AMEND MPR 00-MPC937-0607T-5C2B, DA FORM 4833, AND THE DCII, AND CONTINUED RETENTION AND DISSEMINATION OF THESE RECORDS, HAS RESULTED IN CONTINUING VIOLATIONS OF U.S.C. § 552a(e)(5) AND (6), AND (g)(1)(C), IN ADDITION TO VIOLATIONS OF 32 C.F.R. § 506.6

528. Plaintiff incorporates paragraphs 1-527 by reference.

529. Plaintiff made numerous amendment requests and appeals to the Army to amend its military *criminal* records on Plaintiff: MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII (collectively, "records"). The Army, however, refused to amend even one of the errors, injustices, and inaccuracies listed in these records, as enumerated in the "Six Reasons" in the preceding section. The Army continues to retain and disseminate these records, and will continue to do so for at least forty years—essentially Plaintiff's entire life.

530. On August 22, 2007, Plaintiff made his initial request to amend MPR 00-MPC937-0607T-5C2B and DA Form 4833. Exhibit 9 (August 22, 2007 amendment request to CPT Peters). Plaintiff supplemented this request with various other letters and records. Exhibit 53 (September 2, 2007 supplement to first amendment request to CPT Peters); Exhibit 40 (October 12, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 41 (October 16, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 42 (October 17, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 43 (December 17, 2007 letter to Mr. McGuire, Director, USACRC).

531.    On February 20, 2008, Mr. McGuire informed Plaintiff that the Provost Marshal (LTC Yates) had denied Plaintiff's amendment request. Exhibit 18.

532.    On March 14, 2008, Plaintiff appealed LTC Yates's denial to the DAPARB. Exhibit 44.

533.    On August 13, 2008, the DAPARB denied Plaintiff's appeal. Exhibit 19.

534.    On January 20, 2009, Plaintiff filed an amendment request with the ABCMR. Exhibit 20.

535.    On August 26, 2009, the ABCMR denied Plaintiff's amendment request. Exhibit 10.

536.    In these various requests and appeals to the Army, Plaintiff repeatedly made the Army aware of the errors, inaccuracies, and injustices contained in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII.

537.    More specifically, Plaintiff repeatedly made the Army aware that: (1) its charging (i.e., titling) of Plaintiff, a U.S. civilian and citizen, with crimes was unconstitutional and in direct contradiction to the Supreme Court's holding in Reid v. Covert and its subsequent line of cases; (2) the charging (i.e., titling) of Plaintiff with crimes without probable cause was unconstitutional; (3) there was no evidence at the time of titling to suggest that Plaintiff committed a crime; (4) the Narrative of MPR 00-MPC937-0607T-5C2B is unjust, unethical, unlawful, and unconstitutional because it omits, alters, and fabricates facts; (5) DA Form 4833 unjustly, unethically, unlawfully, and unconstitutionally states that the Army charged Plaintiff with, convicted him of, and sentenced him for committing two crimes: the Army crime 5C2B, based on the UCMJ, and the German crime Körperverletzung, section 223 of the Staatsgesetzbuch (German Criminal Code); (6) its alleged three-day suspension of Plaintiff never

took place; (7) its charging (i.e., titling) of Plaintiff, a U.S. civilian and citizen with, convicting him of, and sentencing him to a three-day suspension for "committing" a German crime was unjust, unethical, unlawful, and unconstitutional; and (8) its charging (i.e., titling) of Plaintiff, a U.S. civilian and citizen with, convicting him of, and sentencing him to a three-day suspension for "committing," the Army crime 5C2B, which is based on the UCMJ, was unjust, unethical, unlawful, and unconstitutional.

538.    The only new error, injustice, and inaccuracy that Plaintiff made the Secretary of the Army aware of during the amendment process, which Plaintiff did not list in the preceding section under one of the "Six Reasons," is that the alleged suspension described in DA Form 4833 never took place. Army records show that Plaintiff was never actually suspended.

539.    Plaintiff's Individual Leave Record covering the first quarter of 2000, which is when the alleged suspension took place, shows no suspension. Exhibit 54.

540.    All suspensions, according to official government regulations (i.e., the Time and Attendance Reporting Manual: Nonappropriated Funds Central Payroll System), are to be documented under the column "Absence W/O Pay." Exhibit 55, at pages marked 6 of 35 and 23 of 35.

541.    Furthermore, AR 215-3, Non-appropriated funds ("NAF") Personnel Policy, states, "A suspension is a period during which an employee is placed in a temporary *non-duty, non-pay status* as a formal disciplinary measure." AR 215-3(2003), ¶ 7-8(a)[46] (Exhibit 39) (emphasis added).

542.    If one looks at page 23 of the Time and Attendance Reporting Manual: Nonappropriated Funds Central Payroll System ("Manual"), under section (1), one will see that

---

46. Plaintiff has been unable to obtain the version of AR 215-3 that was in force during the first quarter pay period after the Snowball Incident.

the numeral "3" represents "Suspension." Exhibit 55, at page marked 23 of 35. Section (2)(c) on the same page of the Manual provides: "AWOP [Absence W/O Pay] Code 3 will always be used for suspension." Id.

543.    Therefore, all suspensions are "non-pay" periods, which are to be noted with the numeral "3" in the column titled "Absence W/O Pay" of an individual's leave records.

544.    Plaintiff's leave record for the period of the alleged suspension contain no "3" in the "Absence W/O Pay" column. Exhibit 54.

545.    Plaintiff's leave record, therefore, clearly shows that he was never suspended. See Exhibit 54.

546.    Furthermore, Ms. Annette Hanna of the Defense Finance and Accounting Service, who sent Plaintiff his leave records, stated, "There is no report of documented suspension on your Individual Leave Record. It would be shown under the column heading Absence W/O Pay." Exhibit 56.

547.    Finally, Army records are not clear on when the "alleged" suspension took place, further showing that no suspension occurred. The Notice of Decision to Suspend states that the suspension occurred on February 1-3 of 2000. Exhibit 4. DA Form 4833 states that Plaintiff's alleged suspension occurred on February 2-4, 2000. Exhibit 2, at 2.


548.    The Secretary of the Army, through LTC Yates, the DAPARB, and the ABCMR, refused to amend even one of the errors, injustices, and inaccuracies in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII. These refusals, and their reasons for their refusals, amounted to intentional and willful violations of the following Privacy Act provisions: 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C).

549.     In addition, the Secretary of the Army's refusal to amend MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII constituted a violation of 32 C.F.R. § 506.6.

### i.  LTC YATES (INITIAL DENIAL AUTHORITY)

550.     Plaintiff incorporates paragraphs 1-549 by reference.

551.     LTC, MP, Yates, was the provost marshal who initially denied Plaintiff's request for amendment. He stated that he would not amend MPR 00-MPC937-0607T-5C2B because:

> Mr. Conley's sworn statement includes his admittance that he punched another individual during the Snowball Incident. A review of the other case documentation pertaining to this incident also verified that the investigating officer was warranted in listing Mr. Conley as a Subject for the offense of assault as this act meets the elements of the offense indexed in this report.

Exhibit 57.

552.     The sworn statements of SSG Clark (the main investigator of the Snowball Incident whose statement consisted of the only detailed summary of the Snowball Incident), Exhibit 29, Jorge Barrofet (the only independent witness besides Mr. Shane Stewart), Exhibit 38, and Mr. Shane Stewart (the civilian security guard at the Abram's Complex, and one of the two independent witnesses, besides Mr. Jorge Barrofet), Exhibit 36, clearly show that Plaintiff was repeatedly attacked by approximately five attackers. See Count III, ¶¶ 240-245, supra.

553.     Plaintiff defended himself only after: (1) approximately five attackers, as a whole, repeatedly hit him with snowballs, verbally assaulted him, and then surrounded him in a threatening manner; (2) one of the approximately five attackers hit him with another snowball from two feet away, with the other attackers surrounding Plaintiff; and (3) the attackers began throwing punches at Plaintiff. See Count III, ¶¶ 240-245, supra.

554.     LTC Yates, therefore, upheld the charging (i.e., titling) of Plaintiff with crimes because Plaintiff defended himself from repeated attacks by approximately five belligerent individuals.

555.     In addition, LTC Yates intentionally ignored all of the errors, injustices, and inaccuracies of which Plaintiff had made him aware. See ¶ 537 (summarizing the errors, injustices, and inaccuracies of which Plaintiff made LTC Yates aware); Exhibit 9 (August 22, 2007 amendment request to CPT Peters). Plaintiff supplemented this request with various other letters and records. Exhibit 53 (September 2, 2007 supplement to first amendment request to CPT Peters); Exhibit 40 (October 12, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 41 (October 16, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 42 (October 17, 2007 letter to Ms. Carpenter of the USACRC); Exhibit 43 (December 17, 2007 letter to Mr. McGuire, Director, USACRC).

556.     Mr. McGuire was to forward all of these documents to LTC Yates. AR 190-45(2007), ¶ 3-6(b)(2) (Exhibit 17).


**ii.  THE DAPARB**

557.     Plaintiff incorporates paragraphs 1-556 by reference.

558.     The DAPARB upheld the "titling" of Plaintiff and LTC Yates's denial of Plaintiff's request for amendment. Exhibit 19. The DAPARB's reasoning consisted of four sentences:

> Upon reviewing the information provided there was no evidence presented to show that the report was factually inaccurate. Further Mr. Conley indicates that he was an active party, and self admitted [sic] to the Incident. Further, he was cited with a 5C offense code for assault. Therefore, his record is not incorrect as a matter of fact.

Exhibit 58, at 1-2.

559.    *First*, the DAPARB justified the charging (i.e., titling) of Plaintiff with crimes, and its decision to uphold the charging, because Plaintiff "indicated" he was "an active party." Plaintiff was "an active party," according to the DAPARB, because, when approximately five belligerent individuals repeatedly attacked Plaintiff, he did not stand in the middle of their circle and allow them to beat him to death, or, at the least, seriously and permanently harm him.

560.    *Second*, the DAPARB justified the charging (i.e., titling) of Plaintiff with crimes, and its decision to uphold these charges, because it claimed that Plaintiff "self admitted [sic] to the Incident." It is unclear what the DAPARB intended to say or imply with such a statement.

561.    In addition, the DAPARB intentionally ignored all of the errors, injustices, and inaccuracies of which Plaintiff had made LTC Yates and the DAPARB aware. See ¶ 537 (summarizing the errors, injustices, and inaccuracies of which Plaintiff made LTC Yates aware); Exhibit 44 (March 14, 2008 appeal to the DAPARB).


### iii. THE ABCMR

562.    Plaintiff incorporates paragraphs 1-561 by reference.

563.    The ABCMR, in addition to being obligated to follow 32 C.F.R. § 505.6(b)(3)(i)[47] when determining whether to amend Army records, is specifically obligated to "[d]irect or recommend changes in military records to correct [an] *error or injustice* . . . ." AR 15-185, ¶ 1-8(b) (emphasis added) (Exhibit 13).

---

47. "The standard for amendment is that the records are inaccurate as a matter of fact rather than judgment, irrelevant, untimely, or incomplete." 32 C.F.R. § 505.6(a)(2). Title 32 further states, "Amendment [of a document] is appropriate if it can be shown that . . . [c]ircumstances leading up to the recorded event were found to be inaccurately reflected in the document . . . ." Id. § 505.6(b)(3)(i).

564.    The ABCMR, however, refused to correct even one of the errors and injustices in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII. Exhibit 10.

565.    *First*, Plaintiff made the ABCMR aware that there existed no evidence to support the Army's charging (i.e., titling) of him with crimes. Exhibit 20, at 4-5. The ABCMR, however, made absolutely no reference to whether evidence existed, much less credible information, to justify the Army's charging (i.e., titling) of Plaintiff. See generally Exhibit 10 (the ABCMR's decision denying Plaintiff's amendment request). The ABCMR, therefore, knew, and showed utter indifference and disregard to the fact, that there was no credible information to support the Army's charging (i.e., titling) of Plaintiff with crimes.

566.    *Second*, Plaintiff made the ABCMR aware of the numerous errors, injustices, and inaccuracies in the Narrative of MPR 00-MPC937-0607T-5C2B. Exhibit 20, at 5-6; Exhibit 60 (Appendix to ABCMR amendment request that detailed, over four pages, all of the inaccuracies and injustices in the Narrative).

567.    The ABCMR, however, refused to amend any of the errors, injustices, and inaccuracies in the Narrative. See generally Exhibit 10. The ABCMR, therefore, knew, and showed utter indifference and disregard to the fact, that there were numerous errors, injustices, and inaccuracies in the Narrative.

568.    For example, Plaintiff made the ABCMR aware that the Narrative of MPR 00-MPC937-0607T-5C2B altered facts by inaccurately and unjustly reflecting Plaintiff's alcohol level. Exhibit 20, at 5-6.

569.    The Narrative, which is to be a true and accurate summary of the Snowball Incident, states that Plaintiff's alcohol level was 0.7%. Exhibit 1, at 9, Section VII – Narrative.

570.     Plaintiff's alcohol level, however, was actually 0.03%. Exhibit 1, at 2, Section III – Subject, Box 16.b, Alcohol/Drug Test Results.

571.     Plaintiff asked the ABCMR to correct this error. The ABCMR, however, nonchalantly dismissed this obvious error and injustice by stating:

> The applicant's contention that his blood alcohol level was unlawfully altered from 0.03 to 0.7 *appears to be nothing more than a transcription error* within the MPR. As such, it has no impact on the overall content of the MPR. All reported parties to the Snowball Incident had consumed alcohol. Further, alcohol consumption had no bearing on the listed offense (assault); the applicant was not titled for drunk or disorderly conduct.

Exhibit 10, at 7 (emphasis added).

572.     This "transcription error," as the ABCMR euphemistically referred to it as, is exactly that—an *error*.

573.     The ABCMR is obligated to correct *errors*. AR 15-185, ¶ 1-8(b) (Exhibit 13).

574.     Most importantly, this "transcription error" is *unjust* because it has a negative "impact" on Plaintiff.

575.     The ABCMR is obligated to correct *injustices*. AR 15-185, ¶ 1-8(b) (Exhibit 13).

576.     Army regulations require the Narrative to be a thorough, true, and accurate summary of the reported incident. AR 190-45(2007), Appendix B, B-2(h) (Exhibit 17).[48]

577.     Individuals receiving MPR 00-MPC937-0607T-5C2B read the Narrative for the specific purpose of finding out what happened during the Snowball Incident. These individuals will read the Narrative and think that Plaintiff was extremely inebriated, which only adds to the

---

48. Plaintiff is citing AR 190-45(2007), which is currently in force, and not AR 190-45(1988), which was in force during the Snowball Incident, because the "Directions for completing DA Form 3975 [a MPR]" in AR 190-45(1988) pertained to an old, out-dated version of the MPR. See AR 190-45(1988), Figure 4-1, "Directions for completing DA form 3975," at 32-33 (Exhibit 26). The directions for completing DA Form 3975 in AR 190-45(2007) correspond to the newer version of the MPR, which the Army used in the Snowball Incident.

unjust, unethical, unlawful and unconstitutional description of the events surrounding the Snowball Incident that the Narrative portrays.

578.    Therefore, contrary to what the ABCMR alleges, the altered alcohol level does have an "impact on the overall content of the MPR," and, most importantly, an *unjust* impact on Plaintiff, because people read the Narrative for the very purpose of obtaining an accurate summary of the "overall content of the MPR," and Plaintiff's involvement therein. People will falsely believe that Plaintiff was extremely intoxicated—twenty-three times more intoxicated than he really was, and twenty-three times more intoxicated than Larson (the only one of the five attackers whose alcohol level the writer of the Narrative bothered to include).

579.    Moreover, although the ABCMR claimed that Plaintiff's alcohol level "has no impact on the overall content of the MPR," and that it "had no bearing on the listed offense," the trained military police investigator (allegedly SFC Cox) who wrote the Narrative felt that Plaintiff's (altered) alcohol level "had a bearing on the listed offense" and was important enough to include in the Narrative.

580.    Furthermore, previous decisions by the ABCMR show that it is more than willing to correct typographical/transcription errors in military records. See, e.g., Exhibit 61 (November 30, 2006 ABCMR decision where the Board corrected what it called a "typographical error" because dates had been transposed); Exhibit 62 (January 12, 2006 ABCMR decision where the Board corrected what it called a "typographical error" because the applicant's place of birth was falsely listed as Virginia, instead of West Virginia); Exhibit 63 (February 24, 2004 ABCMR decision where the Board corrected what it called a "typographical error" because the applicant's social security number was one digit off).

581. *Third*, the ABCMR's disinterest in correcting errors and injustices in MPR 00-MPC937-0607T-5C2B is further supported by another example. Plaintiff made the ABMCR aware that the Army investigator who interviewed Plaintiff claimed that he (the investigator) had authority to administer an oath to Plaintiff pursuant to Article 136(b)(4) of the UCMJ. Exhibit 30, at 3.

582. Plaintiff made the ABCMR aware that Plaintiff was a U.S. civilian, and that as a civilian, the Army investigator, pursuant to Army regulations, only had authority under 5 U.S.C. § 303(b) to administer an oath to Plaintiff. Exhibit 20, at 8 (showing that Plaintiff cited AR 190-30(2005), ¶ 4-12 (Exhibit 28)); see also AR 195-2(1985), ¶¶ 3-18 and 3-23 (Exhibit 3) (stating the same in regards to oaths) (this was in force as of the Snowball Incident).

583. AR 190-30(2005) states, "[Military police investigators] have authority pursuant to Article 136(b)(4), UCMJ to administer oaths to military personnel who are subject to the UCMJ. The authority to administer oaths to civilians who are not subject to the UCMJ is Section 303b, Title 5, United States Code (5 USC 303(b))." AR 190-30(2005), ¶ 4-12 (Exhibit 28).

584. The ABCMR did not address the fact that Plaintiff was a civilian and that the investigator was required to cite 5 U.S.C. § 303(b) when administering Plaintiff an oath. The ABCMR simply claimed, "Paragraph (b)(4) of this article authorizes members of the Armed Forces conducting investigations to administer oaths to *any* suspect or witness," Exhibit 10, at 7 (emphasis added), and that the investigator's citation of Article 136(b)(4) "simply indicates the authority cited by the investigator." Id. at 8.

585. Plaintiff had made the ABCMR aware of AR 190-30(2005), paragraph 4-12, and the fact that he was a civilian. Therefore, the ABCMR's responses cannot be dismissed as simple ignorance. The ABCMR, knew, and showed utter indifference and disregard to the fact, that

Plaintiff was not a member of the military and, therefore, was not subject to being administered oaths pursuant to the UCMJ.

586.    *Fourth*, Plaintiff devoted an entire section of his ABCMR amendment request to the fact that the Army had no right to charge (i.e., title) him with a German crime, or to reference a German crime in any way. Exhibit 20, at 6-7.

587.    The ABCMR claimed the following:

> There is no evidence showing the applicant was ever charged, tried or convicted of any crime by either Federal Republic of Germany authorities or by the U.S. Army.

Exhibit 10, at 7.

588.    The ABCMR—the Army's Beacon of Justice—however, claimed, just a few pages earlier in the same decision, that the Army convicted Plaintiff of a German crime (i.e., made a final determination that Plaintiff *committed* a German crime):

> DA Form 3975 [MPR 00-MPC937-0607T-5C2B], dated 24 January 2000 . . . shows . . . the applicant [Plaintiff], then a nonappropriated fund employee while working for the U.S. Army in the Federal Republic of Germany *committed the criminal offense of bodily injury under German law* . . . ."

Exhibit 10, at 3 (emphasis added).

589.    The ABCMR, a group of select, high-level Army "experts," knew, should have known, and obviously showed utter indifference and disregard to the fact, that a final determination that an individual committed a crime (i.e., a conviction) is subsequent to a "charge."

590.    In addition, the ABCMR, a group of high-level Army "experts," knew, should have known, and obviously showed utter indifference and disregard to the fact, that the Army has absolutely no authority or competence to determine whether a U.S. civilian, such as Plaintiff,

"committed" a German crime, much less the authority to state, in an official, criminal report, that Plaintiff, a U.S. civilian and citizen, "committed" a German crime.

591. Finally, the ABCMR, a group of Army "experts," knew, and obviously showed utter indifference and disregard to the fact, that DOD instructions state: "[t]itling an individual or entity is an operational rather than a legal decision," "[t]he act of titling and indexing *shall not*, in and of itself, connote *any* degree of guilt or innocence," and "[t]he acts of titling and indexing are administrative in nature." See DODI 92, ¶¶ D.4 and F.1 (Exhibit 14); DODI 03, ¶ 6.5 (Exhibit 15); AR 190-45(2007), ¶ 4-3(a) (Exhibit 17) (emphasis added). Plaintiff sent the ABCMR a copy of these DOD instructions. Exhibit 20, at 12. The ABCMR even summarized these DOD instructions in its decision. Exhibit 10, at 6. Despite knowing the DOD instructions regarding titling, the ABCMR showed utter indifference and disregard for these instructions by stating that the Army's "titling" of Plaintiff *did* connote guilt. In fact, the ABCMR stated that the Army's "titling" of Plaintiff in MPR 00-MPC937-0607T-5C2B showed that the Army had determined that Plaintiff "committed the criminal offense of bodily injury under German law." Exhibit 10, at 3.

592. *Fifth*, Plaintiff made the ABCMR aware of the fact that the Army clearly charged (i.e., titled) Plaintiff, a U.S. civilian and citizen, with a crime based on the UCMJ. Exhibit 20, at 7-9; see Count V, supra (explaining how the Army charged (i.e., titled) Plaintiff with the Army crime 5C2B, which is based on the UCMJ).

593. The ABCMR dismissed this claim by simply claiming Plaintiff's assertion was "inaccurate." Exhibit 10, at 8. The ABCMR provided no reasoning as to why Plaintiff's assertion was "inaccurate."

594.     The ABCMR, therefore, knew, but showed utter indifference and disregard to the fact, that the Army had subjected Plaintiff to military law by charging (i.e., titling) him with a crime based on the UCMJ.

595.     *Sixth*, Plaintiff made the ABCMR aware that, although the Army claimed that it suspended Plaintiff in DA Form 4833, his pay records clearly showed that no suspension occurred. Exhibit 64, at 2 (Statement of Disagreement, which was an attachment to the ABCMR application).

596.     The ABCMR dismissed this claim by Plaintiff by stating that DA Form 4833 "makes no mention of a loss of pay." Exhibit 10, at 7. The ABCMR, being select, high-level Army "experts" knew, should have known, or showed utter indifference and disregard to the fact that Army regulations and reporting manuals clearly state that suspensions are "non-pay" periods and shall be reported as such. See ¶¶ 538-547, supra (explaining that the Army never actually suspended Plaintiff, although it falsely claims it did suspend Plaintiff in DA Form 4833).

597.     *Seventh*, Plaintiff made the ABCMR aware that an agency (the State Department) had labeled Plaintiff as a criminal and decided to deny his secret security clearance, based in part on the Army's charging (i.e., titling) of him. Exhibit 20, at 10-11. The ABCMR showed utter indifference and disregard to this fact by not even addressing it.

598.     *Eighth*, Plaintiff made the ABCMR aware that there were no Army regulations or DOD instructions that gave the Army authority to charge (i.e., title) him, a U.S. civilian and citizen. Exhibit 20, at 7-9. The ABCMR showed utter indifference and disregard to this claim by Plaintiff, except to state that Plaintiff "was subject to the provisions of NATO SOFA. Therefore, the military police had the right and obligation to *investigate* the incident." Exhibit 10, at 8 (emphasis added). Plaintiff, however, had made the ABCMR aware of the fact that NATO SOFA

was inapplicable in this instance because of the Supreme Court's ruling in <u>Reid v. Covert</u>, 354 U.S. 1 (1957) (plurality opinion), and the subsequent line of cases. <u>Exhibit 20</u>, at 9.

599.    The ABCMR, therefore, knew of Plaintiff's claims that no DOD instruction or Army regulation existed that gave the Army authority to charge (i.e., title) him with crimes, and that the NATO SOFA was made inapplicable in Plaintiff's case because of the Supreme Court's rulings. The ABCMR, however, showed utter indifference and disregard to Plaintiff's claims that the Army lacked any authority to charge (i.e., title) Plaintiff.

600.    The ABCMR, therefore, intentionally and willfully violated the Privacy Act by knowing of the aforementioned errors, inaccuracies, and injustices in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII, and then showing utter indifference and disregard for these errors, inaccuracies, and injustices by unjustly, unethically, and unlawfully ignoring and/or dismissing every, single one.

601.    The ABCMR, however, does not ignore alleged errors, injustices, inaccuracies, and inequities when they involve higher-ranking individuals than Plaintiff, who is just a former minimum wage, low-level, non-career, civilian employee.

602.    In 1994, the Army titled a female active duty major with adultery, false swearing, and sodomy. Ham Article, <u>supra</u> ¶ 62, at 17 (<u>Exhibit 21</u>).

603.    The ABCMR concluded that there *was* "probable cause" to believe the major had committed adultery, false swearing, and sodomy. <u>Id</u>.

604.    The ABCMR, however, then concluded, "[I]njustice and inequity exist in this case. While there may be probable cause, *crime or guilt has not been shown*, **but** *the investigation will nevertheless serve to the applicant's severe detriment*." <u>Id</u>. (emphasis added).

605. The ABCMR further clarified why it felt that "injustice and inequity" existed in this case:

> [The criminal report in which the Army titled the major] remains accessible [in the DCII] and will or may be reviewed and used in the applicant's future, e.g., for various selection boards such as a command selection board. It is a distinct unfair advantage for anyone under these circumstances when in competition with peers. The Board concludes that this is an injustice and an inequity in this instance.

Id.

606. The ABCMR recommended correction of the officer's records by removing her name from the title block of the criminal report, distributing copies of the amended report to all organizations that had received the original, and removing her name from the DCII. Id.

607. In sum, Plaintiff made the Army, through the Secretary of the Army and its officials and boards, aware of the numerous errors, injustices, and inaccuracies in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII. The Army, however, intentionally and willfully refused to correct (and often refused to even address) even one of the numerous errors, injustices, and inaccuracies in MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII. Therefore, the Army is continuing to intentionally and willfully violate 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C), for the very same reasons as described under each of the "Six Reasons" provided earlier in this Count.

608. Furthermore, each time the Army disseminates MPR 00-MPC937-0607T-5C2B and DA Form 4833, and each time it allows these records and the information in the DCII to be viewed, copied, and/or downloaded, it is creating new records that violate the Privacy Act. See, e.g., Count VII (explaining how the State Department's investigative records on Plaintiff, which were created based solely on MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII, are in violation of the Privacy Act, and that the State Department will disseminate its investigative

records on Plaintiff, upon request, to government agencies); Exhibit 10, at 3 (showing that the ABCMR stated, after having viewed MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 was attached), that Plaintiff had "committed the crime of bodily injury under German law").

609.    MPR 00-MPC937-0607T-5C2B (to which DA Form 4833 is attached), has been viewed and downloaded at least twelve separate times—the last time being on January 26, 2010. Exhibit 11 (stating that MPR 00-MPC937-0607T-5C2B was viewed on January 26, 2010, December 9, 2008, November 7, 2008, July 29, 2008, July 20, 2008, July 7, 2008, June 16, 2008, February 28, 2008, October 6, 2007, July 24, 2007, May 23, 2007, and January 8, 2007).

610.    The Army, however, did not inform Plaintiff who viewed MPR 00-MPC937-0607T-5C2B, or for what purpose they were viewing MPR 00-MPC937-5C2B. Exhibit 52.

611.    Moreover, numerous agencies and countless individuals have access to the DCII and Plaintiff's personal information, and information on the Army's "titling" of him, contained therein. Individuals use the DCII to find and access Plaintiff's "military criminal records," which the Army created on Plaintiff. As of 1998, more than twenty-seven agencies and countless individuals were authorized to access the DCII, and to input data into to the DCII. Ham Article, supra ¶ 62, at 5 n.34 (Exhibit 21). The DSS, which manages the DCII, has not responded to Plaintiff's request for current statistics regarding DCII access, which Plaintiff made on March 9, 2010. Exhibit 104.

612.    "The information retrieved [from the DCII] may be used *to determine promotions, to make employment decisions, to assist in assignment decisions, to make security determinations*, and to assist criminal investigators in subsequent investigations." Ham Article, supra ¶ 62, at 5 (Exhibit 21) (emphasis added).

## iv. VIOLATION OF 32 C.F.R. § 505.6

613.    Plaintiff incorporates paragraphs 1-612 by reference.

614.    Federal regulations state, "The standard for amendment is that the records are inaccurate as a matter of fact rather than judgment, irrelevant, untimely, or incomplete." 32 C.F.R. § 505.6(a)(2). Title 32 further states, "Amendment [of a document] is appropriate if it can be shown that . . . [c]ircumstances leading up to the recorded event were found to be inaccurately reflected in the document . . . ." Id. § 505.6(b)(3)(i).

615.    The Secretary of the Army, through LTC Yates, the DAPARB, and the ABCMR, unlawfully, and intentionally and willfully, refused to amend Plaintiff's records, which Plaintiff clearly showed to be "inaccurate as a matter of fact," and which inaccurately reflected the Snowball Incident.

616.    Therefore, the Secretary of the Army intentionally and willfully violated 32 C.F.R. § 505.6 by refusing to amend its military *criminal* records on Plaintiff.


617.    Plaintiff is aware that courts sometimes apply an unusually deferential standard when reviewing decisions by the military in regards to military members, records pertaining to military members, and the application of Army regulations to the acts and omissions of military members. This situation, however, involves Plaintiff, a U.S. civilian and citizen, not a member of the military. It involves a situation where the Army unconstitutionally exercised military jurisdiction over Plaintiff, violated his rights under the U.S. Constitution, and documented these violations in MPR 00-MPC937-0607T-5C2B, DA Form 4833, the DCII, and other records created because of these three. Furthermore, these military *criminal* records contain numerous errors, injustices, and inaccuracies. Therefore, these records should be corrected to ensure

fairness to Plaintiff, a U.S. civilian and citizen, as required by the Privacy Act. This Court, therefore, should not apply a higher deferential standard when determining the validity of the Army's creation of "military criminal records" on Plaintiff, a U.S. civilian and citizen, and the Army's repeated refusals to amend even one error, injustice, or inaccuracy in these records.

WHEREFORE, Plaintiff requests the Court to:

1. declare, pursuant to 28 U.S.C. § 2201, that the Secretary of the Army's acts and omissions, through its named officials and boards, violated:

    a. 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C);

    b. 32 C.F.R. § 505.6;

2. enjoin the United States, pursuant to 28 U.S.C. § 2202 or the law of equity, through the Army Crime Records Center ("USACRC"), or appropriate agency, from disseminating copies of, or allowing to be viewed, MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, Plaintiff's information in the DCII, and any other record pertaining to Plaintiff and his involvement in the Snowball Incident, until these records have been amended or destroyed, as described below;

3. hold unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, [and] privilege," "in excess of statutory jurisdiction," "without observance of procedure required by law," and "unwarranted by the facts," 5 U.S.C. § 706(2)(A) – (D) and (F);

    a. the Army's creation of MPR 00-MPC937-0607T-5C2B, the DA Form 4833 pertaining to Plaintiff, and indexing of Plaintiff in the DCII;

b. the Army's titling (i.e., charging) of Plaintiff in MPR 00-MPC937-0607T-5C2B and DA Form 4833;

c. the Army's Narrative in MPR 00-MPC937-0607T-5C2B;

d. the Army's DA Form 4833 on Plaintiff (i.e., DA Form 4833 in its entirety);

e. the Army's claim in DA Form 4833 that the Army suspended Plaintiff;

f. the Army's refusals to amend MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII;

4.      compel the Secretary of the Army, pursuant to either 5 U.S.C. § 552a(g)(2)(A), 28 U.S.C. § 1361, or 5 U.S.C. § 706(1), to:

a. amend MPR 00-MPC937-0607T-5C2B, all copies of MPR 00-MPC937-0607T-5C2B, and all copies of MPR 00-MPC937-0607T-5C2B already disseminated by the Army or other military branch by: (1) removing Plaintiff's name from the subject block of MPR 00-MPC937-0607T-5C2B; and (2) removing from MPR 00-MPC937-0607T-5C2B any mention that Plaintiff was "titled," "charged," "accused," or "cited" with any crime, any mention that Plaintiff was made the "subject" of a report or investigation, and any mention that Plaintiff was "suspended" for any crime;

b. remove from all military records (including the minutes and decisions of LTC Yates, the DAPARB, and the ABCMR), and all disseminated records, any mention that the Army "titled," "accused," "cited," or "charged" Plaintiff with a crime, any mention that Plaintiff "committed" or "may have committed" a crime, any mention that the Army made Plaintiff the "subject" of the Army's investigation into the Snowball Incident, and any mention that the Army "suspended" Plaintiff for being involved in the Snowball Incident;

c. replace the current Narrative in MPR 00-MPC937-0607T-5C2B by replacing it with SSG Clark's Sworn Statement (Exhibit 29), absent any mention that Plaintiff was "titled," "cited," "accused," or "charged" with a crime, made the "subject" of an Army investigation, or "suspended";

d. destroy the DA Form 4833 pertaining to Plaintiff because it does not contain one piece of information that is true and accurate, except Plaintiff's name, date of birth, and social security number;

e. remove Plaintiff's name and identifying information from the DCII;

f. provide all persons who viewed or received any record pertaining to Plaintiff and his involvement in the Snowball Incident: (1) a written notice that the Army's "titling" of Plaintiff was unconstitutional and must be disregarded; and (2) copy of each record they viewed or possess, amended as Plaintiff has requested, or as this Court orders;

5. compel, pursuant to 5 U.S.C. § 555a(g)(2)(A), 5 U.S.C. § 706(1), or 28 U.S.C. § 1361, each person (i.e., individual or agency) who viewed any of the Army's records pertaining to Plaintiff's involvement in the Snowball Incident, or to whom the Army sent copies of such records, to destroy those Army records or send them, and all copies, back to the Army to be amended, as described above, and amend, as described above, any records these persons generated as a result of their receipt and viewing of those Army records;

6. compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

a.  amend or destroy Plaintiff's records within a definite time;

b.  notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed;

c.  send Plaintiff in writing, within twenty business days of amending, a copy of the amended record, or proof that a record was destroyed;

7.     hold, pursuant to 5 U.S.C. § 552a(g)(4), that the Secretary of the Army's violations of 5 U.S.C. § 552a(e)(5) and (6), and (g)(1)(C) were intentional and willful violations;

8.     award Plaintiff, pursuant to 5 U.S.C. § 552a(g)(4)(A), statutory damages of $1,000;

9.     award Plaintiff, pursuant to 5 U.S.C. § 552a(g)(4)(A), the following compensatory/actual damages:

a.  $200,000 for loss of reputation, distress, embarrassment, and humiliation resulting from: (1) the Army's unjust, unethical, unlawful, and unconstitutional charging (i.e., titling) of Plaintiff with crimes; (2) the Army's labeling of Plaintiff as a criminal and determination that he committed crimes, without a finding of probable cause; (3) Plaintiff learning of MPR 00-MPC937-0607T-5C2B and the Army's unjust, unethical, unlawful, and unconstitutional charging of Plaintiff, as a result of a security clearance that was initially denied by the State Department, seven years after the Snowball Incident, in an unexpected, embarrassing, and humiliating way; and (4) individuals and agencies viewing MPR 00-MPC937-0607T-5C2B, DA Form 4833, and the DCII, and then labeling Plaintiff as a criminal who committed an Army crime and a German crime;

b. $126,584 for Plaintiff's actual costs in correcting the Army's intentional and willful violations of his rights under the Privacy Act. See Exhibit 106;

c. $100,000 for lost wages because Plaintiff, who has a J.D. and LL.M., has been forced to spend over 700 hours of his life over the last three years attempting to amend MPR 00-MPC937-0607T-5C2B, DA Form 4833, the DCII, and the negative fall-out and repercussions from these documents; and

d. award Plaintiff, pursuant to 5 U.S.C. § 552a(g)(2)(B) and (4)(B), reasonable costs. Plaintiff realizes that the majority of the circuits have ruled that an award of attorney fees under the Privacy Act and the FOIA does not apply to *pro se* litigants. The reasoning behind these holdings is that Congress intended attorneys, hired by litigants, to receive attorney's fees. Wolfel v. U.S., 711 F.2d 66, 68 (6th Cir. 1983).

Congress, however, intended litigants, including *pro se* litigants, who have substantially prevailed in Privacy Act litigation, or who have prevailed despite a governmental agency's intentional and willful refusals to abide by the Privacy Act, to receive costs incurred as a result of being forced to bring suit due to the agency's unlawful, or intentional and willful, violation of the Privacy Act (and, similarly, the FOIA). Parkinson v. Commissioner, 840 F.2d 17, *7 (6th Cir. 1988) (Exhibit 105) (stating, "It is clear that a *pro se* plaintiff cannot recover attorney fees under [the FOIA and Privacy Act]. However, it does not follow that a *pro se* plaintiff cannot be awarded litigation costs pursuant to [these Acts]"); DeBold v. Stimson, 735 F.2d 1037, 1043 (7th Cir. 1984) (stating, "a *pro se* litigant who has substantially prevailed certainly is entitled to 'litigation costs reasonably incurred'"); Clarkson v. Internal Revenue Service, 678 F.

2d 1368, 1371 (11th Cir. 1982) (stating, "Unlike attorney fees, however, costs of litigation can be reasonably incurred even by a *pro se* litigant who is not an attorney").

By not allowing *pro se* litigants to receive the costs associated with bringing suit themselves, courts enable government agencies to violate the Privacy Act. Individuals, whose rights government agencies are violating under the Privacy Act [and the FOIA], will either: (1) be forced to pay for an attorney who they may not be able to afford, on the hope that a court will award them attorney fees; or (2) be forced to spend their own time and money to amend their personal records under the Privacy Act—with no hope of being compensated for asserting their rights under the Privacy Act (unless the court holds that such violation was intentional and willful)—because of the government's unlawful violations of their rights under the Privacy Act.

Denying a *pro se* litigant to recoup litigation costs would force *pro se* litigants to spend countless hours and dollars (often over a period of years), plodding through agency amendment processes that are set up and administered by government experts whose sole purpose is to delay, deny, discourage, and dismiss requests. After ultimately denying the *pro se* litigant's amendment request after the litigant has went through years of administrative "amendment" procedures, the agency forces the *pro se* litigant to either give up, or spend countless more hours and dollars of their own time and money fighting the agency errors and injustices in federal court. The agency, however, which perpetrated the injustices, has, relative to the *pro se* litigant, endless funds, in the form of tax dollars, some from the *pro se* litigant, to spend on countless lawyers and experts who are paid to fight and defend the agency's unjust, unethical, unlawful, and unconstitutional acts and omissions.

### 7. COUNT VII: VIOLATION OF THE PRIVACY ACT BY THE DEPARTMENT OF STATE

618. Plaintiff incorporates paragraphs 1-617 by reference.

619. The State Department has unlawfully, and intentionally and willfully, violated the following provisions of the Privacy Act:

a. Sub-paragraph (d)(2)(A): requiring agencies to respond to an amendment request "not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request." 5 U.S.C. § 552a(d)(2)(A).

b. Sub-paragraph (d)(2)(B): requiring agencies to "promptly" make a determination of whether to amend or deny the amendment request. 5 U.S.C. § 552a(d)(2)(B).

c. Sub-paragraph (d)(3): requiring agencies to allow individuals to appeal a denial of an amendment request. 5 U.S.C. § 552a(d)(3).

d. Sub-paragraph (d)(4): requiring agencies to allow individuals to submit a statement of disagreement upon denial by the agency of their Privacy Act amendment request. 5 U.S.C. § 552a(d)(4).

e. Sub-paragraph (e)(5): requiring agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

f. Sub-paragraph (e)(6): requiring agencies to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C. § 552a(e)(6).

g. Sub-paragraph (g)(1)(C): requiring agencies to:

> maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

5 U.S.C. § 552a(g)(1)(C).

620.     This Court has jurisdiction over these claims pursuant to 5 U.S.C. § 552a(g)(1)(A), (C), and (D), and (g)(2), (4) and (5).

621.     During its investigation of Plaintiff, in connection with Plaintiff's application for a secret security clearance, the State Department's Bureau of Diplomatic Security created records in which it falsely stated that Plaintiff's involvement in the Snowball Incident constituted "criminal conduct." These records also state or imply that Plaintiff was apprehended for assault, accused of assault, charged with assault, convicted of assault, and suspended for assault. Exhibit 5, at 2 (initial denial and February 23, 2007 Adjudicative Worksheet); Exhibit 12 (February 21, 2007 Investigative Certification and Refer to Formal Adjudication); Exhibit 65 (June 13, 2007 Adjudicative Worksheet); Exhibit 66 (Analysis: Executive Order 12968).

622.     Plaintiff made the State Department aware of the errors, injustices, and inaccuracies in its records pertaining to him on eight different occasions during the first six months after he first viewed one of the State Department's investigative records on him.[49]

---

49. Plaintiff's amendment request was not the first time that Plaintiff had informed the State Department of the errors, injustices, and inaccuracies in its records pertaining to Plaintiff, including the fact that its interpretation of "titling" and the events of the Snowball Incident were false and unjust. Plaintiff sent the State Department eight letters trying to point out to the State Department, and its highly-paid contract investigators and security officials, these errors, injustices, and inaccuracies, and explain that Army regulations state "titling shall not connote any degree of guilt or innocence." Plaintiff sent letters on: May 11, 2007 (First Response); May 13, 2007 (Second Response); June 4, 2007 (Third Response); June 11, 2007 (Fourth Response); June 11, 2007 (Fifth Response; on same day as Fourth Response); August 7, 2007 (Sixth Response); August 22, 2007 (Seventh Response); and November 17, 2007 (Eighth Response)

623.    On May 26, 2008, Plaintiff made a Privacy Act amendment request to the State Department to have the State Department amend its records on Plaintiff. Exhibit 67. In that request, Plaintiff explained to the State Department and its "investigators" that the Army had "titled" Plaintiff, and that the State Department's interpretation of "titling" was false and unjust. Plaintiff explained why it was false. Plaintiff also told the State Department that its interpretation of the Army's "titling" of him negatively, unjustly, unethically, unlawfully, and unconstitutionally reflected on his character and reputation. Plaintiff requested that the State Department amend its records accordingly by removing all negative references in its records, where those negative references were based on its investigators' "misunderstanding" of "titling." Exhibit 67.

624.    The State Department has intentionally and willfully not responded for *two years*—and counting—to Plaintiff's Privacy Act amendment request. The State Department had hoped that Plaintiff, someone it deems as unimportant, would either forget about his request, or be forced to give up pursuing it.

625.    By creating its unjust, unethical, unlawful, and unconstitutional records on Plaintiff, and by intentionally and willfully refusing to amend these records for over *two years*, pursuant to Plaintiff's Privacy Act amendment request, the State Department has intentionally and willfully violated the following Privacy Act provisions.

626.    The State Department intentionally and willfully violated sub-paragraph (d)(2)(A) because it failed to acknowledge receipt of Plaintiff's amendment request "not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request." 5 U.S.C. § 552a(d)(2)(A).

---

(Exhibit 70). Plaintiff has provided a copy of the Eighth Response because it consisted of a summarization of the previous responses and points made therein.

627.    On June 3, 2008, the State Department received Plaintiff's May 26, 2008 amendment request. Exhibit 68.

628.    Therefore, the State Department was obligated to send Plaintiff acknowledgement of its receipt of Plaintiff's request by June 16, 2008. 5 U.S.C. § 552a(d)(2)(A).

629.    The State Department, however, acknowledged receipt of Plaintiff's May 26, 2008 amendment request on September 16, 2008—*115 days* after receiving Plaintiff's request. Exhibit 69.

630.    The State Department's response, therefore, which was almost 100 days past the allotted statutory limit, constituted an intentional and willful violation of 5 U.S.C. § 552a(d)(2)(A).

631.    This Court has jurisdiction over a violation of sub-paragraph (d)(2)(A) pursuant to 5 U.S.C. § 552a(g)(1)(D). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of a claim brought under sub-paragraph (g)(1)(D).


632.    The State Department intentionally and willfully violated sub-paragraph (d)(2)(B) because it failed to either "promptly" amend Plaintiff's records, or to "promptly" notify Plaintiff that it had denied Plaintiff's request for amendment. 5 U.S.C. § 552a(d)(2)(B).

633.    The State Department was required to either "promptly" amend its records pursuant to Plaintiff's amendment request, or "promptly" notify Plaintiff of its decision to deny Plaintiff's request. 5 U.S.C. § 552a(d)(2)(B).

634.    The Privacy Act does not define "promptly." One court, however, has stated that a six-month delay was not "prompt" and, therefore, was in violation of the Privacy Act. See

Schaeuble v. Reno, 87 F. Supp. 2d 383, 389 (D. N.J. 2000) (stating, "A six month delay is not a 'prompt' response").

635.    By May 12, 2009, almost *one year* after receiving Plaintiff's May 26, 2008 Privacy Act amendment request, the State Department had still not contacted Plaintiff about a decision regarding his amendment request. Therefore, on May 12, 2009, Plaintiff sent a letter to the State Department, repeating his amendment request and inquiring what, if anything, was being done. Exhibit 71.

636.    On June 11, 2009, the State Department answered Plaintiff's May 12, 2009 inquiry by assuring Plaintiff that his "request for amendment is being given every consideration possible." Exhibit 72. The State Department offered no time frame as to when it would make a decision.

637.    As of May 18, 2010, the State Department has yet to notify Plaintiff as to its decision. It has now been almost *two years* since the State Department received Plaintiff's May 26, 2008 request for amendment.

638.    The State Department has not "promptly" answered Plaintiff's request for amendment.

639.    Therefore, the State Department's intentional and willful failure, after *two years*—and counting, to either amend Plaintiff's records pursuant to his amendment request, or to deny his amendment request, constitutes an intentional and willful violation of 5 U.S.C. § 552a(d)(2)(B).

640.    This Court has jurisdiction over a violation of sub-paragraph (d)(2)(B), pursuant to 5 U.S.C. § 552a(g)(1)(D). This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of a claim brought under sub-paragraph (g)(1)(D).

641.    The State Department also has intentionally and willfully violated Plaintiff's rights under 5 U.S.C. § 552a(d)(3) and (4) because it has intentionally and willfully refused to make a decision on Plaintiff's amendment request for *two years*—and counting.

642.    The State Department's failure, for *two years*—and counting, to make a decision regarding Plaintiff's amendment request constitutes a constructive denial of Plaintiff's request, for purposes of 5 U.S.C. § 552a(d)(2)(B)(ii). The Supreme Court has stated that parties "may bypass the administrative process where exhaustion would be futile or inadequate." Honig v. Doe, 484 U.S. 305, 327 (1988); Crocker v. Tennessee Secondary School Athletic Ass'n, 873 F.2d 933, 937 (6th Cir. 1988) (citing Honig v. Doe; citation incomplete in Lexis copy of case).

643.    It is obvious that Plaintiff would never be able to bring suit in federal court against the State Department for Privacy Act violations if Plaintiff was required to exhaust his administrative remedies by waiting for the State Department to officially deny or accept his request for amendment.

644.    Moreover, the State Department cannot claim that it "forgot" about Plaintiff's amendment request because on May 12, 2009, Plaintiff reminded the State Department that it had yet to act on Plaintiff's amendment request. Exhibit 71.

645.    In addition, the State Department cannot claim that it was "busy" and could not get to Plaintiff's request. The State Department has had *two years* to make a decision on Plaintiff's request.

646.    Plaintiff, therefore, has not been able to exhaust his administrative remedies pursuant to 5 U.S.C. § 552a(d)(3) (by appealing a response) and (d)(4) (by submitting a statement of disagreement) because the State Department has constructively dismissed Plaintiff's

amendment request by not responding after *two years*—and counting. Plaintiff has waited more than a reasonable amount of time for the State Department to "promptly" make a decision.

647.    Therefore, the State Department's intentional and willful refusal—for *two years* (and counting)—to make a decision on Plaintiff's amendment request constituted an intentional and willful violation of Plaintiff's right to appeal, and Plaintiff's right to submit a statement of disagreement, pursuant to 5 U.S.C. § 552a(d)(3) and (4), respectively.

648.    This Court has jurisdiction over the State Department's violation of sub-paragraph (d)(3), pursuant to 5 U.S.C. § 552a(g)(1)(A). This Court has jurisdiction over the State Department's violation of sub-paragraph (d)(4), pursuant to 5 U.S.C. § 552a(g)(1)(D). This Court, pursuant to 5 U.S.C. § 552a(g)(2)(A), has jurisdiction to compel the State Department to amend its records to make them accurate, and to bring them into full compliance with Plaintiff's rights under the Privacy Act. Finally, this Court has jurisdiction over intentional and willful violations of sub-paragraph (d)(4) (which claim is brought under (g)(1)(D)), pursuant to 5 U.S.C. § 552a(g)(4).


649.    The State Department has intentionally and willfully violated sub-paragraph (e)(5) because it, by refusing to amend its records on Plaintiff for *two* years—and counting, has failed to:

> maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

5 U.S.C. § 552a(e)(5). This Court has jurisdiction over this violation pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, this Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

650.    The State Department has intentionally and willfully violated sub-paragraph (e)(6) because it, by refusing to amend its records on Plaintiff for *two* years—and counting, has disseminated—or there is a high probability that it will disseminate in the future—its investigative records pertaining to Plaintiff and, prior to doing so, failed, or will fail, to:

> . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes . . . .

5 U.S.C. § 552a(e)(6).

651.    Plaintiff has not been able to determine whether the State Department has already disseminated its inaccurate and unjust investigative records. Nevertheless, the State Department will disseminate its inaccurate and unconstitutional investigative records to other agencies, if asked (e.g., when Plaintiff applies for a position at another government agency that requires a security clearance or background check). Exhibit 16 (email from the State Department's Bureau of Diplomatic Security, stating that it will disseminate its investigative records pertaining to Plaintiff's security clearance to other governmental agencies, if requested). The State Department has also indexed Plaintiff, and notice of its investigation of Plaintiff, in the Joint Personnel Adjudication System ("JPAS"), which countless agencies and individuals have access to.

652.    This Court has jurisdiction over a violation of sub-paragraph (e)(6) pursuant to 5 U.S.C. § 552a(g)(1)(D). In addition, this Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of claims brought under sub-paragraph (g)(1)(D).

653.     Finally, the State Department has intentionally and willfully violated sub-paragraph (g)(1)(C) because it, by refusing to amend its records on Plaintiff for *two years*—and counting, has failed to:

> maintain any record concerning an   individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

5 U.S.C. § 552a(g)(1)(C). Plaintiff also claims that the State Department's violation of paragraph (g)(1)(C) was intentional and willful. This Court, pursuant to 5 U.S.C. § 552a(g)(4), has jurisdiction over an intentional and willful violation of sub-paragraph (g)(1)(C).

654.     The State Department's Bureau of Diplomatic Security is made up of highly-paid contractors and career employees (collectively "officials") who conduct background investigations on individuals for security clearances. These officials have probably received, reviewed, and interpreted thousands of military police reports and military criminal records. Conclusions made by these officials affect whether individuals obtain security clearances. Therefore, decisions made by these officials ultimately affect an individual's livelihood, because the receipt of a security clearance is usually a prerequisite to obtaining a certain job. These officials, therefore, should completely understand the DOD instructions and military regulations pertaining to the information contained in military records, e.g., "titling." This means that these officials should understand the Smokescreen Version of what titling means (i.e., the "official" version and "legal" version): "[t]itling an individual or entity is an operational rather than a legal decision," "[t]he act of titling and indexing *shall not*, in and of itself, connote *any* degree of guilt or innocence," and "[t]he acts of titling and indexing are administrative in nature." <u>See</u> DODI 92,

¶ D.4 and F.1 (Exhibit 14); DODI 03, ¶ 6.5 (Exhibit 15); AR 190-45(2007), ¶ 4-3(a) (Exhibit 17) (emphasis added).

655.    The State Department officials, however, apparently do not know about the DOD's Smokescreen Version (i.e., the "official" version) of what titling means. They have applied the *Real* Version of what titling means, which *does* connote guilt, and *does* portray "titling" as a legal determination of guilt. The State Department's Bureau of Diplomatic Security is allegedly made up of highly-trained experts who view countless military records for the purpose of deciding whether an individual will receive a security clearance and, therefore, oftentimes a job. They *should* know and apply the Smokescreen Version (i.e., the "official" version and "legal" version) of "titling," despite the fact that the Army does not.

656.    Nevertheless, the State Department failed to maintain Plaintiff's records with the requisite care and accuracy because State Department officials labeled Plaintiff a criminal, claiming or suggesting that he committed assault, and that the Army apprehended, accused, charged, convicted, and sentenced him for assault. These officials created records which were clearly in error, unjust, and inaccurate although they knew, should have known, or showed utter indifference and disregard to the fact that DOD instructions and Army regulations state: "[t]itling an individual or entity is an operational rather than a legal decision," "[t]he act of titling and indexing *shall not*, in and of itself, connote *any* degree of guilt or innocence," and "[t]he acts of titling and indexing are administrative in nature." See DODI 92, ¶ D.4 and F.1 (Exhibit 14); DODI 03, ¶ 6.5 (Exhibit 15); AR 190-45(2007), ¶ 4-3(a) (Exhibit 17) (emphasis added).

657.    The State Department's acts and omissions have resulted, and will continue to result, in determinations that are "adverse" to Plaintiff because its records unjustly, unethically, unlawfully, and unconstitutionally label Plaintiff as a criminal who was accused, charged,

convicted, and sentenced with assault. 5 U.S.C. § 552a(g)(1)(C). In addition, the State Department's acts and omissions allowed these unjust, unethical, unlawful, and unconstitutional records to have "adverse effect[s]" on Plaintiff, and these records will continue to have "adverse effect[s]" on Plaintiff. 5 U.S.C. § 552a(g)(1)(D).

658.    The State Department used its inaccurate records (i.e., its investigative findings) to initially deny Plaintiff a secret security clearance. Exhibit 5. The State Department will personally use these records again, if Plaintiff ever applies for a job at the State Department, or another governmental agency.

659.    The State Department's inaccurate, unjust, unethical, unlawful, and unconstitutional records will cause "adverse determinations" in the future because they are self-perpetuating and self-replicating. This is because the State Department will disseminate its investigative records on Plaintiff to other governmental agencies upon request. Exhibit 16 (email from the State Department's Bureau of Diplomatic Security, stating that it will disseminate its investigative records pertaining to Plaintiff's security clearance to other governmental agencies, if requested by agencies). Other agencies can discover that the State Department has investigative records on Plaintiff through the Joint Personnel Adjudication System ("JPAS").

660.    Plaintiff has not been able to determine how the DCII, the JPAS, and the index operated by the USACRC are cross-referenced, or exactly what kind of information about Plaintiff is contained in these indexes. Regardless, the JPAS allows countless agencies and individuals to either have direct access to the State Department's inaccurate and unjust investigative records on Plaintiff, or easily retrieve these records from the State Department.

WHEREFORE, Plaintiff requests the Court to:

1.  declare, pursuant to 28 U.S.C. § 2201, that the State Department's acts and omissions violated 5 U.S.C. § 552a(d)(2)(A) and (B), (d)(3) and (4), (e)(5) and (6), and (g)(1)(C);

2.  enjoin the State Department, pursuant to 28 U.S.C. § 2202 or the law of equity, from disseminating any of its records pertaining to Plaintiff until they have been amended, as requested below;

3.  hold unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," and "unwarranted by the facts," 5 U.S.C. § 706(2)(A), (D) and (F), the State Department's violations of 5 U.S.C. § 552a(d)(2)(A) and (B), (d)(3) and (4), (e)(5) and (6), and (g)(1)(C);

4.  compel the State Department, pursuant to 5 U.S.C. § 552a(g)(2)(A), 5 U.S.C. 706(1), or 28 U.S.C. § 1331, to:

   a.  amend all of its records pertaining to Plaintiff—including all disseminated records and information on Plaintiff indexed in any database—such that all references to "criminal conduct," "apprehended for assault," "accused," and "charged" in relation to the Snowball Incident are removed from the State Department's records. If the Court finds that the Army must "de-title" and "de-index" Plaintiff from MPR 00-MPC937-0607T-5C2B, DA Form 4833, the DCII, and all other Army records and databases, then Plaintiff requests the Court to compel the State Department to also remove from all of its records and databases any reference to the fact that the Army "titled" or "indexed" Plaintiff for a crime;

   b.  inform, in writing, all persons who viewed or received any record pertaining to its investigation of Plaintiff, that Plaintiff was never apprehended, accused, cited, charged, convicted, or sentenced for any crime by the Army;

5. compel, pursuant to 5 U.S.C. § 555a(g)(2)(A), 5 U.S.C. § 706(1), or 28 U.S.C. § 1361, each person (i.e., individual or agency) who viewed any of the State Department's records pertaining to Plaintiff, or to whom the State Department sent copies of such records, to destroy these records, or send them, and all copies, back to the State Department to be amended, as described above, and amend, as described above, any records these persons generated as a result of their receipt and viewing of those State Department records;

6. compel, pursuant to either 28 U.S.C. § 1361 or 5 U.S.C. § 706(1), the Army and all individuals and agencies who the Court orders to amend or destroy Plaintiff's records, as requested above, or as the Court orders, to:

    a. amend or destroy Plaintiff's records within a definite time;

    b. notify Plaintiff, in writing, within twenty business days of amending, that such amendment has been completed;

    c. send Plaintiff in writing, within twenty business days of amending, a copy of the amended record, or proof that a record was destroyed;

7. hold, pursuant to 5 U.S.C. § 552a(g)(4), that the State Department's violations of violated 5 U.S.C. § 552a(d)(2)(A) and (B), (d)(3) and (4), (e)(5) and (6), and (g)(1)(C) were intentional and willful violations;

8. award Plaintiff statutory damages of $1,000, pursuant to 5 U.S.C. § 552a(g)(4)(A);

9. award Plaintiff actual/compensatory damages, pursuant to 5 U.S.C. § 552a(g)(4)(A), in the amounts of:

    a. $200,000 for loss of reputation, distress, embarrassment, and humiliation because the State Department has insisted on labeling Plaintiff a criminal when Plaintiff has repeatedly told the State Department that titling shall not connote any guilt or

innocence and is simply administrative in nature, and because the State Department has

forced Plaintiff to deal with this loss of reputation, distress, embarrassment, and

humiliation for over three years;

b. $19,434 for Plaintiff's time and other costs associated with attempting to

explain, for three years, to the State Department what titling means (which its highly

trained investigators, who are highly paid with U.S. tax dollars, should know) and

attempting, for *two years*—and counting, to have the State Department amend its

inaccurate and unjust records pertaining to Plaintiff (Exhibit 106);

c. $50,000 for lost wages because Plaintiff, who has a J.D. and LL.M., has spent

the last three years of his life attempting to have the State Department amend its records;

and

10. award Plaintiff "costs of the action," pursuant to 5 U.S.C. § 552a(g)(2)(B) and (4)(B).

See Plaintiff's argument for an award of costs under the prayer for relief of Count VI, supra.


**8. COUNT VIII: SYSTEMIC VIOLATIONS OF THE FOIA BY THE ARMY**

**a. FOIA REQUESTS FOR ARMY REGULATIONS**

661.     Plaintiff incorporates paragraphs 1-660 by reference.

662.     The following paragraphs consist of a chronological order of certain FOIA

requests sent to the Army by Plaintiff. The Army stated that these requests were not valid FOIA

requests. Therefore, the Army claimed that it was not obligated to answer them. These dismissals

by the Army, therefore, are not subject to the doctrine of exhaustion. In other words, the Army

did not state, or imply, that Plaintiff's requests were valid and that the Army (claiming certain

exemptions or other reasons) would not provide the requested information. Simply stated, the

Army *dismissed* Plaintiff's FOIA requests as invalid requests; it did not *deny* them. Therefore, Plaintiff was neither required to appeal the Army's dismissals of his FOIA requests, nor was he able to.

663.    On December 17, 2007, Plaintiff, made a FOIA request to both Captain Reneka S. Redmond ("CPT Redmond") and Captain, Military Police, Victoria L. Peters ("CPT Peters") for the following:

> The Army or DoD regulation that allows Military Police to secretly "title" a civilian employee of the military, with a German crime from the Staatsgesetzbuch, for involvement in an incident that occurred in January of 2000 in Garmisch, Germany.  I was secretly "titled" in such an incident and am requesting the regulation that gave the SJA and MPs authority to take such action.

Exhibit 73 and Exhibit 74.

664.    On January 9, 2008, CPT Redmond refused to answer Plaintiff's FOIA request, claiming she was not obligated to answer it because Plaintiff's FOIA request was asking for "legal assistance." Exhibit 75. She claimed that, because Plaintiff was no longer a military ID holder (i.e., current member or employee of the military), she was not obligated to answer Plaintiff's FOIA request.

665.    Plaintiff, however, was not asking for "legal assistance," as CPT Redmond falsely claimed. Plaintiff was requesting a copy of, or at least a referral to where he could obtain a copy of, the regulation(s) that governed "titling."

666.    Furthermore, CPT Redmond, besides violating the FOIA, clearly contradicted Army regulations, which state that a FOIA request can be "made by *any* person, including a *member of the public* . . . ." AR 25-55, ¶ 1-401, FOIA Requests (Exhibit 76) (emphasis added).

667.    On January 10, 2008, CPT Peters also dismissed Plaintiff's FOIA request, falsely claiming that "Army and DOD instructions, . . . are not covered by 5 U.S.C. § 552, para. (a)(6)(A)(i)." Exhibit 77.

668.    *First*, CPT Peters' citation of 5 U.S.C. § 552(a)(6)(A)(i) is irrelevant. This provision has nothing to do with what constitutes a record or valid request under the FOIA. The FOIA provision that CPT Peters cited as validation for her dismissal of Plaintiff's FOIA request states:

> (6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—
>
>> (i) determine within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefore , and of the right of such person to appeal to the head of the agency any adverse determination;

5 U.S.C. § 552(a)(6)(A)(i).

669.    *Second*, the regulations that Plaintiff requested are clearly "agency rules" and "administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(1)(C) and (2)(C).

670.    *Third*, the regulations that Plaintiff requested clearly fall under 5 U.S.C. § 552(a)(3)(A), which requires each agency to fulfill a request for records that does not fall under sub-paragraphs (1) and (2) of paragraph (a).

671.    *Fourth*, AR 25-55, The Department of the Army Freedom of Information Act Program, states that Army regulations are "records" for purposes of a FOIA request:

> If unaltered publications and processed records, such as *regulations*, manuals, maps, charts, and related geophysical materials are available through an established distribution system with or without charge, the provisions of 5 USC 552 (a) (3)

> normally do not apply and they need not be processed under the FOIA. Normally, records disclosed to the public by publication in the Federal Register also require no processing under the FOIA. In such cases, Components should direct the requester to the appropriate source to obtain the record.

AR 25-55(1997), ¶ 1-402(e), Definitions, "Record" (emphasis added) (Exhibit 76).

672.    CPT Peters, therefore, and everyone else in the Army who denied Plaintiff's FOIA requests for Army regulations, should have either provided Plaintiff with copies of the regulations he requested, or, if the DOD instructions and Army regulations that Plaintiff requested were available "through an established distribution system," CPT Peters and others should have directed Plaintiff "to the appropriate source to obtain the record."

673.    On March 9, 2008, Plaintiff sent the USACRC a FOIA request for the following:

> the statute or Army regulation that allows the U.S. Army to title a U.S. civilian and citizen, in Germany, with a German crime;

Exhibit 78, at 2.

674.    Mr. McGuire, Director, USACRC, denied Plaintiff's FOIA request, stating:

> In reference to some of your "questions" within your March 9, 2008 letter, you must understand that the Freedom of Information Act (FOIA) is not an investigative arm, nor can it respond to various questions.

Exhibit 79.

675.    On March 14, 2008, Plaintiff sent LTC Yates a FOIA request, requesting the following:

> the statute or Army regulation that allows the U.S. Army to "title" a U.S. civilian and citizen, in Germany, with a German crime (or, as you told me on the phone Colonel Yates, the AR that allows MPs to "index" me with a crime)

Exhibit 80, at 2.

676.    LTC Yates never answered Plaintiff's request.

677. On March 27, 2008, Plaintiff sent a FOIA request to Mr. Gary Hargrove of the Army's FOIA Office, requesting the following:

> The Army Regulation or guideline, or any legal authority that gives Military Police the authority to "title" a civilian employee of the military with a crime for an incident that occurs overseas, specifically in Germany. Please cite or refer me to the specific language, i.e. the paragraph of the document that contains the operative language.

Exhibit 81 (emphasis in original).

678. Plaintiff sent this March 27, 2008 FOIA request to Mr. Hargrove after speaking with Mr. Hargrove on the phone at approximately 4:00 p.m., on March 27, 2008. Mr. Hargrove stated that Plaintiff's FOIA request for Army regulations was a valid request and, if Plaintiff sent him such a request, that he would make certain that such request was answered properly. Mr. Hargrove forwarded Plaintiff's request to the Army Judge Advocate General's Office.

679. On April 14, 2008, Colonel Charles N. Pede ("COL Pede") of the Army Judge Advocate General's ("JAG") Office, denied Plaintiff's March 27, 2008 FOIA request, stating that Plaintiff's request was "essentially a request for a legal opinion" and that he (COL Pede) was not required to "answer questions nor to create records or opinions in response to an individual's FOIA requests posed as FOIA questions." Exhibit 82.

680. Again, Plaintiff was neither asking for legal opinion, nor asking a question (or even a "FOIA question," as COL Pede phrased it—whatever that may mean).

681. COL Pede claimed that Plaintiff was essentially asking a question as to whether military investigators "may" investigate alleged misconduct by civilians. Exhibit 82. Plaintiff was not asking a question. Everybody knows that military investigators *do* investigate alleged misconduct by civilians and then title civilians with crimes. Plaintiff requested "[t]he Army

Regulation or guideline, or any legal authority, that gives Military Police the authority to 'title' a civilian employee of the military with a crime . . . ." Exhibit 81.

682.    Plaintiff then discovered that another individual, Mr. Robert Conley,[50] filed a FOIA request that was almost identical to Plaintiff's FOIA request. Mr. Robert Conley made the following request on March 16, 2008, to both the JAG Office, and to the USACRC:

> Please send to me the statute, or the U.S. Army Regulation(s), that gave the U.S. Army the legal authority to "title" a U.S. citizen/civilian with a German crime, or any crime, in the year 2000, after the Germans refused to be involved in the incident.

Exhibit 83 and Exhibit 84.

683.    On April 7, 2008, COL Pede of the JAG Office, answered Mr. Robert Conley's FOIA request by providing him with the regulations that COL Pede believed were relevant (or the regulations that someone told COL Pede were relevant). Exhibit 85.

684.    On April 15, 2008, Mr. Robert Conley appealed COL Pede's answer, believing that COL Pede did not provide him with any of the titling regulations that he had requested.

685.    On July 30, 2008, Mr. Ronald J. Buchholz, Associate Deputy General Counsel of the Army's Office of the General Counsel, answered Mr. Robert Conley's appeal. Mr. Buchholz stated that "no additional regulations could be located that pertain to the authorities for Army police report titling decisions." Exhibit 86.

---

50. Mr. Robert Conley is Plaintiff's father. Mr. Robert Conley knew of Plaintiff's situation. Mr. Robert Conley, however, made his FOIA requests to two separate Army agencies, without Plaintiff's knowledge, because he (Robert Conley), a former 1LT Green Beret (VN 1969), felt that the Army was once again doing things that it knew it should not do, and that the Army would continue with its course of conduct until someone exposed and ferreted out the unlawful activity.

686.     Then, on November 19, 2008, Mr. McGuire of USACRC finally answered Mr. Robert Conley's March 16, 2008 FOIA request by providing him with the regulations that Mr. McGuire believed were relevant (or that someone told Mr. McGuire were relevant). Exhibit 87.

687.     The Army's denials of Plaintiff's requests for regulations were, therefore, obviously unethical and unlawful because two, *separate* Army agencies properly answered Mr. Robert Conley's FOIA requests, which were almost identical to Plaintiff's FOIA requests that the Army repeatedly dismissed.

688.     On December 7, 2009, Plaintiff filed a complaint with the Army JAG Office against COL Pede for his arbitrary and capricious denial of Plaintiff's FOIA request. Exhibit 88. Plaintiff pointed out that COL Pede had dismissed Plaintiff's FOIA request for titling regulations, but that COL Pede had answered Mr. Robert Conley's almost identical FOIA request for titling regulations by providing Mr. Robert Conley with copies of what COL Pede thought were pertinent regulations. Id. at 1. Plaintiff also pointed out that Mr. McGuire, Director, USACRC, had answered Mr. Robert Conley's FOIA request, which was the same one COL Pede had answered, and which was almost identical to the FOIA request from Plaintiff, which COL Pede refused to answer. Id.

689.     Lieutenant Colonel Eric S. Krauss ("LTC Krauss") of the JAG Office, replied to Plaintiff's complaint against COL Pede by stating:

> A proper FOIA request is a request for existing records or records. A request or a legal opinion as to whether military law enforcement agencies may investigate alleged misconduct by civilians is not a proper FOIA request. As it should have duplicated the response to you, the response to Mr. Robert Conley's FOIA request was incorrect.

Exhibit 89.

690.    LTC Krauss, in effect, stated that: (1) COL Pede made a mistake by answering Mr. Robert Conley's request; (2) Mr. McGuire, Director, USACRC (a completely separate agency from the JAG Office) made a mistake by answering Mr. Robert Conley's request; (3) Mr. Buchholz, Associate Deputy General Counsel, of the Army's Office of the General Counsel, made a mistake by answering Mr. Robert Conley's appeal, of COL Pede's answer, to Mr. Robert Conley's FOIA request; and (4) Mr. Gary Hargrove, of the Army's FOIA Office, made a mistake when he told Plaintiff that Plaintiff's request for Army regulations was a valid one.

691.    On January 2, 2010, Plaintiff filed a complaint against LTC Krauss and COL Pede with the Secretary of the Army. Exhibit 90. The Secretary "tasked" Mr. Buchholz with the job of answering Plaintiff's complaint.

692.    On January 25, 2010, Mr. Buchholz answered Plaintiff's complaint. Exhibit 91. Mr. Buchholz, however, in what appears to be a clearly unethical attempt to cover up COL Pede's unlawful and unethical denial of Plaintiff's FOIA request, parroted LTC Krauss's "reasoning." Mr. Buchholz stated that COL Pede should not have answered Mr. Robert Conley's FOIA request. Id. at 2. Mr. Buchholz, however, failed to address why Mr. McGuire, Director, USACRC, felt that Mr. Robert Conley's FOIA request was valid, why Mr. Hargrove of the Army FOIA Office felt that Plaintiff's FOIA request was valid, or why he, Mr. Buchholz, felt that Mr. Robert Conley's FOIA request was valid when he answered Mr. Robert Conley's appeal.[51]

---

51. Mr. Robert Conley, a former attorney, claims that the documents he received from COL Pede (and Mr. McGuire) were not pertinent to his FOIA request. This, he stated, is because the requested documents do not exist. Furthermore, he stated that when Plaintiff's FOIA request arrived at the desk of a recipient-in-common, after Mr. Robert Conley's FOIA request had been "answered," someone finally "woke up." For example, COL Pede received Plaintiff's March 27, 2008 FOIA request (which Plaintiff first sent to Mr. Gary Hargrove, who then forwarded it to COL Pede) *after* Mr. Robert Conley sent his March 16, 2008 FOIA request directly to COL

693.    Mr. Buchholz even claimed that Plaintiff's request would have required COL Pede and LTC Krauss to "conduct research." Exhibit 91, at 2. Such a response is absurd and constitutes an unethical and unlawful "delay and deny" tactic. Plaintiff was asking for specific regulations; Redmond, Peters, McGuire, Pede, Krauss, and Buchholz know exactly which regulations the Army uses to "title" U.S. civilians, and then to "index" them in the DCII. "As of March 2000, the DCII had approximately 24 million individuals indexed, with approximately 30 million investigative dossiers and security clearance eligibility tracings." Exhibit 103. As of 1994, the DCII "was growing at about two million indices per year." Ham Article, supra ¶ 62, at 4 (Exhibit 21).

694.    Despite the astronomical number of individuals, including a sizeable number of U.S. civilians that have been titled and indexed (e.g., 5% as of 2000 would have been 1.2 million civilians "indexed"), the Army's unethical lawyers claim Plaintiff's FOIA requests for titling regulations consisted of "questions" and forced them to do "research."

695.    It is clear, therefore, that Mr. Buchholz was making a blatant, unethical attempt to cover up the obvious FOIA violation made by COL Pede. See Exhibit 92 (February 12, 2010 complaint against Mr. Buchholz sent to the Department of the Army Inspector General; the Inspector General did not address the complaint except to tell Plaintiff he could "seek judicial review" (Exhibit 93)).

696.    In sum, it is clear that Plaintiff was neither asking "questions" in his FOIA requests, nor "asking for a legal opinion."

---

Pede. Mr. Robert Conley claimed that once Plaintiff's FOIA request was received, someone made the decision to employ "Old Faithful": "Deny and Delay." "Deny and delay," according to Mr. Conley, is a process that is almost always successful, especially when used by career employees experienced in its use, and who are never held accountable for the time, trouble, and money they cost requesters—requesters who pay their salaries and pensions.

697.    It is clear that Army regulations are "records" for purposes of the FOIA.

698.    It is clear that Plaintiff's request for the Army regulations and DOD instructions that provided Army personnel with the authority to "title" Plaintiff with crimes was a valid FOIA request, pursuant to both the FOIA and AR 25-55.

699.    It is clear that two, separate Army agencies answered FOIA requests for Army regulations made by another individual, Mr. Robert Conley, while refusing to answer Plaintiff's almost identical FOIA requests.

700.    Even though COL Pede, LTC Krauss, Mr. Buchholz, and CPT Redmond (all of whom are Army lawyers) know exactly which Army regulations and DOD instructions provide military law enforcement personnel with the authority to title civilians with crimes (if such regulations or DOD instructions exist), they dismissed Plaintiff's requests, making unethical "deny and delay" tactic claims that Plaintiff's requests were "questions," and that his "questions" amounted to requests for "legal opinions."

701.    Therefore, it is clear that the Army unethically and unlawfully dismissed Plaintiff's FOIA requests for Army regulations. In fact, it appears that Army employees conspired to deny answering Plaintiff's FOIA requests because: (1) two, separate Army agencies answered almost identical FOIA requests for another individual; and (2) FOIA requests for Army regulations are clearly valid FOIA requests. A review of inter-agency communication between Pede, Krauss, Buchholz, Mr. McGuire, and BG Johnson may provide reasons for the Army's unlawful and unethical actions.

702.    Furthermore, President Obama's FOIA Memorandum for the Heads of the Executive Department and Agencies, and Attorney General Holder's FOIA Guidelines require government agencies to answer FOIA requests instead of trying to find ways to avoid answering

them.[52] Specifically, the President directed agencies to work "in a spirit of cooperation" with FOIA requesters and to be mindful that "[u]nnecessary bureaucratic hurdles have no place in the 'new era of open Government' that the President has proclaimed." Id. ¶ 702 n.52.

### b. FOIA REQUESTS FOR STATISTICS

703. Plaintiff incorporates paragraphs 1-702 by reference.

704. On February 27, 1998, Major Patricia Ham interviewed Mr. McGuire (then, as now, Director, USACRC) for her article, *The CID Titling Process – Founded or Unfounded*. Major Ham noted the following:

> The CID officials declined to provide any statistical information concerning the number of investigations conducted per year, the number of individuals titled per year, the number of founded offenses per year, the number of requests for amendment of ROIs [reports of investigation] per year, and the number of requests for amendment granted per year. According to the Director, CRC, [Mr. Philip McGuire], a request under the provisions of the Freedom of Information Act (FOIA) is required for the information.

Ham Article, supra ¶ 62, at 15 n.133 (Exhibit 21).

705. On December 7, 2009, Plaintiff sent Mr. McGuire, who is still Director of USACRC, a FOIA request (dated December 4, 2009). Plaintiff requested the same information that Mr. McGuire told Major Ham he would provide if sent a FOIA request. Plaintiff, therefore, requested:

> 1. the number of investigations for misconduct (criminal or otherwise) conducted by Army investigators;
> 2. the number of individuals who the Army titled;
> 3. the number of founded offenses;
> 4. the number of requests for amendment of ROIs and MPRs per year; and,
> 5. the number of requests for amendment granted per year.

---

52. President Obama's FOIA Memorandum (January 21, 2009) and Attorney General Holder's FOIA Guidelines: *Creating a "New Era of Open Government,"* (posted April 17, 2009), *available at* http://www.justice.gov/oip/foiapost/2009foiapost8.htm.

Exhibit 94.

706.    On January 8, 2010, Mr. McGuire, Director, USACRC, dismissed Plaintiff's request, stating, as always, that Plaintiff's request consisted of "questions" that forced him to "investigate" and "create records." Exhibit 95.

707.    Therefore, Mr. McGuire unlawfully denied Plaintiff's FOIA request, which requested the exact same information that Mr. McGuire had told Major Ham could be received via a FOIA request. Perhaps Mr. McGuire had the information in 1998, when Major Ham—an Army officer—asked him; but when Plaintiff—an unimportant civilian—asked him, Mr. McGuire "misplaced" the information, or "forgot" where the information was.

708.    On January 2, 2010, Plaintiff sent Mr. McGuire a FOIA request (dated December 31, 2009) that requested the number of civilians that were titled with a crime and indexed in the DCII within the last fifty years. Exhibit 96.

709.    On January 8, 2010, Mr. McGuire sent the same response he sent for Plaintiff's December 4, 2009 FOIA request, above. Mr. McGuire claimed that Plaintiff's request was not valid because Mr. McGuire, under the FOIA, was not obligated to "investigate," "create records," or answer "questions." Exhibit 97.

710.    Plaintiff believes that Mr. McGuire has all the statistics that Plaintiff requested, or that Mr. McGuire knows who has these statistics. Mr. McGuire, however, is unlawfully dismissing Plaintiff's valid FOIA requests.


WHEREFORE, Plaintiff requests the Court to:

1.   declare, pursuant to 28 U.S.C. § 2201, that Plaintiff's FOIA requests for the Army regulations and DOD instructions that gave military investigators authority to "title" U.S.

civilians, such as Plaintiff, with crimes were valid FOIA requests that the Army was obligated to answer;

2.  hold unlawful, and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," and "unwarranted by the facts," 5 U.S.C. § 706(2)(A), (D) and (F):

    a.  the Secretary of the Army's, through Redmond, Peters, McGuire, Pede, Krauss, and Buchholz's, dismissal of Plaintiff's FOIA requests, in which Plaintiff requested copies of the Army regulations and DOD instructions that allow the Army to title U.S. civilians, such as Plaintiff;

    b.  Mr. McGuire's dismissals of Plaintiff's two FOIA requests for statistics regarding titling;

3.  compel Mr. McGuire, Director, USACRC, pursuant to 5 U.S.C. § 552(a)(4)(B) or 28 U.S.C. § 1361 to answer Plaintiff's FOIA requests regarding titling statistics (Exhibit 94 and Exhibit 96);

4.  assess against the United States, through the Army, reasonable costs pursuant to 5 U.S.C. § 552(a)(4)(E). See Plaintiff's argument for an award costs under the prayer for relief of Count VI, supra; and

5.  initiate a proceeding, pursuant to 5 U.S.C. § 552(a)(4)(F), against the employees of the Army who denied Plaintiff's FOIA requests (specifically, but not exclusively, against CPT Redmond, Mr. McGuire, COL Pede, LTC Krauss, Mr. Buchholz, and Brigadier General Rodney L. Johnson, Commander of the USACIDC, who Plaintiff has repeatedly informed of FOIA violations by his subordinates, e.g., McGuire) to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding,

and to determine whether a conspiracy existed among these Army employees to deny answering Plaintiff's valid FOIA requests.

## 9. COUNT IX: CRIMINAL VIOLATION OF 5 U.S.C. § 552a BY PHILIP J. MCGUIRE, DIRECTOR, USACRC

711.   Plaintiff incorporates paragraphs 1-710 by reference.

712.   "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552a(b); see also § (g)(1)(D) (providing this Court jurisdiction over this Count).

713.   On March 26, 2008, LTC Salussolia wrote Plaintiff a letter ("Salussolia letter"), on behalf of Brigadier General Rodney L. Johnson ("BG Johnson"), Commander, U.S. Army Criminal Investigation Command ("USACIDC"). Exhibit 22.

714.   At some point on, or prior to, August 11, 2008, Mr. McGuire pilfered this letter from the files of BG Johnson, Commander, USACIDC.

715.   On August 11, 2008, Mr. McGuire sent a redacted copy of the Salussolia letter to a third-party civilian, without Plaintiff's knowledge or consent. Exhibit 98.

716.   On August 27, 2008, Mr. McGuire sent the same third party an *un-redacted* copy of the pilfered Salussolia letter, again without Plaintiff's knowledge or consent. Exhibit 99.

717.   Plaintiff did not give Mr. McGuire permission to go into his file, pilfer a letter that was created specifically for, and sent specifically to, Plaintiff on behalf of BG Johnson, and then send this letter—twice—first redacted and then un-redacted, to a third party.

718.   The Privacy Act states:

> Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

5 U.S.C. § 552a(i)(1).

719.    Mr. McGuire is an expert on the Privacy Act because he has been the Director of USACRC for at least twelve years.

720.    Therefore, Mr. McGuire "willfully" and knowingly violated sub-paragraph (i)(1) of the Privacy Act by going into Plaintiff's file, pilfering a letter that was created specifically for, and sent specifically to, Plaintiff, on behalf of BG Johnson, and then sending this letter—twice—first redacted and then un-redacted, to a third party, without Plaintiff's knowledge or permission.

WHEREFORE, Plaintiff requests the Court, pursuant to 5 U.S.C. § 552a(i)(1), to:

1. charge Mr. McGuire with a misdemeanor; and

2. fine Mr. McGuire $5,000.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court, in addition to the relief requested after each Count of this Complaint, to:

1. declare unlawful, pursuant to 28 U.S.C. § 2201, and hold unlawful, pursuant to 5 U.S.C. § 706(2)(A) or (D):

    a.    the violation of 32 C.F.R. § 505.6(c)(6) by LTC Yates and Mr. McGuire. This federal regulation states, "If the Denial Authority [LTC Yates] determines that the

amendment is not warranted, he or she *will provide the requester* . . . reason(s) for not amending." See 32 C.F.R. § 505.6(c)(6) (emphasis added). LTC Yates and Mr. McGuire failed to provide Plaintiff the reasons for LTC Yates's denial of Plaintiff's request for amendment, thereby impeding Plaintiff's ability to appeal LTC Yates's denial to the DAPARB. Exhibit 18; see ¶¶ 74-80 (explaining, in detail, the omissions of LTC Yates and Mr. McGuire, and the injustice suffered by Plaintiff because of their omissions).

Plaintiff made BG Johnson and his subordinates in the USACRC and the USACIDC aware of the fact that LTC Yates and Mr. McGuire violated federal law. Exhibit 100, at 2 (January 20, 2009 letter to COL Chambliss, Deputy Commander, USACRC); Exhibit 101 (January 20, 2009 forwarding to BG Johnson, Commander USACIDC, of January 20, 2009 COL Chambliss letter). BG Johnson and his subordinates, however, feel that violation of federal law is acceptable and, when such violations are brought to light, should be dismissed. See Exhibit 102 (memo from someone in USACIDC claiming that Plaintiff's assertions—in his January 20, 2009 letter to COL Chambliss, which asserted that LTC Yates and Mr. McGuire violated federal law by failing to provide Plaintiff with reasons for LTC Yates's denial of Plaintiff's amendment request—were "meritless" assertions and did not even require a reply).;

b.      the violation of 32 C.F.R. § 505.6 (e)(6)(ii) by the DAPARB. Federal regulations required the DAPARB to provide Plaintiff "with the reasons for denial." 32 C.F.R. § 505.6 (e)(6)(ii). The DAPARB, however, failed to provide Plaintiff its "reasons for denial," Exhibit 19, which Plaintiff finally received eight months later via a FOIA request. Exhibit 58 (the DAPARB minutes containing the DAPARB's reasons for denial).; and

2. provide Plaintiff with any further relief that the Court may deem just and proper.

Date: _May 19, 2010_

_____

Neil J. Conley (acting *pro se*)
6755 Sugargrove Road
Chandlersville, Ohio 43727
Phone: 1-717-440-5749
Email: conleyneilj@yahoo.com